Hala J. Gores, Oregon Bar No. 890489
hala@goreslaw.com
Hala J. Gores, P.C.
The Gores Building
1332 S.W. Custer Drive
Portland, OR 97219
503-295-1940
Attorney for Plaintiff

UNITED STATES DISTRICT COURT

DISTRICT OF OREGON

EUGENE DIVISION

| | | |
|---|---|---|
| JUAN & KRIS YRAGUEN | * | Case No. _____ |
| | * | |
| Plaintiffs, | * | |
| | * | Plaintiffs' Complaint |
| v. | * | |
| | * | JURY TRIAL DEMANDED |
| FORD MOTOR COMPANY, | * | |
| | * | |
| Defendant. | * | |

## **COMPLAINT**

Plaintiffs Juan and Kris Yraguen file this their Complaint for personal injuries and

damages, showing this Honorable Court the following.

## **INTRODUCTION**

1.

Juan Yraguen is the President and Manager and was the leader of his family's businesses

in Sutherlin, Oregon. Those businesses are Basco Logging, Inc. and Basco Bros LLC. Basco

Logging is a timber and construction company; Basco Bros LLC is a real estate development

company.  Juan's grandfather, father, and two uncles started Basco Logging over 70 years ago.

Juan and his brothers, Jaime and Nick, worked together in the family business, until Nick's

untimely death in 2015.  Until May 11, 2022, Juan was the chief executive and chief strategist

for those businesses and ran those businesses.

2.

On that date—May 11, 2022—Juan had left his home in Douglas County at 4:30 a.m. and

was driving across the Cascades on Highway 97 on his way to attend a cousin's funeral in Idaho.

He was driving below the speed limit.  He was driving his 2008 model year Ford F-350 "Super

Duty" truck.  He was fully and properly seat-belted.  The tires of the truck hit black ice, the truck

slid off the road, rolled over, and came to rest upright, on its tires.  The roof was crushed:[1]

---

[1] These photographs of Juan's truck do not show the full extent of the intrusion of the roof into
the occupant compartment; the intrusion was greater than the photographs indicate.  It is the
nature of metal that the dynamic crush exceeds the static crush—the metal roof rebounds from
the full extent of the crush that occurs in a rollover wreck.





3.

Ford's collapsed roof crushed Juan's neck and made him what is called an "incomplete quadriplegic." He had paralysis of his legs and of his left arm.[2]

4.

Juan remained conscious throughout the events, cold in the freezing weather, and very aware he had become paralyzed.

5.

Juan remained trapped in the Ford truck, attended to by passers-by who came to his aid, for what one person says "seemed like an hour" before emergency personnel arrived at the scene. Juan was finally extricated from the crushed occupant compartment of his truck, put in an ambulance, and driven to a waiting helicopter, which life-flighted him to St. Charles Hospital in Bend, Oregon. In that hospital, emergency, life-saving neurosurgery was performed.

6.

For decades the Yraguen family was a loyal "Ford family." They had purchased a great many Ford trucks for their personal and business use at Basco Logging Inc. That included many of Ford's heavy "Super Duty" trucks and Ford's lighter F150 trucks, as well as larger Ford trucks used in the logging business. About every ten years, the three brothers who worked in the business – Juan, Nick (who died in 2015), and Jaime – each purchased Ford trucks to use in the business. In November 2007, the three brothers purchased three nearly identical Ford "Super

---

[2] From the surgeon's Operative Note dated May 11, 2022: "A CT scan of the cervical spine revealed findings of C4-C5 fracture dislocation with a left-sided unilateral jumped facet and a right sided perched facet. On exam he has dense bilateral lower extremity paraplegia as well as complete plegia of the left upper extremity. His right upper extremity demonstrates gross proximal muscle antigravity strength 4/5."

Duty" trucks – model year 2008 F350s.  One of those trucks was the truck involved in the subject wreck where the roof crushed down on Juan Yraguen and broke his neck.

7.

The Yraguen family is no longer a "Ford family."

8.

Shortly after the wreck, the truck was returned to the place of Juan's family business, Basco Logging, in Douglas County.  The truck has remained there ever since.

9.

Ford calls the truck that maimed Juan a "Super Duty" truck.  That F350 is a heavy truck—heavier than Ford's top selling "F150" trucks—but it inexplicably has a much weaker roof.

10.

Obviously, a heavier truck needs a stronger roof to protect occupants in a rollover.

11.

Ford has never explained why it sold heavy-duty trucks with a weaker roof than the roof on its light-duty "F-150" trucks.

12.

Ford sold 5.2 million of those "Super Duty" trucks (F250s, F350s, F450s, and F550s) with the same roof, as model year 1999 through 2016 trucks.

13.

Ford made billions of dollars selling the 1999-2016 model year "Super Duty" trucks.

14.

At a press conference on September 27, 2022, Ford's CEO Jim Farley stated "For 25 years, Super Duty has been America's #1 heavy duty truck. . . . If Super Duty was its own business, it would be a Fortune 500 company. That's how big this is."

15.

Those "Super Duty" trucks with the 1999–2016 roof are infamous in legal circles and with safety advocates, because the roof is so weak and deadly dangerous.

16.

It is estimated that Ford has been sued some 200 times as a result of deaths and injuries from roof crush in rollover wrecks involving those trucks.[3]

17.

Yet Ford has persisted in insisting the roofs are "absolutely safe."

18.

Ford never warned Juan or his brothers of the danger posed to them. Ford has never warned any citizens of that danger.

19.

Instead, Ford has steadfastly insisted there's nothing wrong with the roof.

20.

On August 19, 2022, a Georgia jury rendered a verdict against Ford in the amount of $1.7 Billion in a case where the same truck—a Ford "Super Duty" with the same roof—rolled over. The roof crush killed two residents of Georgia. *Hill v. Ford Motor Company*, Case. No. 16-C-

---

[3] Through March 2017, Ford had confessed to having been sued in 162 cases where a "Super Duty" truck rolled over and there was roof crush that was alleged to have caused death or injury.

04179-S2 (State Ct. of Gwinnett County, Georgia). The victims, Voncile and Melvin Hill, both died at the scene of the wreck.

21.

After that verdict, Ford continued to insist the roof was "reasonably safe" – whatever that means.

22.

Just over one month after that verdict, at the press conference on September 27, 2022, Ford's CEO said, "[W]e go to extreme lengths to absolutely torture test our trucks for durability and reliability. And that's why they're called Built Ford Tough."

23.

There is absolutely nothing "tough" about the roofs on Ford's subject 5.2 million "Super Duty" trucks.

## PARTIES, JURISDICTION, AND VENUE

24.

Plaintiffs Juan and Kris Yraguen are residents of Douglas County, Oregon. Plaintiffs are subject to the jurisdiction and venue of this Court. They live eight miles from the office for the family businesses.

25.

The subject truck, a 2008 Ford F-350 (VIN 1FTWW31R48EC65817) is being stored in Douglas County, Oregon, at the facilities of Juan's family business, Basco Logging Inc. and has been stored there since shortly after the May 11, 2022 wreck.

26.

Douglas County is within the Eugene Division of the District of Oregon. Both Plaintiffs reside in that Division, and the subject truck is located in that Division.

27.

Defendant Ford Motor Company ("Ford") is a foreign corporation organized and existing under the laws of Delaware with its principal place of business located at One American Road, Dearborn, Michigan 48126. Ford is engaged in the business of designing, manufacturing, marketing, distributing, and selling vehicles in the State of Oregon, throughout the United States, and elsewhere.

28.

Ford markets its vehicles extensively in the State of Oregon and urges Oregon citizens to buy its vehicles through television, radio, print media, and direct mail. Ford dealerships sell and repair vehicles under Ford warranties in the State of Oregon. Ford distributes replacement parts to dealers and independent automotive shops in the State of Oregon.

29.

The truck that injured Plaintiffs was sold to the Plaintiffs' family business, Basco Logging, Inc. on November 13, 2007, as a new truck, by Ford through its dealer in Oregon.

30.

Ford is subject to the jurisdiction of this Court because it purposefully avails itself of business opportunities in this state, transacts substantial business in this state, the claims arise out of and relate to Ford's activities in this state, and Ford maintains a registered agent in this state. Ford's registered agent in Oregon is: C T Corporation System, 780 Commercial Street SE, Suite 100, Salem, Oregon 97301.

31.

This Court has original jurisdiction under the provisions of 28 U.S.C. §1332, as complete

diversity exists between the parties and the amount in controversy exceeds the sum of $75,000

exclusive of interest and costs.

32.

Venue is proper in this District because a substantial part of the events or omissions

giving rise to the claim occurred in this District and the property—the truck—that is the subject

of the action is located in this District.  28 U.S.C.A. § 1391(b)(2).

33.

Venue is proper in this Division under D. Or. Local Rule 3-2 because divisional venue is

proper in the division in which a substantial part of the events giving rise to the claim occurred or

a substantial part of the property that is the subject of the action is located.

## THE SUBJECT TRUCK

34.

The subject truck was designed by Ford.

35.

The subject truck was manufactured by Ford.

36.

The subject truck was sold to Basco Logging, Inc. by Ford's dealer in Oregon on

November 13, 2007.

37.

The subject truck was manufactured in Kentucky. That state has no "statute of repose."[4]

Consequently, the Oregon statute of repose does not apply.[5]

## FORD'S KNOWLEDGE OF THE DEFECT AND OF THE DANGER

38.

Ford has known for over 20 years that the roofs of the subject 1999–2016 model year "Super Duty" trucks were dangerously weak, defective, and deadly, and were killing and maiming innocent American citizens.

39.

The defective and dangerously weak roofs on those "Super Duty" trucks have killed, paralyzed, or severely injured hundreds, if not thousands, of American citizens.

40.

Ford has refused to state how many American citizens have been killed or maimed as a result of roof crush after a rollover wreck involving the subject "Super Duty" trucks.

41.

It is quite possible that no automotive defect in history other than the "sidesaddle" gas tanks in the "C/K" trucks manufactured by General Motors, or Ford's own rollover-prone Explorer SUVs, has resulted in more lawsuits and more victims than the roof crush defect in Ford's 1999-2016 model year "Super Duty" trucks.

---

[4] *Ostendorf v. Clark Equip. Co.*, 122 S.W.3d 530, 537 (Ky. 2003).
[5] *Miller v. Ford Motor Company,* 363 Or. 105 (2018) (on certified question from the 9th Circuit U. S. Court of Appeals).

42.

During the litigation of the *Hill* case and during the trial of that case Ford had, through its official corporate representative, insisted there was nothing at all wrong with the subject roof and that the roof was "*absolutely safe*."

43.

Ford's public response to the *Hill v. Ford* verdict imposing punitive damages against Ford was to claim that the subject roof is "*reasonably safe*." Despite over 200 lawsuits and many Americans killed or severely injured, Ford claimed "the safety record is strong."

44.

After the *Hill v. Ford* verdict, Ford also claimed that the subject roof was "the strongest in its class." However, it is undisputed—from Ford's own document—that the subject roof was the weakest roof in Ford's entire fleet of cars and trucks. Plaintiffs' Exhibit 164 in *Hill v. Ford*:

# Roof Crush Resistance (Ford Internal) 



45.

After the verdict in *Hill v. Ford*, Ford Motor Company did not accept any responsibility, refused to admit the subject roofs were defective, did not warn anyone of the danger, and did not recall the defective trucks.

46.

There are literally dozens of wrecks known to Ford where there was similar roof crush in the Ford "Super Duty" trucks and resultant deaths or injuries to occupants.

47.

In the *Hill v. Ford* trial, the Court admitted into evidence 79 other incidents, as substantially similar wrecks with roof crush (other similar incidents, known as "OSIs") where people were killed or injured.

48.

In every one of those OSIs, the roof was crushed and intruded into the passenger compartment—which is exactly what happened in Juan's wreck on May 11, 2022.

49.

Ford has refused to state how many substantially similar wrecks are known to Ford.

50.

Not later than the year 2000, Ford was on *actual notice* from other similar wrecks involving roof crush in the "Super Duty" trucks with injuries and/or deaths that the dangerously weak roofs in its "Super Duty" trucks were killing and maiming Americans in rollover wrecks.

51.

Ford absolutely knew that the roofs on the "Super Duty" trucks were dangerously weak and defective.

52.

The jury in the *Hill* trial found there was "clear and convincing evidence" that Ford's conduct amounted to "willful misconduct," "wantonness," or "that entire want of care that would raise the presumption of conscious indifference to the consequences."

53.

The *Hill v. Ford* case was first tried in 2018, but Ford was so certain a substantial punitive damages verdict would result that Ford set out to deliberately cause a mistrial. That misconduct earned Ford issue preclusion sanctions. *See* Exhibit A hereto – 7/19/18 Sanctions Order entered by the *Hill* court.

54.

Despite those sanctions, at the second trial of *Hill v. Ford,* in 2022,[6] Ford was allowed to present any evidence it wanted to present claiming that the roof was not defective or claiming that roof crush supposedly doesn't cause injuries, in an attempt to persuade the jury that punitive damages should not be imposed.

55.

Given an opportunity during the 2022 trial of *Hill v. Ford* to present evidence that the subject roof was not defective and dangerously weak, *Ford elected not to call to the witness stand* a single Ford engineer who was involved in the design of the subject roof or of the five-times-stronger roof for the "Super Duty" trucks designed by Ford in 2006 (but not used in a "Super Duty" truck until the 2017 model year). (This was the roof designed by Ford's "ERSP" Team of engineers. *See* ¶¶ 80-94, *infra.*)

56.

Ford's own documents, including documents from long ago, prove that Ford knew that roof crush is deadly, and that Ford knew the importance of building roofs that would hold up in a rollover wreck, and that Ford knew how to build safe roofs.

57.

*Ninety years ago,* in 1933, Ford created a video of a Model A Ford automobile being rolled down a hill where it rolled over seven times, after which the roof was totally intact:[7]

---

[6] Retrial was delayed by the pandemic and the resulting court backlog, and by Ford's attempts to appeal and get reversed the *Hill* court's Sanctions Order in both the Georgia Court of Appeals and the Georgia Supreme Court. Ford's attempts failed.

[7] The full video is available to download and view in the following Dropbox link: https://www.dropbox.com/scl/fo/ifebbn6z7zdw1fg6h54gq/h?rlkey=cu97n9legs3p0gosvuoag966k&dl=0.



58.

*Sixty-two years ago*, in 1961, Ford created a video of a crash test involving a 1961

Mercury Comet manufactured by Ford, in which the car rolled over two times with two roof

impacts:[8]

---

[8] The full video is available to view and download in the following Dropbox link:
https://www.dropbox.com/scl/fo/tx1fil13s1q6azih1korm/h?rlkey=dxguqqxgkzvy129bj4ogzqhu4&dl=0 .



59.

In that 1961 Comet rollover crash test, there was no collapse of the roof. In that crash test the dummies occupying the front seat were restrained only by seat belts—without shoulder belts. The seat belts held them in their seats—without any so-called "diving" into the roof. Ford's narrator for the video of the 1961 Comet rollover crash test stated:

- "Both drivers hold their seated positions and neither driver is thrown forcibly against the interior of the car."

- "Landing on the roof for the second time without any collapse of the structure or injury to the passengers."

- "Even after 2 complete rolls full protection of the passengers is provided by the roof structure."

## FORD DELIBERATELY WEAKENED THE ROOFS USED IN THE 1999-2016 MODEL YEAR "SUPER DUTY" TRUCKS

60.

The original roof for the new version of the "Super Duty" trucks that were planned for sale as the 1999 model year trucks was designed in the 1994–1995 time frame.

61.

After that roof had been designed, an edict came from Ford executives for "cost containment."

62.

In compliance with that edict, Ford removed components from and reduced the size of metal components in the already-designed roof for the "Super Duty" trucks.

63.

The removal of metal from the roof made the roof weaker.

64.

After "cost containment" resulted in a weaker roof, Ford itself never conducted any physical testing of the strength of the roof.

65.

Ford engineers have admitted the roof on the "Super Duty" trucks could have been five times stronger.

66.

Ford's own designated corporate representative has admitted under oath in *Hill v. Ford* that the "cost containment" measure for the roof saved Ford $100 per truck. Ford sold 5.2 million of the 1999–2016 "Super Duty" trucks, generating an additional $520 million in profit.

## FORD KNEW THAT A STRONGER ROOF WAS ESSENTIAL FOR OCCUPANT "SURVIVAL SPACE" AND SAFETY

### 67.

Ford knew it was crucial to have a safety cage to protect occupants, and a roof that would not collapse, thus providing occupants with "survival space." Before Juan's 2008 Ford F350 was even built, the engineers of Ford's Volvo division[9] had *both* acknowledged the necessity of preventing "structural collapse" of a roof in a rollover *and* had designed a roof that would not collapse down on to the occupants. Ford's engineers in its Volvo division called this a "safety cage":



**Body structure**
**Safety cage 1**



*"A rigid framework surrounding the occupants which creates a support for the interior safety equipment and provides a survival space for the vehicle occupants in case of a crash"*

 

w w w . a u t o s t e e l . o r g

---

[9] Ford owned Volvo from 1999 until 2010.

68.

The purpose of the safety cage for the roof was "no structural collapse":



69.

That "XC90" roof shown in those documents served as the "benchmark" for the all-new design for a "Super Duty" roof created by Ford engineers in 2005-2006 (the "ERSP" roof)—a roof that was five times stronger but cheaper to build than the roof Ford put in 5.2 million model year 1999 through 2016 "Super Duty" trucks.

---

[10] Those two documents are readily available on the internet: https://www.citizen.org/wp-content/uploads/acf3a35.pdf

70.

Ford did not use that five- times- stronger roof in any "Super Duty" trucks until the model year 2017 truck.

71.

Ford has never offered any explanation for its decision not to protect occupants of its heavy "Super Duty" trucks like it protected occupants of the vehicles Ford sold under the name "Volvo."

72.

Ford has never explained why it made the decision ***not*** to provide occupants in its heavy "Super Duty" trucks a safety cage roof that would prevent structural collapse and thereby prevent catastrophic injuries in inevitable rollover wrecks.

73.

Ford's CEO did tell the public, on September 27, 2022, that the "the Super Duty is the truck for people who build our country."[11]

## **FORD KNEW THAT THE SUBJECT ROOFS WOULD COLLAPSE IN A ROLLOVER WRECK**

74.

Ford's knowledge that the subject roof would collapse in a rollover wreck did not come just from other wrecks Ford learned about because of lawsuits.

___

[11] Jim Cannis, CEO of Ford Pro also said at the same event: "It's a truck that has helped Ford Pro earn more than 40% of the U.S. market for commercial full-size trucks and vans. That's a remarkable number. More than double the next two competitors combined.  And this, now let me tell you, includes more than 50% share in some of the roughest and toughest industries, like utilities, and mining, *forestry*, construction, and emergency response." (Emphasis added.)

75.

The world's largest supplier of airbag and seat belt components for vehicles is Autoliv, Inc.  In 2009, Autoliv did a full-scale rollover crash test for Ford, paid for by Ford, testing a "Super Duty" truck.  This was the result:



76.

A Ford engineer who was a member of Ford's ERSP team has admitted under oath that in the test the roof *collapsed*.

77.

That crash test was 13 years before Juan was injured and paralyzed by roof crush.

78.

That Autoliv crash test in 2009 was more evidence known to Ford that the "Super Duty" roof was deadly dangerous.

79.

Yet, Ford executives still refused to put the five-times-stronger roof in the "Super Duty" trucks.

## FORD KNEW THAT IT COULD BUILD A FIVE TIMES STRONGER ROOF FOR THE "SUPER DUTY" TRUCKS

80.

In January 2005, fearing that the federal government might finally replace the minimum standard for roof strength that then dated from 1971 and apply that increased minimum standard to heavy duty trucks such as the Ford "Super Duty," Ford assembled a team of roof engineers to design an all-new roof *specifically for* the "Super Duty" trucks.

81.

Ford called the roof redesign project the "Enhanced Roof Strength Program for Super Duty Trucks" ("ERSP").[12]

82.

The reason Ford's ERSP team was tasked with designing an all-new far stronger roof for the "Super Duty" trucks was captured in a memorandum written by a member of that team,

---

[12] For some reason Ford's lawyers attempt to call the "ERSP for Super Duty Trucks" the 'big bang' effort, and encourage Ford engineers who testify to use those words – "big bang." That tends to obscure the fact the purpose of the entire program was to build an "enhanced" five-times-stronger roof *specifically for* the subject "Super Duty" trucks.

which noted that it was important to design such a stronger roof because of lawsuits filed against Ford as a result of roof crush during rollover wrecks in the "Super Duty" trucks.

83.

That was *in January 2005*—just seven years into Ford's use of the subject roof.  Already, then, Ford was besieged by lawsuits alleging that the roof was dangerous and deadly.

84.

In about sixteen months, the "ERSP" Team of Ford roof engineers completed the design of an all-new roof that was five times as strong as the existing roof on Ford's "Super Duty" trucks—*and was cheaper to build.*

85.

The new roof that ERSP Team designed was five times stronger than the roof in the "Super Duty" truck owned by Juan.

86.

Ford knew what a great design Ford's ERSP team's roof was—Ford gave that ERSP Team the "Henry Ford Technical Excellence Award" for their work.

87.

Ford did not use that five-times-stronger roof on the "Super Duty" trucks for eleven more years—until the 2017 model year.

88.

January 2005, when the ERSP for Super Duty trucks design work began, was one year and 11 months before Ford sold Juan the 2008 model year F-350 on November 13, 2007.

89.

Ford could have put the five times stronger ERSP roof in Juan's truck. Ford decided not to do so.

90.

Ford built and sold the subject 2008 F350 – the truck which Juan was driving on May 11, 2022. Ford put the weaker roof in that truck instead of the five-times-stronger ERSP roof that Ford's ERSP Team of engineers *had already designed* before then, despite the fact the stronger roof was *cheaper to build* than the weak roof Ford put in Juan's truck.

91.

Ford did not warn *anybody* that it had designed and could furnish a five times stronger roof for the "Super Duty" trucks—not people who had bought or might ride in "Super Duty" trucks sold before that new roof was designed, and not people who bought and rode in "Super Duty" trucks Ford sold *after* its engineers had designed and showed Ford how to build that stronger roof.

92.

Instead of using that five-times-stronger roof in its "Super Duty" trucks, Ford lobbied the federal government agency NHTSA[13] not to apply a stronger minimum federal roof strength standard to the heavy trucks for several more years.

93.

Ford did, however, put the stronger ERSP roof in its best-selling F150 pickup trucks, starting in 2009, upgraded further in 2011, and finally the full five-times-stronger ERSP roof was put in the 2015 model year F150.

---

[13] National Highway Traffic Safety Administration.

94.

Ford has never offered any explanation or excuse for its failure to install the five-times-stronger roof in the "Super Duty" trucks for which it was designed.

## THE SUBJECT ROOFS FAILED TO MEET *ANY* "STANDARD" FOR ROOF STRENGTH

95.

The strength of a roof is typically measured by what is called the "strength to weight" ratio, or "SWR."

96.

Ford has in the past claimed that when the 1999–2016 "Super Duty" trucks were being built and sold, Ford's own internal minimum standard for SWR was 1.8.

97.

According to calculations made by Ford's own engineer, Hikmat Mahmood, Ph.D., a member of Ford's ERSP team, the SWR of the 1999–2016 "Super Duty" truck roof was 1.1.

98.

According to Ford's own Chief Global Safety Engineer Steven Kozak, the SWR of the 1999–2016 "Super Duty" truck roof was 1.2.

99.

When Ford's ERSP Team was designing the all-new five-times-stronger roof for the "Super Duty" truck, the internal standard for roof strength of Ford's Volvo division was 3.5 SWR.

100.

Ford absolutely knew that a stronger roof was necessary for the safety of occupants – Ford's own ERSP Team used the roof of the XC90 which Ford sold under its "Volvo" brand as

the "benchmark" for its strategy to design the five-times-stronger roof for the "Super Duty" truck.

101.

Despite Ford's own 1.8 SWR standard, and the 3.5 SWR standard of Ford's Volvo division, and Ford's ERSP Team having designed a five-times-stronger roof specifically for the "Super Duty" trucks, which roof had an SWR of 5.85, Ford kept right on building and selling to American citizens those "Super Duty" trucks with a SWR of only 1.1 or 1.2—including Juan's 2008 F350.

102.

By contrast, for the lighter-weight 2015 model F150, Ford used the roof designed by Ford's ERSP team, with a roof strength of 5.85 SWR.

103.

After 2015, lawsuits continued to be filed against Ford alleging deaths and injuries caused by roof crush in rollover wrecks of Ford "Super Duty" trucks with the weak roof.

104.

By contrast, Ford has admitted that it does not know of a single lawsuit filed against Ford alleging death or injury caused by roof crush in rollover wrecks of the 2015 model year or later F150 *with a roof strength of 5.85 SWR.*

**THE SUBJECT ROOF IS INDEFENSIBLE**

105.

Ford has no defense to the claim that the roofs on 5.2 million "Super Duty" trucks it sold from 1999 through 2016 are defective.

106.

The Insurance Institute for Highway Safety (IIHS) is an independent group formed and funded by liability insurance companies with the intent of reducing deaths and injuries in wrecks.

107.

Since 2009, IIHS has required that a roof have a roof strength of at least 4.0 SWR to qualify for a "good" safety rating.

108.

All automakers have scrambled to increase the roof strength in their vehicles to obtain the "good" safety rating for roof strength, with one exception: Ford made no such attempt with respect to its "Super Duty" trucks until it did so for the 2017 model year "Super Duty" trucks.

109.

Ford has never explained why it dawdled in increasing roof strength on its heavy trucks—which obviously need stronger roofs more than do lighter vehicles, such as the F-150.

110.

Ford has never explained why it continued to build and sell its "Super Duty" trucks with a roof strength of only 1.1 SWR (or 1.2, depending on which Ford engineer's calculations one uses)—the weakest in Ford's fleet of cars and trucks.

111.

Ford's decision to keep selling its heavy "Super Duty" trucks with the weak roof was contrary to the IIHS standard, contrary to Ford's own supposed internal standard, contrary to the standard of Ford's own Volvo division, and utterly illogical given the availability of the five-times-stronger ERSP roof and given Ford's decision to put the five-times-stronger roof in its lighter F150 trucks.

## THE DANGERS OF THE SUBJECT ROOF WERE FORESEEABLE TO FORD

112.

That vehicles will be involved in rollover wrecks was and is foreseeable to Ford.

113.

That a roof crushing into the occupant space of a vehicle during a rollover wreck can cause injuries and can kill was and is foreseeable to Ford.

114.

The roof crush that occurred on May 11, 2022, which caused life-altering injuries to Juan, was foreseeable to Ford.

115.

The roof crush that occurred on May 11, 2022, which caused life-altering injuries to Juan, *was actually foreseen by Ford*.

116.

Ford was on notice that such dangerous roof crush in the subject "Super Duty" trucks was happening and would happen. That notice came from both real world wrecks known to Ford and in crash tests. By May 11, 2022, Ford had been sued for roof crush injuries and deaths many times – an estimated 200 times or more.

117.

The roof crush that occurred on May 11, 2022 was avoidable: Ford had known how to prevent that roof crush *for decades*. Not only that—Ford's own ERSP Team had taught Ford specifically how to avoid that dangerous roof crush specifically in the "Super Duty" trucks— ***before*** Ford built the 2008 F350 Ford sold to Juan, and ***sixteen years before*** Juan was injured.

118.

Ford knew, and knows, that it is imperative to design an occupant protection system within a vehicle that will provide survival space within the vehicle in the event of a rollover wreck.

119.

Ford's dangerously weak and defective roof caused the injury from which Juan has suffered and suffers still.

**MORE INNOCENT CITIZENS ARE DESTINED TO BE KILLED
OR BE MAIMED BY THE SUBJECT TRUCKS**

120.

Ford's response to allegations that the roofs on its 1999–2016 "Super Duty" trucks are defective and dangerously weak is to claim that everyone else is wrong—Congress, NHTSA, IIHS, and even Ford's own engineers.

121.

*It is an absolute certainty* that more American citizens will be killed, paralyzed, and otherwise severely injured in rollover wrecks of the 1999–2016 Ford "Super Duty" trucks when the roof crushes down on them. American citizens are mostly unaware of the danger posed by the subject roof because Ford continues to protest that the roof is "absolutely safe" and refuses to warn of the danger.

122.

Juan Yraguen suffered his devastating injury four years after the first trial in *Hill v. Ford* in April 2018, when Ford escaped the punitive damages verdict it expected by deliberately procuring a mistrial.

123.

On August 19, 2022, after the $1.7 Billion verdict in *Hill v. Ford,* one of the plaintiffs' counsel in that case was widely quoted in the national press: "More deaths and severe injuries are certain because millions of these trucks are on the road."[14]

124.

Just three days after the verdict in *Hill v. Ford*, another couple almost the same exact ages as Mr. and Mrs. Hill, and also driving a red Ford F-250 "Super Duty" truck, were injured when their truck rolled over and the roof crushed down on them. Their names were Debra and Herman Mills. Debra died at the scene of the wreck, after being extricated from the upside-down truck with the crushed roof. Herman lingered for nine days in a hospital before succumbing to his injuries.

125.

It seems self-evident that a punitive damages award of $1.7 Billion was insufficient to cause Ford to accept responsibility and warn American citizens of the danger of riding in a 1999–2016 "Super Duty" truck.

---

[14] https://www.cbsnews.com/news/ford-f250-truck-crash-1-7-billion-jury-award-melvin-hill-voncile-hill/#:~:text=A%20Georgia%20jury%20has%20returned,a%20company%20representative%20said%20Sunday; https://www.nbcnews.com/news/us-news/ford-appeal-verdict-georgia-truck-crash-killed-couple-rcna44153; https://www.latimes.com/world-nation/story/2022-08-21/georgia-jury-awards-1-7-billion-in-ford-truck-crash-case; https://fortune.com/2022/08/21/georgia-jury-awards-almost-2-billion-ford-crash-case-truck/.

126.

Something drastic and dramatic has to be done to make Ford stop the line of victims that continues every year—as is proved by the horrible injury inflicted upon Juan Yraguen four years after Ford escaped a punitive damages verdict in the first *Hill v. Ford* trial in 2018, and as is proved by the fatal injuries inflicted upon Mr. and Mrs. Mills just three days after the verdict in the second *Hill v. Ford* trial on August 19, 2022.

## THE EFFECT OF FORD'S MISCONDUCT ON THESE PLAINTIFFS

127.

From when he was in the hospital in Bend, Oregon Juan has undergone physical therapy to try to help him with his condition and to stay alive. Juan was in St. Charles Hospital from the day of the rollover/roof crush wreck, May 11, 2022, for a month:



128.

On June 10, 2022, Juan was flown to Shirley Ryan Ability Lab in Chicago, where he stayed for two months, receiving treatment. Since that time, Juan has been under the care of a physiatrist in Eugene, Oregon. Juan has also received physical therapy at Mercy Hospital in Roseburg, Oregon, and from a mobile therapy service that visits his home weekly.

129.

Juan and Kris had to have a small exercise pool installed in the garage of their home for therapy. Juan gets in the pool with help from Kris and family members three times per week:



Friends also come to help.

130.

Kris administers physical therapy to Juan every morning, in addition to feeding him, bathing him, and attending to his bladder and bowel functions, over which Juan has no control. Juan spends about three hours per day in therapy. The various therapies take a lot of effort and focus, but Juan is determined to live, and to get better as much as he can.

131.

Aided by Juan's hard work and Kris' help, Juan has attained some use of his right arm, though his right hand remains numb and stiff with little dexterity (he is right-handed). Juan's left arm is a consistent cause of pain and of little use, though he is able to move it some.

132.

Juan Yraguen has spent his life in the family businesses, Basco Logging Inc. and Basco Brothers LLC. The logging business was founded by Juan's grandfather, father, and uncles. Juan's grandfather was an immigrant from the Basque region in northern Spain. He immigrated to this country through Ellis Island in 1906 and came first to southeastern Oregon to herd sheep on Steens Mountain.

133.

Before his injury, Juan worked 60 hours per week or more in the family businesses. He was President and CEO/Manager of Basco Logging Inc. and Basco Bros LLC. After Juan's brother Nick died in 2015, Juan and his other brother Jaime continued to operate the business, but Juan was the key strategist who oversaw all business operations; his brother Jaime's specialty was working in the field. Since his injury, Juan has been unable to work more than 8–10 hours per week.

134.

The effect of Juan's injury upon the family businesses has been severe. Basco Logging Inc. has had to cut back on its logging operations; it was unable to bid on logging jobs that it otherwise would have taken. In addition, Basco Logging Inc. has also been unable to bid on contract construction jobs it would otherwise seek to do. Completion of projects already underway for Basco Logging Inc. has been significantly delayed. Those consequences were a direct result of Juan not being able to direct and advance these businesses. Both Basco Logging Inc. and Basco Brothers LLC have lost considerable business opportunities as a direct result of Juan's injury.

135.

A great deal of the responsibilities formerly shouldered by Juan have had to be borne by Kris. Kris Yraguen was trained as a Certified Public Accountant; she is Controller of Basco Logging Inc. She has had to assume, as much as she can, much of the leadership role which Juan used to provide for the family businesses.

136.

Kris has also had to be the primary caregiver for her formerly-vibrant and energetic husband Juan.

137.

Kris and Juan Yraguen were married in 1989. They have three children: Boni, age 30; Arie, age 28; and Carson, age 17.

138.

Juan's injury has obviously caused Kris to lose the full and much-beloved companionship of a healthy, vibrant husband.

139.

The physical and emotional toll on Kris has been profound.

## **FORD's "DIVING" ARGUMENT**

140.

Instead of explaining why Ford did not provide a "safety cage" to "the people that build our country" and did not make available to them a roof with "no structural collapse," Ford has persisted in arguing in court cases that roof crush doesn't matter because occupants "dive" into the roof in the nanosecond before the roof crushes down on them.

141.

That is an argument no one believes and that literally makes no sense.

142.

If Ford *did* actually believe in its "diving" argument, then obviously Ford had an inescapable duty to do whatever was necessary to prevent occupants of its trucks from diving into the roof. Ford has done nothing to prevent such supposed "diving."

143.

The "diving" argument is made up for lawsuits. No one professes to believe it other than automakers' lawyers and paid testifiers.

144.

In *Hill v. Ford*, plaintiffs' counsel took the videotaped depositions for use at trial of six actual Ford roof engineers who had been involved in either the subject roof or the roof designed by Ford's ERSP team that was supposed to replace that weak roof.

145.

Present for each of those depositions was a Ford lawyer who has defended many "Super Duty" roof crush cases.

146.

Not a single one of those actual Ford roof engineers professed to have even heard of the "diving" argument, much less relied on it for the purpose of justifying the building of weak roofs.

147.

The "diving" argument was based on some so-called "studies" done by persons who are recidivist testifiers for automakers in roof crush cases, most notably Kenneth Orlowski.

148.

At the *Hill v. Ford* trial in 2022, Ford had every opportunity to present that "diving" argument but elected not to present as witnesses any of the authors of those so-called "studies," despite the fact Orlowski was listed by Ford as one of its expert witnesses for the *Hill v. Ford* trial.

149.

In *Hill v. Ford*, the court ruled those so-called "studies" about "diving" could be presented in evidence, *if* Ford showed that actual roof engineers at Ford ever relied on them.

Plaintiffs' Complaint                    37

150.

At the *Hill v. Ford* trial, Ford elected not to call to the witness stand a single Ford

engineer who was involved in the design of the subject roof or the five-times-stronger ERSP roof

to testify that actual Ford roof engineers ever relied on such so-called "studies" in designing

roofs for Ford vehicles, or, for that matter, had ever even heard of that "diving" argument.

151.

Ford's "diving" argument has been rejected by the U.S. Congress, and by NHTSA, and

has been mocked by the liability insurers' automotive safety organization, IIHS.

152.

That 'diving' argument is, of course, contrary to law as well as contrary to common

sense. As Judge William P. Adams wrote in 2013 regarding that Ford argument:

> Defendant Ford's position in this case, described by Defendant Ford
> as counterintuitive, is that a stronger car roof does not necessarily
> reduce the risk of injury in a rollover accident. Given that Federal
> Motor Vehicle Safety Standard number 216, "Roof crush
> resistance", has as its purpose "to reduce death and injuries due to
> the crushing of the roof into the occupant compartment in rollover
> crashes", 49 CFR 571.216 (S2) *Defendant Ford's position could be
> described as something other than counter-intuitive.*

8/20/13 Order Granting Plaintiffs' *Daubert* Motion Challenging Ford Expert Testimony

Regarding Crown Victoria "CRIS" Testing, p. 2, *Hatfield v. Ford Motor Co.*, Case No. 77639

(State Ct. Bibb County) (emphasis added).

153.

Ford's "diving" argument was made up by testifiers and lawyers to attempt to defend roof

crush cases and to try to convince NHTSA not to increase the federal minimum standard for roof

strength.

# LIABILITY OF FORD MOTOR COMPANY

## COUNT ONE - Strict Products Liability

### 154.

Plaintiffs incorporate paragraphs 1 through 153, above.

### 155.

This claim is made pursuant to ORS 30.920.

### 156.

The subject F-350 truck was designed, manufactured, and sold by Ford.  The roof of that truck was defectively designed and defectively manufactured.  The occupant compartment and restraint system of that truck were defectively designed, and were inadequate to protect occupants and to provide survival space in the event of a foreseeable rollover wreck.  Those defects caused all of Plaintiffs' injuries.   Ford is strictly liable for Plaintiffs' injuries and damages.

### 157.

The F-350 was in a defective condition when it was sold by Ford; the roof was weak and unsafe.

### 158.

The subject F-350 was unreasonably dangerous to users when sold by Ford; the roof was weak and unsafe.

### 159.

The roof sold by Ford that collapsed and broke Juan's neck had not been modified or changed after the F-350 was sold by Ford.

## COUNT TWO – Negligence

### 160.

Plaintiffs incorporate paragraphs 1 through 159, above.

### 161.

Before Ford sold Juan's 2008 F-350 "Super Duty" truck and before Juan was injured on May 11, 2022, Ford was acutely aware of and clearly knew about the unreasonable danger posed by the weak roofs on the subject trucks and on Juan's 2008 F-350 "Super Duty" truck.

### 162.

Ford had a duty to design, manufacture, and sell the subject truck and Juan's 2008 F-350 "Super Duty" truck with a safe roof – a roof that would not collapse in a foreseeable rollover wreck, with an occupant compartment that would protect the occupants.

### 163.

Ford knew of the dangers and risks of injury caused by its weak roof. Ford could and did foresee precisely the causation of injury that befell Juan.

### 164.

The roofs in the subject trucks, and in Juan's 2008 F-350 "Super Duty" truck, were dangerous to an extent beyond which would be contemplated by an ordinary consumer or user of the product.

### 165.

Ford breached its duty to Juan and Kris Yraguen.

166.

Ford's conduct created a foreseeable and unreasonable risk of injury to Juan and to any other users of Ford's 1999-2016 model year "Super Duty" trucks, including the 2008 F-350, and that conduct in fact caused the injuries to Juan and to Kris complained of herein.

## COUNT THREE – Failure to Warn

167.

Plaintiffs incorporate paragraphs 1 through 166, above.

168.

This claim is made pursuant to ORS 30.900 and other law.

169.

Juan's 2008 F-350 "Super Duty" truck, and all Ford's 1999–2016 model year "Super Duty" trucks, are defective and unreasonably dangerous due to inadequate warnings of the dangers posed by the weak roofs. These trucks were defective when they left Ford's control and were sold to the public, including to Juan. Ford had actual knowledge of the dangers posed by the weak roofs on the subject trucks and on Juan's 2008 F-350 "Super Duty" truck. Ford's failure to warn users and consumers, including Plaintiffs, of the defective and unreasonably dangerous weak roofs on the F-350 truck proximately caused Plaintiffs' injuries and damages.

170.

Ford did not warn anyone that the "Super Duty" truck roof was dangerously weak.

171.

Ford did not warn anyone that a five-times-stronger roof was available for the "Super Duty" trucks and was both economically and technologically feasible.

172.

Ford breached its duty to warn consumers and users of the subject trucks, including Juan and Kris, of the danger known to Ford.

173.

The dangers of the subject roofs, and the risk of injury posed thereby, were not known by the general public, or by Juan and Kris.

174.

Ford has concealed the aforesaid dangers and risks for years and continues to do so.

175.

The dangers of the subject roofs, and the risk of injury posed thereby, were not obvious to consumers and users, or to Juan and Kris.

**COUNT FOUR – Punitive Damages**

176.

Plaintiffs incorporate paragraphs 1 through 175, above.

177.

This claim is made pursuant to ORS 31.730, ORS 30.925, and other law.

178.

With regard to the conduct described herein, Ford has shown a reckless and outrageous indifference to a highly unreasonable risk of harm.

179.

With regard to the conduct described herein, Ford has acted with a conscious indifference to the health, safety, and welfare of others.

180.

Ford has adamantly and constantly refused to take any remedial measures to eliminate the risk posed by its unsafe roofs and to thereby prevent reoccurrence of the conduct described herein and the consequences of that conduct to innocent citizens.

181.

To the contrary, Ford has continued to insist that the subject roofs are "absolutely safe."

182.

Ford knows that claiming the subject roofs are "absolutely safe," or even "reasonably safe" – whatever that means – is false.

183.

At all times, and specifically prior to May 11, 2022, Ford knew that the likelihood of serious harm resulting from its conduct was certain.

184.

The misconduct by Ford described herein has been hugely profitable to Ford.

185.

Just weakening the subject roof to begin with generated an additional $520 million in profits for Ford, as Ford's own corporate representative confessed without refutation by Ford.

186.

Ford has made billions of dollars in profits selling the subject 1999–2016 "Super Duty" trucks with the subject weak roof.

187.

The "Super Duty" line of trucks has been a huge profit-maker for Ford. As Ford's own CEO stated at a press conference on September 27, 2022, "If Super Duty was its own business, it would be a Fortune 500 company. That's how big this is."

188.

Ford has continuously refused to disclose how many billions of dollars in profits Ford made from selling the subject 1999–2016 model years "Super Duty" trucks.

189.

The misconduct described herein has continued for almost 30 years – from the time when, in 1994, Ford executives decreed "cost containment" which weakened the already-weak roof that Ford had designed for use in the 1999 model year "Super Duty" trucks. That misconduct has continued after Ford was first sued on account of that weak roof, in 2000, and since the Autoliv crash test in 2009 showed the roof crushed flat in a foreseeable, ordinary rollover, and despite an estimated 200 lawsuits like this one.

190.

The attitude of Ford about the dangers posed by its misconduct can only be described by saying simply, "Ford just does not care."

191.

Ford's financial condition is sound. Undisputed testimony at the second trial in *Hill v. Ford* established that Ford had in years prior average revenues of $145 billion, net income in 2021 of $18 billion, $257 billion in total assets, and as a matter of policy kept on hand at year end each year the sum of $20 billion in cash and cash equivalents.

192.

Ford has not been deterred by verdicts—not even the $1.7 Billion verdict in *Hill v. Ford* which Ford has said it would appeal, claiming that Ford owed nothing.

## DAMAGES SOUGHT

193.

Plaintiffs incorporate by reference paragraphs 1–192.

194.

All damages claimed by Plaintiffs were proximately caused by the tortious acts and omissions of Ford, for which Ford is liable.

195.

Plaintiff Juan Yraguen claims and is entitled to recover compensatory damages for the following:

(a)    all components of the mental, emotional, and physical pain and suffering Juan endured upon impact and up until the present time;

(b)    all components of the mental, emotional, and physical pain and suffering Juan will endure in the future;

(c)    past and future loss of enjoyment of life;

(d)    loss of the ability to function as a normal human being, man, and husband;

(e)    loss of the ability to enjoy a productive working life, leading his family business as he did before that roof crushed his neck;

(f)    compensatory damages for all past and future economic damages, including medical bills, medical expenses, and other necessary future expenses;

(g)     compensatory damages for future costs of care and a life care plan that will maximize his ability to function and his lifespan;

(h)     compensatory damages for all past and future economic damages, including lost wages and income as well as lost or diminished capacity to earn;

(i)     compensatory damages for the loss resulting from diminution in what his businesses have been able to do and could have been able to do in the future;

(j)     compensatory damages for the loss resulting from lost and missed opportunities for his businesses;

(k)     shock, fright, and terror experienced before, during, and after the wreck; and

(l)     all other damages recoverable under Oregon law.

196.

Plaintiff Kris Yraguen claims and is entitled to recover damages from defendants in an amount to be determined by the considered judgment of the jury as demonstrated by the evidence for her past, present, and future loss of consortium, companionship, comfort, services, aid, and other losses resulting from the severe injuries to her husband.

197.

Punitive damages should be imposed against Ford with respect to the claims made by Plaintiff Juan Yraguen for all the reasons described above.

198.

Punitive damages should be imposed against Ford with respect to the claims made by Plaintiff Kris Yraguen for all the reasons described above.

## **PRAYERS FOR RELIEF**

WHEREFORE Plaintiffs pray for the following relief:

(a)    That summons issue requiring defendant to appear as provided by law

to answer this Complaint;

(b)    That service be had upon defendant as provided by law;

(c)    That Plaintiffs have a trial by jury;

(d)    That Plaintiffs have and recover all compensatory damages

recoverable under Oregon law as set forth above;

(e)    That the Court impose punitive damages against Ford;

(f)    That the Court require that Ford pay all of Plaintiffs' expenses of

litigation, including attorneys' fees; and

(g)    For such other and further relief as the Court shall deem just and appropriate.


Dated: September 20, 2023.


*/s/Hala J. Gores*
Hala J. Gores, Oregon Bar No. 890489
hala@goreslaw.com
HALA J. GORES, P.C.
The Gores Building
1332 S.W. Custer Drive
Portland, OR 97219
503-295-1940

James E. Butler, Jr., Georgia Bar No. 099625
*Pro Hac Vice Motion Forthcoming*
jim@butlerprather.com
Ramsey B. Prather, Georgia Bar No. 658395
*Pro Hac Vice Motion Forthcoming*
ramsey@butlerprather.com
Daniel E. Philyaw, Georgia Bar No. 877765
*Pro Hac Vice Motion Forthcoming*
dan@butlerprather.com
Allison B. Bailey, Georgia Bar No. 478434
*Pro Hac Vice Motion Forthcoming*
allison@butlerprather.com
BUTLER PRATHER LLP

Plaintiffs' Complaint                                47

P.O. Box 2766
Columbus, GA 31902
706-322-1990

Judy Snyder, Oregon Bar. No. 732834
judy@jdsnyder.com
LAW OFFICES OF JUDY SNYDER
4248 Galewood Street
Lake Oswego, OR 97035
503-228-5027