Nancy M. Erfle, OSB No. 902570
nerfle@grsm.com
Laura S. Polster, OSB No. 172007
lpolster@grsm.com
GORDON REES SCULLY MANSUKHANI, LLP
1300 SW Fifth Avenue, Suite 2000
Portland, OR  97201
Tel: (503) 222-1075   Fax: (503) 616-3600

Vaughn A. Crawford, ASB # 006324 (*pro hac vice*)
vcrawford@swlaw.com
Craig Logsdon, ASB # 020223 (*pro hac vice*)
clogsdon@swlaw.com
Snell & Wilmer

Paul F. Malek, ASB # 0656-A48P (*pro hac vice*)
pmalek@huielaw.com
Huie, Fernambucq & Stewart, LLP

*Attorneys for Defendant Ford Motor Company*

# UNITED STATES DISTRICT COURT

## DISTRICT OF OREGON

### EUGENE DIVISION

| | |
|---|---|
| JUAN AND KRIS YRAGUEN,<br><br>       Plaintiffs,<br><br>  vs.<br><br>FORD MOTOR COMPANY,<br><br>       Defendant. | Case No. 6:23-cv-01366-AA<br><br><br>DEFENDANT FORD MOTOR COMPANY'S MOTION FOR PARTIAL SUMMARY JUDGMENT ON PLAINTIFFS' MANUFACTURING, FAILURE TO WARN, AND PUNITIVE DAMAGES CLAIMS<br><br><br>[REQUEST FOR ORAL ARGUMENT] |

DEFENDANT FORD MOTOR COMPANY'S MOTION FOR
PARTIAL SUMMARY JUDGMENT ON PLAINTIFFS'
MANUFACTURING, FAILURE TO WARN, AND PUNITIVE
DAMAGES CLAIMS - Page i
(6:23-cv-01366-AA)

GORDON REES SCULLY MANSUKHANI, LLP
1300 SW Fifth Avenue, Suite 2000
Portland, OR  97201
Telephone: (503) 222-1075
Facsimile:  (503) 616-3600

## Table of Contents

Table of Contents ............................................................................................................ ii

Index of Authorities ....................................................................................................... iv

I.    LR 7-1(a) Certification. ......................................................................................... 1

II.   Motion. ................................................................................................................... 1

III.  Legal Memorandum in Support of Ford's Motion for Partial Summary Judgment. ....... 1

    A.   Introduction. ...................................................................................................... 1

    B.   Summary judgment standard. ........................................................................... 2

    C.   Undisputed facts relevant to Ford's motion. .................................................... 3

          1.   Undisputed facts about this accident and the allegations against Ford. ......... 3

          2.   Undisputed facts about Ford's roof strength design decisions for the 1999-2016 Super Duty trucks, which includes the subject truck .................. 4

    D.   Ford is entitled to summary judgment on all claims that the vehicle was defectively or negligently manufactured. ................................................. 14

    E.   Ford is entitled to summary judgment on Plaintiffs' "failure-to-warn" claims. .... 15

          1.   Plaintiffs cannot create a genuine issue of material fact about the causation element. ........................................................................................ 16

          2.   Plaintiffs' warnings claim here is redundant of their design claim, and thus not actionable.  Plaintiffs do not contend the subject truck could have been made safe with a warning. .......................................................... 18

          3.   Plaintiffs' allegation that Ford continued to fail to warn of the weak roof post-sale is not an actionable, independent claim. ....................................... 20

    F.   Ford is entitled to summary judgment on all punitive damages claims. ............... 22

          1.   Standard for recovery of punitive damages. .................................................. 22

          2.   The Court must apply the "clear and convincing evidence" standard in evaluating whether a genuine issue of fact on punitive damages exists. ...... 23

          3.   Plaintiffs cannot produce clear and convincing evidence that Ford acted maliciously or with indifference to the risk of injury due to roof deformation. ..................................................................................................... 25

              a.   There was no applicable standard to disregard. ................................... 25

DEFENDANT FORD MOTOR COMPANY'S MOTION FOR PARTIAL SUMMARY JUDGMENT ON PLAINTIFFS' MANUFACTURING, FAILURE TO WARN, AND PUNITIVE DAMAGES CLAIMS - Page ii
(6:23-cv-01366-AA)

**GORDON REES SCULLY MANSUKHANI, LLP**
1300 SW Fifth Avenue, Suite 2000
Portland, OR  97201
Telephone: (503) 222-1075
Facsimile:  (503) 616-3600

b. Expert testimony cannot "buy" a punitive damage claim................... 25

c. Allegations in lawsuits filed by legal advocates are not evidence...... 26

d. Plaintiffs lack testing of their own and their criticisms of Ford's testing falls flat................................................................................. 27

4. Ford's evidence negates the claim that Ford acted with "malice" or was "indifferent" to the risk of injury due to roof deformation. ......................... 29

a. What nearly 40-years of crash studies show....................................... 29

b. What Ford told NHTSA. ...................................................................... 29

5. Ford is entitled to summary judgment on Plaintiffs' punitive damages claim..................................................................................................... 31

IV. Conclusion. ................................................................................................. 32

Certificate of Compliance ............................................................................................. 33

Certificate of Service ..................................................................................................... 33

DEFENDANT FORD MOTOR COMPANY'S MOTION FOR PARTIAL SUMMARY JUDGMENT ON PLAINTIFFS' MANUFACTURING, FAILURE TO WARN, AND PUNITIVE DAMAGES CLAIMS - Page iii
(6:23-cv-01366-AA)

**GORDON REES SCULLY MANSUKHANI, LLP**
1300 SW Fifth Avenue, Suite 2000
Portland, OR 97201
Telephone: (503) 222-1075
Facsimile: (503) 616-3600

Index of Authorities

**Page(s)**

CASES

*Anderson v. Liberty Lobby, Inc.*,
477 U.S. 242, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986)..................................................2, 23, 24

*Andor by Affatigato v. United Air Lines, Inc.*,
303 Or. 505 (1987)..........................................................................................................22

*Badger v. Paulson Inv. Co., Inc.*,
311 Or. 14 (1991)............................................................................................................22

*Barlett v. MacRae*,
54 Or. App. 516, 635 P.2d 666 (1981)................................................................................17

*Benjamin v. Wal–Mart Stores, Inc.*,
185 Or. App. 444, 61 P.3d 257 (2002).................................................................................16

*Crosswhite v. Jumpking, Inc.*,
411 F.Supp.2d 1228 (D.Or.2006) ................................................................................16, 17

*Davidson v. Apple, Inc.*,
2017 WL 3149305 (N.D. Cal. July 25, 2017).......................................................................15

*Deering v. Lassen Cmty. Coll. Dist.*,
No. 2:07–CV1521–JAM–DAD, 2011 WL 202797 (E.D.Cal., Jan. 20, 2011) ..........................3

*Douglas v. Bussabarger*,
73 Wash.2d 476, 438 P.2d 829 (1968)................................................................................18

*E.R. Squibb & Sons, Inc. v. Cox*,
477 So.2d 963 (Ala. 1985).................................................................................................17

*Easter v. Am. W. Fin.*,
381 F.3d 948 (9th Cir.2004) ...............................................................................................3

*Erickson Air-Crane Co. v. United Technologies Corp.*,
303 Or. 281, 735 P.2d 614 ...........................................................................................20, 21

*In re First All. Mortgage Co.*,
471 F.3d 977 (9th Cir. 2006) ............................................................................................24

DEFENDANT FORD MOTOR COMPANY'S MOTION FOR PARTIAL SUMMARY JUDGMENT ON PLAINTIFFS' MANUFACTURING, FAILURE TO WARN, AND PUNITIVE DAMAGES CLAIMS - Page iv
(6:23-cv-01366-AA)

GORDON REES SCULLY MANSUKHANI, LLP
1300 SW Fifth Avenue, Suite 2000
Portland, OR  97201
Telephone: (503) 222-1075
Facsimile:  (503) 616-3600

*Fontaine v. Provident Mut. Life Ins. Co. of Philadelphia*,
   10 Fed. Appx. 415 (9th Cir. Mar. 19, 2001) ....................................................23, 24

*Gilmour v. Norris Paint & Varnish Co., Inc.*,
   52 Or.App. 179, 627 P.2d 1288 (1981)...................................................................16

*Goschie v. JP Morgan Chase Bank, N.A.*,
   6:10-CV-06424-AA, 2014 WL 6064783 (D. Or. Nov. 7, 2014) ............................24

*Harper v. Wallingford*,
   877 F.2d 728 (9th Cir.1989) ....................................................................................3

*Harris v. Northwest Natural Gas Co.*,
   284 Or. 571, 588 P.2d 18 (1978) ...........................................................................16

*Ivy v. Ford Motor Co.*,
   646 F.3d 769 (11th Cir. 2011) ................................................................................25

*Justice v. Rockwell Collins, Inc.*,
   720 Fed. Appx. 365 (9th Cir. 2017).......................................................................24

*Kambury v. DaimlerChrysler Corp.*,
   185 Or. App. 635, 60 P.3d 1103 ......................................................................20, 21

*L.A. Gear California, Inc. v. Gen. Am. Life Ins. Co.*,
   129 F.3d 126 (9th Cir. 1997) ..................................................................................24

*Martell v. General Motors, LLC*,
   492 F.Supp.3d 1131 (D. Or. 2020) .........................................................................15

*Nissan Motor Co. v. Armstrong*,
   141 S.W.3d 131 (Tex. 2004)....................................................................................27

*In re Oracle Corp. Sec. Litig.*,
   627 F.3d 376 (9th Cir.2010) .....................................................................................2

*Paugh v. King Henry's, Inc.*,
   No. 04-763, 2005 WL 1565112 (D. Or. June 30, 2005) .........................................24

*Pirv v. Glock, Inc.*,
   CV 06-145 PK, 2010 WL 11579455 (D. Or. July 19, 2010).................................24

*Rivera v. Philip Morris, Inc.*,
   395 F.3d 1142 (9th Cir.2005) ...................................................................................2

DEFENDANT FORD MOTOR COMPANY'S MOTION FOR
PARTIAL SUMMARY JUDGMENT ON PLAINTIFFS'
MANUFACTURING, FAILURE TO WARN, AND PUNITIVE
DAMAGES CLAIMS - Page v
(6:23-cv-01366-AA)

**GORDON REES SCULLY MANSUKHANI, LLP**
1300 SW Fifth Avenue, Suite 2000
Portland, OR 97201
Telephone: (503) 222-1075
Facsimile: (503) 616-3600

*Safeco Insurance Co. v. Baker*,
   515 So.2d 655 (La. App. 1987)............................................................18

*Schmidt v. Pine Tree Land Dev.*,
   291 Or. 462, 631 P.2d 1373 (Or. 1981) .................................................23

*Schreiber v. Plum Creek Timber Co. Inc.*,
   77 F.3d 490 (9th Cir. 1996) .................................................................24

*Sealey v. Hicks*,
   309 Or. 387, 788 P.2d 435, *cert denied*, 498 U.S. 819, 111 S.Ct. 65,
   112 L.Ed.2d 39 (1990) ...................................................................20, 21

*Sluimer v. Verity, Inc.*,
   606 F.3d 584 (9th Cir.2010) ...................................................................2

*Smith v. FredMeyer*,
   70 Or. App. 30, 687 P.2d 1128 (1984)........................................18, 19, 20

*Smothers v. Gresham Transfer, Inc.*,
   332 Or. 83, 23 P.3d 333 (2001) ............................................................20

*Taylor v. Bos. Sci. Corp.*,
   2020 WL 4592923 (D. Ariz. Aug. 5, 2020)...............................................15

*Thompson ex rel. Thorp Family Charitable Remainder Unitrust v. Federico*,
   324 F. Supp. 2d 1152 (D. Or. 2004) ..................................................23, 24

*Villiarimo v. Aloha Island Air, Inc.*,
   281 F.3d 1054 (9th Cir.2002) ..................................................................2

*Washington Mut. Ins. v. United States*,
   636 F.3d 1207 (9th Cir.2011) ..................................................................2

## RULES

FED.R.CIV.P. 56 ........................................................................................1

FED.R.CIV.P. 56(a)....................................................................................2

LR 7-1(a)...................................................................................................1

DEFENDANT FORD MOTOR COMPANY'S MOTION FOR
PARTIAL SUMMARY JUDGMENT ON PLAINTIFFS'
MANUFACTURING, FAILURE TO WARN, AND PUNITIVE
DAMAGES CLAIMS - Page vi
(6:23-cv-01366-AA)

**GORDON REES SCULLY MANSUKHANI, LLP**
1300 SW Fifth Avenue, Suite 2000
Portland, OR  97201
Telephone: (503) 222-1075
Facsimile:  (503) 616-3600

## STATUTES

ORS 30.900 .................................................................................................................21

ORS 30.920 .................................................................................................................18

ORS 30.920(3) .............................................................................................................18

ORS 31.730(1) .............................................................................................................22

## OTHER AUTHORITIES

Restatement (Second) of Torts § 402A, cmt j ...........................................................18

Restatement (Second) of Torts § 402A, comments a through m .................................18

DEFENDANT FORD MOTOR COMPANY'S MOTION FOR
PARTIAL SUMMARY JUDGMENT ON PLAINTIFFS'
MANUFACTURING, FAILURE TO WARN, AND PUNITIVE
DAMAGES CLAIMS - Page vii
(6:23-cv-01366-AA)

**GORDON REES SCULLY MANSUKHANI, LLP**
1300 SW Fifth Avenue, Suite 2000
Portland, OR 97201
Telephone: (503) 222-1075
Facsimile: (503) 616-3600

Defendant Ford Motor Company ("Ford") moves for partial summary judgment on several of Plaintiffs' claims, as follows:

## I.     LR 7-1(a) Certification.

In compliance with LR 7-1(a), Ford hereby certifies that the parties made a good faith effort through a telephone conference to resolve Ford's motion for partial summary judgment and have been unable to do so.

## II.     Motion.

Ford moves for partial summary judgment pursuant to Federal Rule of Civil Procedure 56 on the following causes of action asserted by the Plaintiffs:

1. All claims of defective or negligent manufacturing of the subject vehicle (¶ 155 of Plaintiffs' First Amended Complaint (Doc. 25) ("Complaint"));

2. All failure to warn claims (Count Three of Complaint, ¶¶ 166-174); and

3. All punitive damages claims (Count Four of Complaint, ¶¶ 175-191)

## III.     Legal Memorandum in Support of Ford's Motion for Partial Summary Judgment.

### A.     Introduction.

This case arises out of a single vehicle accident in which Plaintiff Juan Yraugen, driving a 2008 Ford F-350 Super Duty pickup truck, rolled the vehicle and suffered cervical spine injuries. Plaintiffs claim that his injuries were caused by the defectively designed, weak roof structure of the F-350.

Although this is a straightforward design defect case, Plaintiffs have attempted to tack on several inapposite and unsupported causes of action: manufacturing defect, "failure to warn," and

DEFENDANT FORD MOTOR COMPANY'S MOTION FOR PARTIAL SUMMARY JUDGMENT ON PLAINTIFFS' MANUFACTURING, FAILURE TO WARN, AND PUNITIVE DAMAGES CLAIMS - Page 1
(6:23-cv-01366-AA)

**GORDON REES SCULLY MANSUKHANI, LLP**
1300 SW Fifth Avenue, Suite 2000
Portland, OR 97201
Telephone: (503) 222-1075
Facsimile: (503) 616-3600

punitive damages. The Court should streamline this case for trial by eliminating these causes of action on summary judgment. There is no evidence that the subject vehicle deviated from its design intent, which eliminates the manufacturing claims. There is no evidence that any "failure to warn" caused the injuries to the Plaintiffs, and the theory does not even apply under the facts of this case. And there is no evidence, under the applicable "clear and convincing" standard or otherwise, that Ford's conduct in designing this roof was "malicious" or "indifferent," as required under Oregon law.

B.     <em>Summary judgment standard.</em>

Summary judgment is appropriate when "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." *Washington Mut. Ins. v. United States*, 636 F.3d 1207, 1216 (9th Cir.2011); s*ee also* FED.R.CIV.P. 56(a). In response to a properly supported motion for summary judgment, the nonmoving party must go beyond the pleadings and show there is a genuine dispute as to a material fact for trial. *Rivera v. Philip Morris, Inc.*, 395 F.3d 1142, 1146 (9th Cir.2005). "This burden is not a light one.... The non-moving party must do more than show there is some 'metaphysical doubt' as to the material facts at issue." *In re Oracle Corp. Sec. Litig.*, 627 F.3d 376, 387 (9th Cir.2010) (citation omitted).

A dispute as to a material fact is genuine "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Villiarimo v. Aloha Island Air, Inc.*, 281 F.3d 1054, 1061 (9th Cir.2002) (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986)). The court must draw all reasonable inferences in favor of the nonmoving party. *Sluimer v. Verity, Inc.*, 606 F.3d 584, 587 (9th Cir.2010). "Summary judgment

DEFENDANT FORD MOTOR COMPANY'S MOTION FOR PARTIAL SUMMARY JUDGMENT ON PLAINTIFFS' MANUFACTURING, FAILURE TO WARN, AND PUNITIVE DAMAGES CLAIMS - Page 2
(6:23-cv-01366-AA)

**GORDON REES SCULLY MANSUKHANI, LLP**
1300 SW Fifth Avenue, Suite 2000
Portland, OR 97201
Telephone: (503) 222-1075
Facsimile: (503) 616-3600

cannot be granted where contrary inferences may be drawn from the evidence as to material issues." *Easter v. Am. W. Fin.*, 381 F.3d 948, 957 (9th Cir.2004) (citation omitted). A "mere disagreement or bald assertion" that a genuine dispute as to a material fact exists "will not preclude the grant of summary judgment." *Deering v. Lassen Cmty. Coll. Dist.*, No. 2:07–CV1521–JAM–DAD, 2011 WL 202797, at *2 (E.D.Cal., Jan. 20, 2011) (citing *Harper v. Wallingford*, 877 F.2d 728, 731 (9th Cir.1989)).

C.   *Undisputed facts relevant to Ford's motion.*

1.   <u>Undisputed facts about this accident and the allegations against Ford.</u>[1]

This case arises from a May 11, 2022 single-vehicle rollover of a 2008 Ford F-350 Super Duty pickup truck (the "subject truck") in which the driver and sole vehicle occupant, Plaintiff Juan Yraugen, suffered incomplete paraplegia.[2]

Plaintiffs (Juan and his wife Kris Yraugen) claim that their injuries were caused when the roof of the subject truck "crushed" during the rollover, because it was defectively weak in design.[3]

A Ford dealer sold the subject truck to Bosco Logging, Inc., a family business run by Juan and his brothers, in November 2007.  Juan's brother Nick, who died in 2015, handled the purchase of the subject truck.[4]

---

[1] By reciting the allegations made by Plaintiffs in the Complaint, Ford wants to make clear that Ford is not admitting the truth of the allegations.  *See* Defendant Ford Motor Company's Answer and Affirmative Defenses to Plaintiffs' First Amended Complaint (Doc. 29).
[2] Complaint ¶ 2.
[3] *Id.* ¶ 3.
[4] *Id.* ¶¶ 6, 29; Deposition of Juan Yraugen, <u>Exhibit 1</u>, at 132:13-18; 134:8- 135:3.

DEFENDANT FORD MOTOR COMPANY'S MOTION FOR PARTIAL SUMMARY JUDGMENT ON PLAINTIFFS' MANUFACTURING, FAILURE TO WARN, AND PUNITIVE DAMAGES CLAIMS - Page 3
(6:23-cv-01366-AA)

GORDON REES SCULLY MANSUKHANI, LLP
1300 SW Fifth Avenue, Suite 2000
Portland, OR  97201
Telephone: (503) 222-1075
Facsimile:  (503) 616-3600

Plaintiffs allege that Ford sold 1999-2016 Super Duty trucks, including the subject truck, with a defectively weak roof, and that Ford has known of this defect since at least 2000, seven years before the subject truck was sold to Bosco Logging, Inc.[5]

Plaintiffs sue Ford for strict products liability and negligence based on the alleged "defectively designed and defectively manufactured" roof, occupant compartment, and restraint system.[6]

Plaintiffs sue Ford for "failure to warn" Plaintiffs of the defectively designed roof,[7] both before and after the sale of the subject truck in November 2007.[8]

Plaintiffs also sue Ford for punitive damages.[9]

2.   Undisputed facts about Ford's roof strength design decisions for the 1999-2016 Super Duty trucks, which includes the subject truck.

Former Ford Design Analysis Engineer (DAE) Christopher Eikey - a witness in this case – is familiar with Ford's roof strength design for Ford Super Duty trucks sold from 1999-2016.[10]

Mr. Eikey is an automotive safety engineer with a B.S. degree in Mechanical Engineering from Ohio State University. He worked for Ford as an automotive engineer from 1999 until 2022.[11]

Mr. Eikey describes his experience while employed at Ford in areas such as "(a) design and development of vehicle closures and structures; (b) testing of vehicle closures and structures; (c) vehicle body construction and manufacturing; (d) vehicle assembly; (e) vehicle crash safety;

---

[5] Complaint ¶¶ 38, 50-51.
[6] *Id.* ¶¶ 153-165.
[7] *Id.* ¶¶ 166-174.
[8] *Id.* ¶¶ 18, 45, 91, 121, 125, 168-174.
[9] *Id.* ¶¶ 175-191.
[10] *See generally* Affidavit of Christopher Eikey, Exbibit 2, attachment B (6/14/24 expert report).
[11] Affidavit of Eikey, ¶¶ 3, 4.

DEFENDANT FORD MOTOR COMPANY'S MOTION FOR PARTIAL SUMMARY JUDGMENT ON PLAINTIFFS' MANUFACTURING, FAILURE TO WARN, AND PUNITIVE DAMAGES CLAIMS - Page 4
(6:23-cv-01366-AA)

GORDON REES SCULLY MANSUKHANI, LLP
1300 SW Fifth Avenue, Suite 2000
Portland, OR 97201
Telephone: (503) 222-1075
Facsimile: (503) 616-3600

(f) analysis of vehicle performance; (g) evaluation of carbon monoxide production, intrusion, and exposure in vehicles; (h) evaluation of image-based systems such as rearview cameras and forward-facing cameras used for Driver Assist Features; (i) development of specifications and recommended procedures; (j) analysis of test data; and (k) accident reconstruction."[12]

Mr. Eikey is familiar with the 2008 F-350, its roof structure, and the roof design methodology.[13]

The platform of the 2008 F-350 was internally known at Ford as the P356, which was produced from 2008-2010.[14] From a roof-structure perspective, there was little change in the roof structure from 1999 through 2016 F-250 platforms (PHN131--1999-2007; P473--2011-2016).[15]

Federal Motor Vehicle Safety Standard (FMVSS) 216 is the federal roof strength standard.[16]

FMVSS 216 did not apply to trucks in the weight classification that included the P356 platform, which were exempted from the regulation based, in part, on the weight and size of the vehicle line—much like competitive or peer vehicles manufactured by GM and Dodge.[17]

Although this line of Super Duty trucks was exempt from compliance with FMVSS 216, Ford nevertheless selected deliberate and robust roof strength targets for the PHN131 platform.[18]

---

[12] Affidavit of Christopher Eikey, <u>Exhibit 2</u>, attachment B (6/14/24 expert report), at 3.
[13] *Id.* at 4-10.
[14] *Id.* at 4.
[15] *Id.* at 5.
[16] *Id*. at 6-9.
[17] *Id*. at 7.
[18] *Id.* at 7-8.

DEFENDANT FORD MOTOR COMPANY'S MOTION FOR PARTIAL SUMMARY JUDGMENT ON PLAINTIFFS' MANUFACTURING, FAILURE TO WARN, AND PUNITIVE DAMAGES CLAIMS - Page 5
(6:23-cv-01366-AA)

**GORDON REES SCULLY MANSUKHANI, LLP**
1300 SW Fifth Avenue, Suite 2000
Portland, OR 97201
Telephone: (503) 222-1075
Facsimile: (503) 616-3600

According to Mr. Eikey, Ford analyzed materials related to the importance of roof strength and concluded that a certain level of roof strength is desirable and needed, but beyond a certain level, adding additional strength to the roof and supporting pillars does not generally impart an additional benefit to occupants involved in rollover crashes.[19]

According to Mr. Eikey, "Rollovers are random, chaotic events with random, chaotic kinematics of the vehicle and the occupant. The loading conditions on the roof structure associated with roof-to-ground impacts during a rollover are complex and continually changing. The load location, direction, magnitude, and duration are unique to a given roof-to-ground impact experienced during a rollover sequence. Rollovers typically result in the vehicle's roof structure and other areas of the vehicle experiencing multiple impacts with the ground and/or other objects. Research and field data analysis have shown that injuries can occur in various ways, to various parts of the body, and to varying degrees of severity in rollover accidents regardless of the roof strength of a particular vehicle."[20]

Despite those difficulties, for over fifty years, Ford and other automobile manufactures have been studying the phenomenon of rollover crashes and injury causation.[21] Crash studies, laboratory studies, field data analysis, and statistical analysis have all been analyzed.[22] All uniformly reflect that there is no causal relationship between roof strength or deformation and injury causation.[23]

---

[19] *Id.* at 9-10.
[20] *Id.* at 9.
[21] *Id.* at 9-10.
[22] *Id.* at 9.
[23] *Id.*

DEFENDANT FORD MOTOR COMPANY'S MOTION FOR PARTIAL SUMMARY JUDGMENT ON PLAINTIFFS' MANUFACTURING, FAILURE TO WARN, AND PUNITIVE DAMAGES CLAIMS - Page 6
(6:23-cv-01366-AA)

**GORDON REES SCULLY MANSUKHANI, LLP**
1300 SW Fifth Avenue, Suite 2000
Portland, OR 97201
Telephone: (503) 222-1075
Facsimile: (503) 616-3600

Crash tests have been conducted—both dolly-rollover-type tests and inverted drop testing—to better understand the relationship between severe roof deformation and injury.[24] Those crash studies document (1) rollover occupant kinematics, and (2) when occupant or dummy neck loading occurs in relation to roof deformation.[25] Those studies conclude that further strengthening or reinforcing the roof does not change or reduce the risk of injury or occupant neck loading, because the timing of the peak neck loading occurs before significant roof deformation.[26] Those conclusions have remained unchanged over multiple decades.[27]

On December 6, 2001—before the production of the Subject Truck—Ford wrote a letter to the National Highway Traffic and Safety Administration (NHTSA) in response to a request from NHTSA for comments on a proposal to further strengthen the FMVSS 216 requirements and extend the strength requirements in some capacity to heavier trucks like the Subject Truck.[28] Within the attachments to that letter are multiple published, peer-reviewed crash studies and field data analysis. The articles are entitled:

- "Rollover Crash Tests, The Influence of Roof Strength Injury Mechanics;"

- "The Influence of Roof Strength on Injury Mechanics Using Belted Occupants;"

- "The Influence of Increased Roof Strength on Belted and Unbelted Dummies in Rollover and Drop Tests;"

---

[24] *Id.* at 10.
[25] *Id.*
[26] *Id.*
[27] *Id.*
[28] *Id.* at 10; Affidavit of Michael Leigh, <u>Exhibit 3</u>, ¶¶ 11-18 and attachment A (12/6/01 letter from Ford to NHTSA).

DEFENDANT FORD MOTOR COMPANY'S MOTION FOR PARTIAL SUMMARY JUDGMENT ON PLAINTIFFS' MANUFACTURING, FAILURE TO WARN, AND PUNITIVE DAMAGES CLAIMS - Page 7
(6:23-cv-01366-AA)

**GORDON REES SCULLY MANSUKHANI, LLP**
1300 SW Fifth Avenue, Suite 2000
Portland, OR 97201
Telephone: (503) 222-1075
Facsimile: (503) 616-3600

- "The Relationship Between Roof Strength and Occupant Injury in Rollover Accident Data;" and,

- "Repeatable Dynamic Rollover Test Procedures with Controlled Roof Impact."[29]

In each of these published, peer-reviewed studies, the conclusions were fundamentally the same: reinforcing the roof made no measurable difference to what was occurring to the occupant (or in some cases, an anthropomorphic crash test dummy) during the rollover.[30]

Using a crash study identified as "Inverted Drop Test on a 1999 Ford F-250 with a Production Roof," Mr. Eikey explained the test parameters in several of the above crash studies, later studies, and the results of those studies:

> So this, I believe, was a series of tests. There was a production roof drop test that we're looking at here, and then there was also a reinforced roof drop test, sort of a matched-pair type of analysis, and the intent was to look at the injury mechanism, so the dummy loading was evaluated with the differences in the roof structures between the two vehicles to determine if there was any difference in the type of loading that the dummy was experiencing.
>
> Q. And was there a difference?
>
> No. Both sets of tests show what we've shown in various batteries of tests over time that the changes in roof strength that we -- that we use when we mock up a vehicle with a reinforced roof have no effect on the injury level, the injury criteria, the neck loading that we see in the -- in the instrumented dummy.
>
> Q. Okay. So from a kinematic standpoint, what these tests show is that the loading mechanism for the neck is not affected whether this cab is reinforced or not; it would be the same either way?

---

[29] Affidavit of Michael Leigh ¶ 11; Affidavit of Christopher Eikey, attachment C (7/16/21 deposition in *Meng v. Ford*) at 69:14-76:11.
[30] Affidavit of Christopher Eikey, attachment C (7/16/21 deposition in *Meng v. Ford*) at 75:24-76:7.

DEFENDANT FORD MOTOR COMPANY'S MOTION FOR PARTIAL SUMMARY JUDGMENT ON PLAINTIFFS' MANUFACTURING, FAILURE TO WARN, AND PUNITIVE DAMAGES CLAIMS - Page 8
(6:23-cv-01366-AA)

**GORDON REES SCULLY MANSUKHANI, LLP**
1300 SW Fifth Avenue, Suite 2000
Portland, OR 97201
Telephone: (503) 222-1075
Facsimile: (503) 616-3600

That's correct. It's similar -- it's similar levels of loading.[31]

Mr. Eikey testified that the researchers were looking not just at roof deformation, but when injurious loads were recorded by the instrumented crash dummies.[32] Mr. Eikey explained that the video and data transmitted from the instrumentation documented that the injurious load to the crash dummy was recorded when the vehicle impacts the ground, and "the occupant moves towards the ground. It's physics. The vehicle, essentially, slows as it hits the ground, and the occupant continues to move towards the point of impact. So, the dummy's head is at the point of impact in these tests, and it's contacting, essentially, the ground with the roof panel between it or a part of the roof structure between it."[33]

What the crash studies visually show, and document, is that reinforcing the roof does not change the injurious impact to the occupant or when it occurs:

> Q. Okay. And is it your testimony that would be the same regardless of whether or not the cab was reinforced with roll bars or something or a cage or something similar to that?
>
> Yes. So what we've seen in these batteries of tests is when we have a reinforced roof structure, artificially reinforced to a very high strength-to-weight ratio, we run the same test, and we find very similar neck loading in those tests, just like we did in the production roof. And the timing of that -- it's not just the levels or the amount of compression in the neck; it's also the timing. And the timing of the peak also occurs, even in the production vehicles, well before significant deformation of the vehicle.[34]

---

[31] *Id.* at 99:17-100:13.
[32] *Id.* at 100:14-101:15.
[33] *Id.* at 105:10-17.
[34] *Id.* at 105:18-106:6.

DEFENDANT FORD MOTOR COMPANY'S MOTION FOR PARTIAL SUMMARY JUDGMENT ON PLAINTIFFS' MANUFACTURING, FAILURE TO WARN, AND PUNITIVE DAMAGES CLAIMS - Page 9
(6:23-cv-01366-AA)

**GORDON REES SCULLY MANSUKHANI, LLP**
1300 SW Fifth Avenue, Suite 2000
Portland, OR 97201
Telephone: (503) 222-1075
Facsimile: (503) 616-3600

The intent of the matched pair testing—comparing the occupant safety performance of a production roof with a reinforced roof—was to measure when the injurious neck loading occurs and whether it changes, depending upon the roof structure. And the uniform conclusion based upon that testing is that it does not: "[w]e see similar levels of neck load, and the timing of the neck load is also similar."[35] The same tests have been conducted on many different vehicle lines and the results are the same.[36]

The field data available to Ford in 2001 when it responded to NHTSA's request for comments reflected that 97.4% of belted occupants do not sustain a serious injury in a rollover crash, under the then current roof strength standards.[37] In other words, this data was also consistent with the matched-pair crash study conclusions:

> Q. Okay. What is the essential conclusion drawn from that paper that is important to Ford Motor Company in this 2001 submission to NHTSA?
>
> This paper is a very thorough look at the existing field data statistics that were available at the time. It's probably one of the first comprehensive look at field data as it relates to rollover injury causation -- or field injury analysis that was done. And, ultimately, the findings are similar to what I've been speaking about today, and what other statistical analysis and research testing has shown that there's not a correlation of roof strengths to injury risk. And it further shows, from a field statistics standpoint, that our vehicles designed to the standards that were applicable or the design targets that Ford had set were performing well in the field. I think at that time in '93, 98.4 or so percent of belted occupants were not severely injured in a rollover accident. Those statistics are similar throughout time, but they may evolve a little bit given the availability of more statistics, but later analysis corresponds with that high percentage of people

---

[35] *Id.* at 107:5-17.
[36] *Id.* at 108:18-25.
[37] *Id.* at 71:1-72:7.

DEFENDANT FORD MOTOR COMPANY'S MOTION FOR PARTIAL SUMMARY JUDGMENT ON PLAINTIFFS' MANUFACTURING, FAILURE TO WARN, AND PUNITIVE DAMAGES CLAIMS - Page 10
(6:23-cv-01366-AA)

**GORDON REES SCULLY MANSUKHANI, LLP**
1300 SW Fifth Avenue, Suite 2000
Portland, OR 97201
Telephone: (503) 222-1075
Facsimile: (503) 616-3600

that are properly belted. They walk away without serious injuries in a high percentage of rollover accidents.

Q. If I stated that for belted occupants in rollover crashes, 97.4 percent walk away with little to no injury, would that refresh your recollection?

That might be the proper number, yes. I guess I would look back at the paper. It's obviously–the paper is what it is and it speaks for itself. The numbers are within the paper. I was just going from memory, but, yeah, that's possible.

Q. Correct, correct. And you're right. There's another Datalink study that is 98.6 percent. So, you're right.[38]

Despite the lack of any proven scientific causal relationship that increased roof strength (reinforcing the roof) would prevent serious head and neck injuries in rollover crashes, Ford nonetheless set a roof strength target for the PHN131 Super Duty roof.[39]

Ford met its roof strength targets for the Subject Truck, as demonstrated by computer aided engineer (CAE) calculations and physical testing by the government that confirmed those calculations.[40]

The foregoing evidence both supports and confirms what Ford knew at the time that the subject truck's roof was being designed and developed, and that is why in its December 6, 2001 correspondence to the NHTSA, among other things, Ford affirmed its commitment to customer safety and pointed out that strengthening its roof structure(s) beyond the existing design targets was not the path forward to promote customer safety in rollover crashes—instead, the Company reiterated:

---

[38] *Id.* at 70:23-72:7.
[39] Affidavit of Christopher Eikey, <u>Exhibit 2</u>, attachment B (6/14/24 expert report), at 7.
[40] *Id.* at 7-8.

DEFENDANT FORD MOTOR COMPANY'S MOTION FOR PARTIAL SUMMARY JUDGMENT ON PLAINTIFFS' MANUFACTURING, FAILURE TO WARN, AND PUNITIVE DAMAGES CLAIMS - Page 11
(6:23-cv-01366-AA)

**GORDON REES SCULLY MANSUKHANI, LLP**
1300 SW Fifth Avenue, Suite 2000
Portland, OR 97201
Telephone: (503) 222-1075
Facsimile: (503) 616-3600

Ford Motor Company is committed to further improving the safety of its vehicles by advancing the state-of-the art in occupant protection using a variety of new technologies. We are continually developing innovative systems and technologies that can provide practicable safety benefits to our customers. These efforts include both accident avoidance (preventing the event), and occupant protection (during the event) to enhance occupant safety in rollover crashes.[41]

According to Ford employee Michael Leigh, a witness in this case and a member of Ford's Automotive Safety Office (ASO), in the time frame in question, crash safety was a shared responsibility within Ford—ASO, Product Development Crash Safety and Advanced Vehicle and Engineering Technology.[42]

In his affidavit filed in this case, Michael Leigh affirmed the above, testifying that:

1.  ASO examined whether Ford's internal safety design guideline on roof strength should exceed existing federal requirements and applicability. Ford's safety design guideline for roof strength is based on applicable federal motor vehicle safety standards, available crash testing, field data (accident data available in publicly maintained databases such as NASS and FARS), and published peer-reviewed literature. Additionally, Ford's own laboratory testing has been utilized to evaluate the relationship between roof strength and injury causation in rollover crashes.[43]

2.  That process of examination was used to set roof strength targets that provide a high level of safety in rollover crashes. Those targets were then cascaded down to the requisite engineering and manufacturing teams.[44]

3.  Ford's December 4, 2001 response to that request for comment references many of these articles as sources of Ford's knowledge on the subject of understanding the reasons for the lack of casual relationship between roof structure deformation and occupant injury risk. Ford told NHTSA that obviating roof/pillar deformation by using a structure, while maintaining the same roof-to-ground impact environment, does not change the occupant impact or inherent injury potential risk. That

---

[41] Affidavit of Michael Leigh, <u>Exhibit 3</u>, attachment A (12/6/01 letter from Ford to NHTSA), at 1.
[42] Affidavit of Michael Leigh at ¶¶ 6-7.
[43] *Id.* at ¶ 8.
[44] *Id.* at ¶ 9.

DEFENDANT FORD MOTOR COMPANY'S MOTION FOR PARTIAL SUMMARY JUDGMENT ON PLAINTIFFS' MANUFACTURING, FAILURE TO WARN, AND PUNITIVE DAMAGES CLAIMS - Page 12
(6:23-cv-01366-AA)

GORDON REES SCULLY MANSUKHANI, LLP
1300 SW Fifth Avenue, Suite 2000
Portland, OR 97201
Telephone: (503) 222-1075
Facsimile: (503) 616-3600

knowledge was based on the Malibu I and Malibu II studies, crash data, and peer reviewed articles.[45]

4.      Ford's December 2001 response to NHTSA describes the misconception that because there is roof damage, the roof "intruded" or "moved into" the occupant's compartment during the rollover and contacted the occupant, causing injury. Ford pointed NHTSA to the Malibu I and II crash testing as evidence of the misconception that roof/pillar deformation caused the injury.[46]

5.      Ford's response to NHTSA also referenced Ford's review of crash data, and the conclusion based upon that data that there is not an established causal connection between roof deformation and occupant injury. Ford told NHTSA that even in cases of severe roof/pillar deformation, the injury mechanism must be analyzed considering the severity of the impact, the duration of the impact, and the timing of the injury relative to the deformation.[47]

6.      Ford's response also referenced testing Ford had reviewed. That testing reflected that the highest neck loading experienced by Hybrid III test dummies is caused by the initial ground impact—not the subsequent roof/pillar deformation. Again, Ford identified the source of that knowledge as published peer reviewed articles and the Malibu I and Malibu II crash studies.[48]

7.      In addition to the above, Ford referenced its knowledge of a study of 60,758 single rollover accidents, where the researchers found no relationship between roof strength-to-weight ratio and the risk of severe injury. The basis for that knowledge was a published and peer reviewed article authored by E. A. Moffett and J. Padmanaban in 1995.[49]

8.      Ford explained that it knew, based upon occupant kinematic studies, that in a rollover accident, a safety belted occupant's head will be in contact with, or very close to, the roof, roof rail, door frame or side glass as a result of rotational forces even before any roof-to-ground contact. The occupant is moving toward those structures independent of roof/pillar deformation.[50]

9.      In its December 4, 2001 response, Ford also discussed a new test device known as CRIS, designed to create repeatable dynamic rollover impact simulations for the first roof-to-ground impact, a crash study Michel Leigh was personally familiar

---

[45] *Id.* at ¶¶ 11-13.
[46] *Id.* at ¶ 14.
[47] *Id.* at ¶ 15.
[48] *Id.* ¶ 16.
[49] *Id.* at ¶ 17.
[50] *Id.*

DEFENDANT FORD MOTOR COMPANY'S MOTION FOR PARTIAL SUMMARY JUDGMENT ON PLAINTIFFS' MANUFACTURING, FAILURE TO WARN, AND PUNITIVE DAMAGES CLAIMS - Page 13
(6:23-cv-01366-AA)

GORDON REES SCULLY MANSUKHANI, LLP
1300 SW Fifth Avenue, Suite 2000
Portland, OR 97201
Telephone: (503) 222-1075
Facsimile: (503) 616-3600

with. See CRIS and SAE 2003-01-0172, Matched-Pair Rollover Impacts of Rollcaged and Production Roof Cars Using the Controlled Rollover Impact System (CRIS), and SAE No. 2001-01-0476, Repeatable Dynamic Rollover Test Procedure With Controlled Roof Impact.[51]

10.     CRIS confirmed that there is not an established causal connection between significant roof deformation and occupant injury. Later testing using a dynamic rollover component test system further confirmed the original conclusions reached by researchers involved in the Malibu I and Malibu II and CRIS research.[52]

The results of a 2005 horizontal platen testing of competitive Chevrolet and Dodge Ram heavy duty truck roofs showed that the Ford Super Duty truck had consistent results with competitor vehicles.[53]

The benchmarking testing of competitive Chevrolet and Dodge Ram heavy duty shows that the Ford Super Duty roof materials and assembly methods were state of the art.[54]

The F-250 roof was manufactured with multiple grades and thickness of structural steel and resultant structure robust and strong.[55]

> D.     *Ford is entitled to summary judgment on all claims that the vehicle was defectively or negligently manufactured.*

In Paragraph 155 of the Complaint, Plaintiffs allege that "the roof of [the subject truck] was defectively designed and defectively manufactured," and that these defects "caused all of Plaintiffs' injuries." Plaintiffs also appear to include negligent manufacture of the truck in their negligence claims. (Complaint ¶ 161).

---

[51] *Id.* at ¶ 18.
[52] *Id.* at ¶ 19.
[53] Affidavit of Christopher Eikey, Exhibit 2, attachment B (6/14/24 expert report), at 11-12.
[54] *Id.* at 19-22.
[55] *See id.* at 5-6.

DEFENDANT FORD MOTOR COMPANY'S MOTION FOR PARTIAL SUMMARY JUDGMENT ON PLAINTIFFS' MANUFACTURING, FAILURE TO WARN, AND PUNITIVE DAMAGES CLAIMS - Page 14
(6:23-cv-01366-AA)

GORDON REES SCULLY MANSUKHANI, LLP
1300 SW Fifth Avenue, Suite 2000
Portland, OR 97201
Telephone: (503) 222-1075
Facsimile: (503) 616-3600

Plaintiffs have no evidence that the subject truck was defectively or negligently manufactured, or that any manufacturing issue caused Plaintiffs' injuries. As recently explained in *Martell v. General Motors, LLC*, 492 F.Supp.3d 1131 (D. Or. 2020) design defect claims and manufacturing defect claims are distinctly different:

> Design defects are distinct from manufacturing defects. A manufacturing defect occurs when a manufacturer constructs a single product in a substandard manner, generally resulting in a deviation from the manufacturer's intended result or from other seemingly identical products. *See, e.g., Taylor v. Bos. Sci. Corp.*, 2020 WL 4592923, at *2 (D. Ariz. Aug. 5, 2020). A design defect, however, occurs when a manufacturer builds a product exactly how it was designed, but the design itself is defective. *See, e.g., Davidson v. Apple, Inc.*, 2017 WL 3149305, at *21 (N.D. Cal. July 25, 2017).

492 F.Supp.3d at 1139-40.

Ford is entitled to summary judgment on Plaintiffs' manufacturing claims, whether brought under strict products liability or negligence causes of action. Plaintiffs have no evidence, expert or otherwise, that the subject truck's roof, occupant containment, or restraints deviated from Ford's intended design. Not only is there no evidence of such deviation, Plaintiffs do not even so allege anywhere in their 197-paragraph Complaint. Plaintiffs' entire case is an attack on Ford's design of the subject truck.

Accordingly, Ford is entitled to summary judgment on all manufacturing claims.

E.     *Ford is entitled to summary judgment on Plaintiffs' "failure-to-warn" claims.*

In addition to their strict liability and negligence claims based on alleged defective design of the subject truck, Plaintiffs allege a cause of action based on Ford's supposed "failure to warn"

DEFENDANT FORD MOTOR COMPANY'S MOTION FOR PARTIAL SUMMARY JUDGMENT ON PLAINTIFFS' MANUFACTURING, FAILURE TO WARN, AND PUNITIVE DAMAGES CLAIMS - Page 15
(6:23-cv-01366-AA)

GORDON REES SCULLY MANSUKHANI, LLP
1300 SW Fifth Avenue, Suite 2000
Portland, OR 97201
Telephone: (503) 222-1075
Facsimile: (503) 616-3600

them about the alleged design defect. (Complaint ¶¶ 166-174). Plaintiffs' failure to warn claims fail because there is no genuine issue of fact that any alleged failure to warn caused Plaintiffs' injuries. Additionally, the failure to warn claims fail because, in a case where the product cannot be made safe by a warning, a failure to warn claim is redundant of the design defect claim, and thus not actionable. Finally, Plaintiffs have no cause of action for alleged post-sale failure to warn because all they have alleged is a post-sale continuation of the same alleged failure to warn, which is not independently actionable under Oregon law.

1. <u>Plaintiffs cannot create a genuine issue of material fact about the causation element.</u>

An essential element of a plaintiff's cause of action for failure to warn of a product's danger is causation. *Harris v. Northwest Natural Gas Co.*, 284 Or. 571, 588 P.2d 18 (1978). Here, Plaintiffs cannot make that showing because there is no evidence that Juan and Kris Yraugen relied upon, or even were aware of, any of the warnings, instructions, or materials that Ford *did* provide with the subject truck before it was purchased. Accordingly, Ford's warnings (or lack thereof) could not have been a substantial factor in causing their injuries.

To establish causation, "'the plaintiff in a strict liability case is required to establish that [the alleged inadequate warning] proximately caused his injuries or damages.'" *Crosswhite v. Jumpking, Inc.*, 411 F.Supp.2d 1228, 1235 (D.Or.2006) (quoting *Gilmour v. Norris Paint & Varnish Co., Inc*., 52 Or.App. 179, 184, 627 P.2d 1288 (1981)). "Oregon courts have held that an inadequate warning 'must be a *substantial cause* of the person's injuries.'" *Id.* (quoting *Benjamin v. Wal–Mart Stores, Inc.*, 185 Or. App. 444, 458, 61 P.3d 257 (2002)) (emphasis added).

DEFENDANT FORD MOTOR COMPANY'S MOTION FOR PARTIAL SUMMARY JUDGMENT ON PLAINTIFFS' MANUFACTURING, FAILURE TO WARN, AND PUNITIVE DAMAGES CLAIMS - Page 16
(6:23-cv-01366-AA)

**GORDON REES SCULLY MANSUKHANI, LLP**
1300 SW Fifth Avenue, Suite 2000
Portland, OR 97201
Telephone: (503) 222-1075
Facsimile: (503) 616-3600

Juan Yraugen did not purchase the 2008 Ford F-350. Rather, it was purchased by Bosco Logging, Inc. in November 2007.[56] The purchase was handled by Juan's brother Nick, who died in 2015.[57] Juan explained that it was Nick's responsibility to handle the acquisition of vehicles and equipment for the family business they shared: "[W]hen it was time to buy these pickups, [Nick] just—he took care of it."[58] In addition to his lack of involvement in the selection or purchase of the 2008 Ford F-350, Juan did not do any research online about safety ratings before the truck was purchased.[59]

The implications of Juan Yraugen's lack of involvement in the decision to purchase the 2008 Ford F-350 is well-illustrated by *Barlett v. MacRae*, 54 Or. App. 516, 635 P.2d 666 (1981). There, the plaintiff claimed that the warning provided on a container of poisonous dye used for marking cattle was inadequate. *Id.* at 518. The evidence showed that "while relieving himself and looking across the country, decedent seized the plastic jug and drank from it without looking at it." *Id.* Noting that any alleged labeling deficiencies could not have been the cause of the plaintiff's injury because the plaintiff did not read the label, the Oregon Court of Appeals affirmed the trial court's decision to grant a directed verdict in favor of the defendant. *Id.* at 519. *See also Crosswhite v. Jumpking, Inc.*, 411 F.Supp.2d 1228, 1235-36 (D. Or. 2006) (where plaintiff did not observe any of the ten warnings on a trampoline, plaintiff failed to present genuine issue of material fact that additional warning against performing flips and jumping with multiple people would have prevented injury); *E.R. Squibb & Sons, Inc. v. Cox*, 477 So.2d 963 (Ala. 1985) (plaintiff's claim

---

[56] Complaint ¶36.
[57] Complaint ¶ 6; Deposition of Juan Yraugen, Exhibit 1, at 132:13-18; 134:8- 135:3.
[58] Deposition of Juan Yraugen at 135:2-3.
[59] *Id.* at 133:7-11.

DEFENDANT FORD MOTOR COMPANY'S MOTION FOR PARTIAL SUMMARY JUDGMENT ON PLAINTIFFS' MANUFACTURING, FAILURE TO WARN, AND PUNITIVE DAMAGES CLAIMS - Page 17
(6:23-cv-01366-AA)

**GORDON REES SCULLY MANSUKHANI, LLP**
1300 SW Fifth Avenue, Suite 2000
Portland, OR 97201
Telephone: (503) 222-1075
Facsimile: (503) 616-3600

that insulin manufacturer failed to warn failed because plaintiff never read the box or the insert that came with the box of insulin); *Safeco Insurance Co. v. Baker*, 515 So.2d 655 (La. App. 1987) ("[E]ven if the more specific warnings had been available, such warnings [regarding proper installation of fireplace] would have been futile because [the installer] did not even read the instructions he had available."); *Douglas v. Bussabarger*, 73 Wash.2d 476, 438 P.2d 829 (1968) (upholding a jury verdict in favor of anesthesia manufacturer because doctor did not review the label of the drug prior to administering it).

2.  <u>Plaintiffs' warnings claim here is redundant of their design claim, and thus not actionable. Plaintiffs do not contend the subject truck could have been made safe with a warning.</u>

The gist of a failure-to-warn claim regarding a product is that an adequate warning would render the product safe for its intended use. *See* Restatement (Second) of Torts § 402A, cmt j ("In order to prevent the product from being unreasonably dangerous, the seller may be required to give directions or warning, on the container, as to its use.... Where warning is given, the seller may reasonably assume that it will be read and heeded; and a product bearing such a warning, which is safe for use if it is followed, is not in defective condition, nor is it unreasonably dangerous."); *see also* ORS 30.920(3) (compelling that ORS 30.920 claims be construed in accord with Restatement (Second) of Torts § 402A, comments a through m). But here, the Plaintiffs do not allege that a warning would have rendered the 2008 Ford F-350 safe for its ordinary use. As such, Plaintiffs may state claims predicated on design defect; but they do not state warning claims.

This principal is illustrated by *Smith v. FredMeyer*, 70 Or. App. 30, 687 P.2d 1128 (1984). After being injured by a wall tile falling on him, the plaintiff alleged:

DEFENDANT FORD MOTOR COMPANY'S MOTION FOR PARTIAL SUMMARY JUDGMENT ON PLAINTIFFS' MANUFACTURING, FAILURE TO WARN, AND PUNITIVE DAMAGES CLAIMS - Page 18
(6:23-cv-01366-AA)

**GORDON REES SCULLY MANSUKHANI, LLP**
1300 SW Fifth Avenue, Suite 2000
Portland, OR 97201
Telephone: (503) 222-1075
Facsimile: (503) 616-3600

> That the adhesive mounting tape as manufactured, designed and sold for use in mounting the described glass mirrors to a wall was unreasonably dangerous and defective causing unnecessary danger to plaintiff in that:
>
> (1) It did not keep and maintain the glass mirror tiles securely attached to plaintiff's bedroom wall as would be contemplated by the ordinary purchaser or consumer, more particularly plaintiff;
>
> (2) It was sold by defendant without warning to the purchaser, more particularly plaintiff, that it would not securely hold the glass tiles to a wall.

*Id.* at 32. The trial court granted the defendant's motion to strike subparagraph (2) of the pleading because "it merely restated the allegations of subparagraph (1) and ... it failed to state a claim for failure to warn." *Id.* On appeal, the appellate court affirmed:

> We read [subparagraph (2)] to allege that defendants were required to warn users that their product, even if used properly, contained an inherent defect, making it unsuitable for its intended use. *If a product is unsuitable for its intended use, and as a result is unreasonably dangerous, then the correct inquiry is whether there is a manufacturing or design defect, not whether the manufacturer should have warned of the defect.* If the tiles fell off the wall because of a defect, then liability would be predicated on the defect as alleged in subparagraph (1), not on a failure to warn of the defect.

*Smith*, 70 Or. App. at 33 (emphasis added).

Here, as in *Smith*, Plaintiffs simply allege that the subject truck was defectively designed, such that it is unsafe for its intended use. They do not, nor will they ever, allege that a warning would have made the subject truck safe. If Plaintiffs did so contend, then they would have designated a human factors or warnings expert in this case and would have proposed a suitable warning. They have done neither, precisely because they recognize that the failure to warn claim

DEFENDANT FORD MOTOR COMPANY'S MOTION FOR PARTIAL SUMMARY JUDGMENT ON PLAINTIFFS' MANUFACTURING, FAILURE TO WARN, AND PUNITIVE DAMAGES CLAIMS - Page 19
(6:23-cv-01366-AA)

**Gordon Rees Scully Mansukhani, LLP**
1300 SW Fifth Avenue, Suite 2000
Portland, OR 97201
Telephone: (503) 222-1075
Facsimile: (503) 616-3600

is merely a repackaging of their design defect claim, not a viable stand-alone claim.  Accordingly, as in *Smith*, Plaintiffs' warning claims are redundant of their design defect claims and fail.

        3.      <u>Plaintiffs' allegation that Ford continued to fail to warn of the weak roof post-sale is not an actionable, independent claim.</u>

The *Smith* case (*supra*) holds that there is no cause of action for "failure to warn" when the alleged missing warning is effectively "do not buy this product because it is defectively designed." In response, Plaintiffs may argue Ford is liable for failure to warn separate and apart from the design defect claim by failing to warn the Plaintiffs *post-sale*, i.e., after the sale of the subject truck in November 2007 and up until the time of the accident, as Ford allegedly learned more information about its "defective roof" after 2007.

Oregon courts have rejected this argument, holding that "'[a]n initial failure to warn prior to the first sale of the [product]' that merely continues after the date of the sale" is not an actionable failure to warn that is separate and apart from the products liability claim.  *Kambury v. DaimlerChrysler Corp.*, 185 Or. App. 635, 642, 60 P.3d 1103 (Or. App. 2003 (quoting *Sealey v. Hicks*, 309 Or. 387, 399, 788 P.2d 435, *cert denied*, 498 U.S. 819, 111 S.Ct. 65, 112 L.Ed.2d 39 (1990), partially overruled on other grounds by *Smothers v. Gresham Transfer, Inc.*, 332 Or. 83, 123, 23 P.3d 333 (2001)).  *Kambury*, like this case, was a products liability action against an automotive manufacturer.  Plaintiffs alleged that the decedent's death was caused by the defective deployment of the vehicle's airbag.  As in this case, the plaintiffs alleged that the automotive manufacturer failed to warn of the defective nature of the airbag both at the time of purchase and on a continuing basis up to and including the time of the accident.  185 Or. App. at 640.  Relying on *Sealey* and another Oregon Supreme Court case, *Erickson Air-Crane Co. v. United*

DEFENDANT FORD MOTOR COMPANY'S MOTION FOR PARTIAL SUMMARY JUDGMENT ON PLAINTIFFS' MANUFACTURING, FAILURE TO WARN, AND PUNITIVE DAMAGES CLAIMS - Page 20
(6:23-cv-01366-AA)

GORDON REES SCULLY MANSUKHANI, LLP
1300 SW Fifth Avenue, Suite 2000
Portland, OR 97201
Telephone: (503) 222-1075
Facsimile: (503) 616-3600

*Technologies Corp.*, 303 Or. 281, 735 P.2d 614, the court held that the plaintiffs had failed to allege an actionable claim for post-sale failure to warn:

> Reading *Sealey* and *Erickson*[60] together, we hold that "[a]n initial failure to warn prior to the first sale of the [product]" that merely continues after the date of the sale is not sufficient to state a claim independently of ORS 30.900. *See Sealey*, 309 Or. at 399, 788 P.2d 435. At a minimum, the complaint must allege "a failure to warn at some later date after the product's defect was discovered," *id.*, or some other negligent act that occurs after the date of purchase, *Erickson*, 303 Or. at 289, 735 P.2d 614. In this case, the amended complaint does not allege that defendants discovered a defect after the decedent purchased the car but failed to warn her of that defect, nor does it allege, as the complaint did in *Erickson*, that some other negligent act occurred after the product was sold. Rather, the complaint alleges only that defendants failed to warn decedent before she bought the car and that that initial failure continued until the date of her death.

185 Or.App. at 642-43.

The Plaintiffs here quite clearly allege that Ford knew of the defective roof structure when it sold the subject truck to the Plaintiffs. As in *Kambury* and *Sealey*, Plaintiffs do not allege that Ford discovered the roof defect after the sale of the vehicle, thus giving rise to an independent cause of action for post-sale failure to warn; rather, they simply allege that Ford continued to fail to warn about a defect Ford already knew about. And unlike *Erickson*, Ford did not undertake to provide any warnings (incorrect or otherwise) to the Plaintiffs after the sale of the subject truck. Accordingly, Plaintiffs' cause of action of post-sale failure to warn is not actionable.

---

[60] As explained by the *Kambury* court, in *Erickson*, the Oregon Supreme Court found that a distinguishable post-sale cause of action for failure to warn existed where, ten years after the sale of the product, the manufacturer undertook to supply instructions for the use of the product to the purchaser, and the product failed when the purchaser followed the manufacturer's incorrect post-sale instructions. 185 Or.App. at 641. *Erickson* is distinguishable here because Ford did not make any post-sale representations to Plaintiffs about the roof of the subject vehicle.

DEFENDANT FORD MOTOR COMPANY'S MOTION FOR PARTIAL SUMMARY JUDGMENT ON PLAINTIFFS' MANUFACTURING, FAILURE TO WARN, AND PUNITIVE DAMAGES CLAIMS - Page 21
(6:23-cv-01366-AA)

**GORDON REES SCULLY MANSUKHANI, LLP**
1300 SW Fifth Avenue, Suite 2000
Portland, OR 97201
Telephone: (503) 222-1075
Facsimile: (503) 616-3600

*F.*     *Ford is entitled to summary judgment on all punitive damages claims.*

In order to avoid summary judgment, Plaintiffs must show that a reasonable juror could find, under a "clear and convincing" evidentiary standard, that Ford's conduct in analyzing the connection between roof strength and the risk of occupants' head and neck injuries was "malicious" or "indifferent." No reasonable juror could find this was so. As detailed in Ford's summary judgment evidence, in analyzing the causal relationship between roof strength and occupant injuries, Ford conducted testing, published and studied peer-reviewed literature, analyzed real-world crash data, developed its own internal standard for Super Duty roof strength where no federal standard existed, and shared its findings with the applicable regulatory body, NHTSA, in 2001. If Ford's conduct had been "malicious" or "indifferent," it would have done none of these things. The fact that Ford did these things negates Plaintiffs' punitive damages claim.

1.     Standard for recovery of punitive damages.

In Oregon, punitive damages are "a penalty for conduct that is culpable by reason of motive, intent, or extraordinary disregard of or indifference to known or highly probable risks to others." *Andor by Affatigato v. United Air Lines, Inc.*, 303 Or. 505, 517 (1987). To award punitive damages, a defendant's "degree of culpability" must be "greater than inattention or simple negligence." *Badger v. Paulson Inv. Co., Inc.*, 311 Or. 14, 28 (1991). This standard is codified in ORS 31.730(1), which provides that punitive damages may be awarded only when "clear and convincing evidence" shows the defendant "acted with malice or has shown a reckless and outrageous indifference to a highly unreasonable risk of harm and has acted with a conscious indifference to the health, safety and welfare of others." This is a stringent standard that makes

**GORDON REES SCULLY MANSUKHANI, LLP**
1300 SW Fifth Avenue, Suite 2000
Portland, OR 97201
Telephone: (503) 222-1075
Facsimile: (503) 616-3600

punitive damages available only for conduct that goes "beyond mere carelessness to a willful or reckless disregard of a risk of harm to others of a magnitude evincing a high degree of social irresponsibility." *Schmidt v. Pine Tree Land Dev.*, 291 Or. 462, 631 P.2d 1373, 1375 (Or. 1981).

Evidence that a defendant's conduct potentially fell below the applicable standard of care does not meet this test. Evidence that may be sufficient to create a triable issue of fact on the underlying claim may still be insufficient to meet the more stringent requirement for punitive damages. *See Fontaine v. Provident Mut. Life Ins. Co. of Philadelphia*, 10 Fed. Appx. 415, 419 (9th Cir. Mar. 19, 2001) ("Although Fontaine's evidence is sufficient to raise a triable issue that Provident acted unreasonably in terminating benefits, it is not sufficient to raise a triable issue with respect to whether clear and convincing evidence shows Provident is guilty of oppression, malice or fraud."); *Thompson ex rel. Thorp Family Charitable Remainder Unitrust v. Federico*, 324 F. Supp. 2d 1152, 1171 (D. Or. 2004) (denying summary judgment as to the underlying claims but granting summary judgment as to punitive damages because the evidence submitted was sufficient to create a question of fact as to underlying liability but not the more stringent standard that applies to punitive damages).

        2.       <u>The Court must apply the "clear and convincing evidence" standard in evaluating whether a genuine issue of fact on punitive damages exists.</u>

In *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242 (1986), the Supreme Court stated "we are convinced that the inquiry involved in ruling on a motion for summary judgement... necessarily implicates the substantive evidentiary standard of proof that would apply at the trial on the merits." *Id.* at 252, 106 S.Ct. at 2512. That is, according to the *Anderson* Court, the evidentiary burden of

DEFENDANT FORD MOTOR COMPANY'S MOTION FOR PARTIAL SUMMARY JUDGMENT ON PLAINTIFFS' MANUFACTURING, FAILURE TO WARN, AND PUNITIVE DAMAGES CLAIMS - Page 23
(6:23-cv-01366-AA)

**GORDON REES SCULLY MANSUKHANI, LLP**
1300 SW Fifth Avenue, Suite 2000
Portland, OR 97201
Telephone: (503) 222-1075
Facsimile: (503) 616-3600

the party opposing the summary judgment is to be considered by the judge in ruling on the motion. The Supreme Court instructed that "in ruling on a motion for summary judgment, the judge must view the evidence presented through the prism of the substantive evidentiary burden.... The question ... is whether a jury could reasonably find either that the plaintiff proved his case by the quality and quantity of evidence required by the governing law or that he did not." *Anderson*, 477 U.S. at 254 (emphasis in original).

The Ninth Circuit has repeatedly confirmed that the heightened evidentiary burden applies to a party opposing summary judgment. *See, e.g., Justice v. Rockwell Collins, Inc.*, 720 Fed. Appx. 365, 367 (9th Cir. 2017); *Fontaine v. Provident Mut. Life Ins. Co. of Philadelphia*, 10 Fed. Appx. 415, 419 (9th Cir. 2001); *L.A. Gear California, Inc. v. Gen. Am. Life Ins. Co.*, 129 F.3d 126 (9th Cir. 1997); *In re First All. Mortgage Co.*, 471 F.3d 977, 998-99 (9th Cir. 2006). *See also Schreiber v. Plum Creek Timber Co. Inc.*, 77 F.3d 490 (9th Cir. 1996) (affirming summary judgment on a fraud claim, which also required proof under the clear and convincing standard, because "the evidence Schreiber has submitted would not allow a jury to find the elements of a fraud claim by clear and convincing evidence.").

The Oregon Federal District Court has also repeatedly applied this heightened evidentiary burden on summary judgment motions directed at punitive damages. *See, e.g., Pirv v. Glock, Inc.*, CV 06-145 PK, 2010 WL 11579455, at *15 (D. Or. July 19, 2010); *Paugh v. King Henry's, Inc.*, No. 04-763, 2005 WL 1565112 (D. Or. June 30, 2005); *Thompson ex rel. Thorp Family Charitable Remainder Unitrust v. Federico*, 324 F. Supp. 2d 1152, 1170-71 (D. Or. 2004); *Goschie v. JP Morgan Chase Bank, N.A.*, 6:10-CV-06424-AA, 2014 WL 6064783, at *9 (D. Or. Nov. 7, 2014).

DEFENDANT FORD MOTOR COMPANY'S MOTION FOR PARTIAL SUMMARY JUDGMENT ON PLAINTIFFS' MANUFACTURING, FAILURE TO WARN, AND PUNITIVE DAMAGES CLAIMS - Page 24
(6:23-cv-01366-AA)

**GORDON REES SCULLY MANSUKHANI, LLP**
1300 SW Fifth Avenue, Suite 2000
Portland, OR 97201
Telephone: (503) 222-1075
Facsimile: (503) 616-3600

3. <u>Plaintiffs cannot produce clear and convincing evidence that Ford acted maliciously or with indifference to the risk of injury due to roof deformation.</u>

Based on past cases with Plaintiffs' counsel, Ford is well-aware of what they will contend is their "clear and convincing evidence" supposedly creating a fact issue on punitive damages. It is neither clear, not convincing. Worse, most of it is not even admissible. The key "safety issue" is whether there is a causal relationship that establishes that reinforcing the roof prevents injuries, typically to the head and neck, in rollover crashes. Does that causal relationship exist? Was that relationship proven? When was it proven and uniformly accepted by the industry and federal government, if ever? Was that design knowledge, if it existed, flagrantly disregarded, to the extent that not making a much stronger roof was beyond the pale of accepted automobile design?

*a. There was no applicable standard to disregard.*

To begin, there was no federal roof strength standard applicable to the 2008 Ford F-350, given its weight classification. FMVSS 216, the federal roof strength standard, did not apply to the 2008 F-350. Hence, this is not a case involving the flagrant and repeated violation of a safety regulation. In other words, Plaintiffs are in the impossible position of first proving the existence of a roof strength standard that did not exist and then proving by clear and convincing evidence that every manufacturer who did not comply with that non-existent standard should be punished.

*b. Expert testimony cannot "buy" a punitive damage claim.*

One cannot "buy" a punitive damage case merely by paying an expert a lot of money. *See Ivy v. Ford Motor Co*., 646 F.3d 769, 777 (11th Cir. 2011) (because vehicle satisfied tests deemed proper by government agency, the fact that plaintiff retained an after-the-fact expert to opine on

DEFENDANT FORD MOTOR COMPANY'S MOTION FOR PARTIAL SUMMARY JUDGMENT ON PLAINTIFFS' MANUFACTURING, FAILURE TO WARN, AND PUNITIVE DAMAGES CLAIMS - Page 25
(6:23-cv-01366-AA)

**GORDON REES SCULLY MANSUKHANI, LLP**
1300 SW Fifth Avenue, Suite 2000
Portland, OR 97201
Telephone: (503) 222-1075
Facsimile: (503) 616-3600

one side of that debate did not create a fact issue for the jury to decide). If the rule were otherwise, every case would involve punitive damages, diluting their exceptional nature.

The proof necessary to impose punitive damages must come from the defendant who is sought to be punished. Again, the so-called "safety issue" is whether roof deformation causes injuries in a rollover crash. What Plaintiffs will not tell the Court is that they have *no evidence* that roof deformation causes severe injuries in a rollover crash and that the very best they can do is reference studies that conclude that occupants are hurt in rollover crashes, and in some severe rollover crashes, the roof is deformed; hence, the deformed roof caused those injuries. This of course is a classic logic fallacy.

        *c.*      *Allegations in lawsuits filed by legal advocates are not evidence.*

The bulk of Plaintiffs' "proof" that roof deformation causes injuries in rollover crashes comes not from any peer-reviewed and published crash study, but instead from self-serving allegations penned by attorneys in lawsuits just like this one. But that proof is not even admissible. The lawsuit allegations in this case are not "proof" of anything and the fact another attorney in another case made or more likely copied the same allegations is likewise not "proof." Every plaintiff's response when so confronted is to argue that the allegations are at least "notice." But the flaw in that argument is exposed by just asking "notice" of what? Is it "notice" that some attorney, hired as an advocate for a client, made allegations that may or may not be true? Worse, the "notice of what" response *requires that the Court assume the allegations are "true," something the rule against admitting hearsay forbids*. Undaunted, plaintiffs will show that there are *a lot of lawsuits*. A whole lot of inadmissible evidence does not become admissible just because there is

DEFENDANT FORD MOTOR COMPANY'S MOTION FOR PARTIAL SUMMARY JUDGMENT ON PLAINTIFFS' MANUFACTURING, FAILURE TO WARN, AND PUNITIVE DAMAGES CLAIMS - Page 26
(6:23-cv-01366-AA)

**Gordon Rees Scully Mansukhani, LLP**
1300 SW Fifth Avenue, Suite 2000
Portland, OR 97201
Telephone: (503) 222-1075
Facsimile: (503) 616-3600

more of it, a point the Texas Supreme Court recognized years ago. *Nissan Motor Co. v. Armstrong*, 141 S.W.3d 131 (Tex. 2004) ("To sum up, product defects must be proved; they cannot simply be inferred from a large number of complaints. If the rule were otherwise, product claims would become a self-fulfilling prophecy -- the more that are made, the more likely all must be true.").

Inadmissible hearsay allegations from legal advocates is not, and never has been, sufficient proof to authorize punitive damages. Whether a connection exists between roof deformation and severe injuries in rollover crashes must be proven. Lawyers are not crash safety engineers.

> d.     *Plaintiffs lack testing of their own and their criticisms of Ford's testing falls flat.*

Plaintiffs will next say Ford did not do "physical testing," on the 2008 F-350 roof and did not conduct any "dynamic testing" of the roof. They will say that Ford's failure to do so is necessarily proof of a flagrant disregard of the safety risk created by not building a stronger roof. So stated, the argument flaws are too many to list.

Plaintiffs will never tell the Court what is "proper testing." "Dynamic testing," unless performed under defined parameters, is not repeatable and offers no assistance in making design decisions. Modern use of computer added engineering (CAE), however, allows repeated test runs, without building a new vehicle each time. And that is the approach Ford took, which was the accepted approach, then and now.

Plaintiffs will complain of the lack of physical FMVSS 216 testing, but again, FMVSS 216 did not apply to this vehicle. Notably, Plaintiffs will not argue that had the roof of their truck met FMVSS 216, Juan Yraugen would have not suffered any injury.

DEFENDANT FORD MOTOR COMPANY'S MOTION FOR PARTIAL SUMMARY JUDGMENT ON PLAINTIFFS' MANUFACTURING, FAILURE TO WARN, AND PUNITIVE DAMAGES CLAIMS - Page 27
(6:23-cv-01366-AA)

**Gordon Rees Scully Mansukhani, LLP**
1300 SW Fifth Avenue, Suite 2000
Portland, OR  97201
Telephone: (503) 222-1075
Facsimile:  (503) 616-3600

To be sure, much testing was conducted by Ford and others with instrumented crash dummies, and the results of those studies peer-reviewed and published. Vehicle type does not make a difference. The issue is roof strength. If Plaintiffs' argument is correct, then we should see increased head and neck injuries across all lines of vehicles, because all have the same or similar roof strength. Likewise, if Plaintiffs are right, vehicles with relatively stronger roofs should reflect lower head and neck injuries in rollover crashes. But the field data collected by the federal government shows none of that. Hence, the reference to no testing *on this vehicle*, while untrue, is largely beside the point. The relationship between roof deformation and head and neck injuries in rollover crashes has been repeatedly examined using a variety of vehicles, using matched pair testing—an OEM roof compared to a rigid or reinforced roof. The results are the same. A roll cage does not prevent the injurious contact which occurs *before significant roof deformation*.[61]

Lastly, Plaintiffs will say Ford was on notice that the 2008 F-350 roof strength did not meet Ford's *internal* targets. This argument is not much better than the first. Even if we assume for sake of argument that is true, which it is not, the failure to meet internal targets, without more, is *not* evidence of intentional or flagrant disregard *unless* the difference in the target roof strength is proven that it would have prevented severe injuries, including head and neck injuries, in rollover crashes just like this one, and that Ford knew it. Again, that proof does not exist. Once again Plaintiffs will omit telling the Court the rest of the story—they will never concede that had Ford met *that target* it would have been a "safe" level of roof strength, let alone prevented Juan Yraugen's injuries in this accident.

---

[61] *See supra* "Undisputed Facts" section.

DEFENDANT FORD MOTOR COMPANY'S MOTION FOR PARTIAL SUMMARY JUDGMENT ON PLAINTIFFS' MANUFACTURING, FAILURE TO WARN, AND PUNITIVE DAMAGES CLAIMS - Page 28
(6:23-cv-01366-AA)

**GORDON REES SCULLY MANSUKHANI, LLP**
1300 SW Fifth Avenue, Suite 2000
Portland, OR  97201
Telephone: (503) 222-1075
Facsimile:  (503) 616-3600

4. Ford's evidence negates the claim that Ford acted with "malice" or was "indifferent" to the risk of injury due to roof deformation.

   a. *What nearly 40-years of crash studies show.*

In the relevant timeframe, the industry-recognized crash studies examining the relationship between significant roof deformation and head and neck injuries in rollover crashes were the Malibu and CRIS studies. Ford employee Michael Leigh described the internal Ford process of reviewing and analyzing crash testing, accident field data, and peer-reviewed published scientific literature regarding the relationship between roof deformation and occupant injury causation in rollover accidents."[62] Those crash studies included Malibu and CRIS.[63] The crash studies showed a alack of causal relationship between roof deformation and head and neck injuries in a rollover crash.[64]

   b. *What Ford told NHTSA.*

The best evidence of what anyone "knows," or whether they acted in flagrant disregard of a known and recognized safety risk is what they publicly tell others. In October 2001, NHTSA requested comments on potential changes to FMVSS 216.[65] As part of his job responsibilities in Ford's Automotive Safety Office (ASO), Michael Leigh was responsible for gathering Ford's knowledge on the subject and preparing Ford's response to that request for comment.[66] A publicly available December 4, 2001 letter on Ford letterhead describes exactly what Ford knew.[67]

---

[62] Affidavit of Michael Leigh ¶ 10.
[63] *Id.* ¶¶ 10, 16, 18.
[64] *Id.* ¶ 11.
[65] *Id.* ¶ 12
[66] *Id.*
[67] Affidavit of Michael Leigh, attachment A (12/6/01 letter from Ford to NHTSA).

DEFENDANT FORD MOTOR COMPANY'S MOTION FOR PARTIAL SUMMARY JUDGMENT ON PLAINTIFFS' MANUFACTURING, FAILURE TO WARN, AND PUNITIVE DAMAGES CLAIMS - Page 29
(6:23-cv-01366-AA)

**GORDON REES SCULLY MANSUKHANI, LLP**
1300 SW Fifth Avenue, Suite 2000
Portland, OR 97201
Telephone: (503) 222-1075
Facsimile: (503) 616-3600

Ford *told* NHTSA that obviating roof/pillar deformation by using a roll cage structure, while maintaining the same roof-to-ground impact environment, does not change the occupant impact or inherent injury potential risk.[68] Ford *told* NHTSA that it reached that conclusion based on the Malibu I and Malibu II studies, crash data, and published peer-reviewed articles on the subject.[69] As Michael Leigh explained, "CRIS confirmed that there is not an established causal connection between significant roof deformation and occupant injury."[70] And on December 4, 2001, Ford *told* NHTSA that, even in cases of severe roof/pillar deformation, the injury mechanism must be analyzed considering the severity of the impact, the duration of the impact, and the timing of the injury relative to the deformation.[71] Ford *told* NHTSA that was true for all vehicles.[72]

Ford supported its conclusions, citing a study of 60,758 single rollover accidents, where the researchers found no relationship between roof strength-to-weight ratio and the risk of severe injury.[73] The basis for that knowledge was a published peer-reviewed article authored by E. A. Moffett and J. Padmanaban in 1995.[74]

None of the above is even disputed. There was no contrary proof. There was no response to Ford's letter to NHTSA, debunking any of the data or crash studies identified in that letter, much less the conclusions of the crash studies and conclusions drawn from the government collected accident data.

---

[68] Affidavit of Michael Leigh ¶ 13.
[69] *Id.* ¶¶ 11-17.
[70] *Id.* ¶ 19.
[71] *Id.* ¶ 15.
[72] *Id.*
[73] *Id.* ¶ 17.
[74] *Id.*

DEFENDANT FORD MOTOR COMPANY'S MOTION FOR PARTIAL SUMMARY JUDGMENT ON PLAINTIFFS' MANUFACTURING, FAILURE TO WARN, AND PUNITIVE DAMAGES CLAIMS - Page 30
(6:23-cv-01366-AA)

**GORDON REES SCULLY MANSUKHANI, LLP**
1300 SW Fifth Avenue, Suite 2000
Portland, OR 97201
Telephone: (503) 222-1075
Facsimile: (503) 616-3600

Ford was not indifferent to the question of whether severe roof deformation can cause head and neck injuries in rollover accidents. Even after 2001, Ford continued to investigate that relationship by conducting further crash studies that only validated the earlier conclusions from Malibu and CRIS.[75] Indeed, the drop testing of inverted vehicles with reinforced roofs and ROCS tests confirms the conclusions of the Malibu and CRIS studies. Michael Leigh summed up the results opining that the "[l]ater testing using a dynamic rollover component test system ("ROCS") further confirmed the original conclusions reached by researchers involved in the Malibu I and Malibu II and CRIS research."[76] Far from ignoring the issues, Ford extensively studied it. Plaintiff does not like those results, but merely disagreeing with the science is not a foundation for a punitive damage claim.

5. Ford is entitled to summary judgment on Plaintiffs' punitive damages claim.

On the "safety issue" that matters and lies at the core of the claims in this case, Plaintiff does not even have a colorable case, let alone a "clear and convincing" one, that Ford's conduct rose to the level necessary to award punitive damages under Oregon law: "malice" or "indifference." The proof is absent, as is the proof that Ford's roof strength targets, when compared to other heavy-duty trucks, were outside the norm. To the contrary, testing of competitive trucks showed the opposite. Of the competitive vehicles, the Ford Super Duty truck was the strongest. In other words, Plaintiffs' punitive damage argument applies to all

---

[75] *Id.* ¶ 19.
[76] *Id.*

DEFENDANT FORD MOTOR COMPANY'S MOTION FOR PARTIAL SUMMARY JUDGMENT ON PLAINTIFFS' MANUFACTURING, FAILURE TO WARN, AND PUNITIVE DAMAGES CLAIMS - Page 31
(6:23-cv-01366-AA)

**Gordon Rees Scully Mansukhani, LLP**
1300 SW Fifth Avenue, Suite 2000
Portland, OR 97201
Telephone: (503) 222-1075
Facsimile: (503) 616-3600

manufacturers of heavy-duty trucks in 2008, equally. That is not an exceptional case warranting punitive damages.

## IV. Conclusion.

For the foregoing reasons, Ford respectfully requests that the Court grant summary judgment on Plaintiffs' manufacturing claims, "failure to warn" claims, and punitive damages claims.

Dated: October 15, 2024    GORDON REES SCULLY MANSUKHANI LLP

            By:   */s/ Nancy M. Erfle*
            Nancy M. Erfle, OSB No. 902570
            nerfle@grsm.com
            Laura S. Polster, OSB No. 172007
            lpolster@grsm.com

            Snell & Wilmer, LLP
            Vaughn A. Crawford (*pro hac vice*)
            vcrawford@swlaw.com
            Craig Logsdon (*pro hac vice*)
            clogsdon@swlaw.com

            Huie, Fernambucq & Stewart, LLP
            Paul F. Malek (*pro have vice*)
            pmalek@huielaw.com

            *Attorneys for Defendant Ford Motor Company*

DEFENDANT FORD MOTOR COMPANY'S MOTION FOR PARTIAL SUMMARY JUDGMENT ON PLAINTIFFS' MANUFACTURING, FAILURE TO WARN, AND PUNITIVE DAMAGES CLAIMS - Page 32
(6:23-cv-01366-AA)

**GORDON REES SCULLY MANSUKHANI, LLP**
1300 SW Fifth Avenue, Suite 2000
Portland, OR 97201
Telephone: (503) 222-1075
Facsimile: (503) 616-3600

## Certificate of Compliance

This brief complies with the applicable word-count limitation under LR 7-2(b) because it contains 9,115 words, including headings, footnotes, and quotations, but excluding the caption, table of contents, table of cases and authorities, signature block, exhibits, and any certificates of counsel.

*/s/ Nancy M. Erfle*
Nancy M. Erfle

DEFENDANT FORD MOTOR COMPANY'S MOTION FOR PARTIAL SUMMARY JUDGMENT ON PLAINTIFFS' MANUFACTURING, FAILURE TO WARN, AND PUNITIVE DAMAGES CLAIMS - Page 33
(6:23-cv-01366-AA)

**GORDON REES SCULLY MANSUKHANI, LLP**
1300 SW Fifth Avenue, Suite 2000
Portland, OR 97201
Telephone: (503) 222-1075
Facsimile: (503) 616-3600

Certificate of Service

I hereby certify that on this 15th day of October, 2024, a true and correct copy of the foregoing document, was sent electronically to the below registered participants as identified on the Notice of Electronic Filing.

Hala J. Gores, OSB No. 890489
HALA J. GORES, P.C.
1332 SW Custer Drive
Portland, OR 97219
hala@goreslaw.com
Sabrina@goreslaw.com

James E. Butler, Jr. Georgia Bar No. 099625
jim@butlerprather.com
Ramsey B. Prather, Georgia Bar No. 658395
ramsey@butlerprather.com
Daniel E. Philyaw, Georgia Bar No. 877765
dan@butlerprather.com
Allison B. Bailey, Georgia Bar No. 478434
allison@butlerprather.com
BUTLER PRATHER LLP

*Attorneys for Plaintiffs*

PO Box 2766
Columbus, GA 31902

cc: Kim McCallister,
kim@butlerprather.com;
Beth Glen, beth@butlerprather.com;
Sarah Andrews, sarah@butlerprather.com;
Nick Giles, nick@butlerprather.com;

Judy Snyder, OSB No. 732834
LAW OFFICES OF JUDY SNYDER
4248 Galewood Street
Lake Oswego, OR 97035
judy@jdsnyder.com
cc: erin@jdsnyder.com

*/s/ Gabrielle Oyarzun*
Gabrielle Oyarzun
goyarzun@grsm.com

**GORDON REES SCULLY MANSUKHANI, LLP**
1300 SW Fifth Avenue, Suite 2000
Portland, OR 97201
Telephone: (503) 222-1075
Facsimile: (503) 616-3600