Hala J. Gores, Oregon Bar No. 890489
hala@goreslaw.com
Hala J. Gores, P.C.
The Gores Building
1332 S.W. Custer Drive
Portland, OR 97219
503-295-1940

James E. Butler, Jr., Bar No. 099625 (*pro hac vice*)
jim@butlerprather.com
Ramsey B. Prather, Bar No. 658395 (*pro hac vice*)
ramsey@butlerprather.com
Daniel E. Philyaw, Bar No. 877765 (*pro hac vice*)
dan@butlerprather.com
Allison B. Bailey, Bar No.478434 (*pro hac vice*)
allison@butlerprather.com
BUTLER PRATHER LLP

Judy Danelle Snyder, OSB No. 732834
judy@jdsnyder.com
LAW OFFICES OF JUDY SNYDER

*Attorneys for Plaintiffs*

## UNITED STATES DISTRICT COURT

## DISTRICT OF OREGON

## EUGENE DIVISION

| | | |
|---|---|---|
| JUAN & KRIS YRAGUEN | * | Case No. 6:23-cv-01366AA |
| | * | |
| Plaintiffs, | * | PLAINTIFFS' RESPONSE TO |
| | * | DEFENDANT FORD MOTOR |
| v. | * | COMPANY'S MOTION FOR PARTIAL |
| | * | SUMMARY JUDGMENT |
| FORD MOTOR COMPANY, | * | |
| | * | |
| Defendant. | * | |
| | * | REQUEST FOR ORAL ARGUMENT |

# TABLE OF CONTENTS

Table of Contents.............................................................................................................ii

Index of Authorities.........................................................................................................ii

I.     Introduction.......................................................................................................1

II.    Summary Judgement Standard ..........................................................................1

III.   Statement of Material Facts...............................................................................2

    A.  Ford's Dangerously Weak Roof Paralyzed Juan Yraguen................................2

    B.  The Dangerously Weak "Super Duty" Roof....................................................2

        1.  Ford Knowingly Designed, Manufactured, and Sold the "Super Duty" with a Weak and Untested Roof Structure, Which Ford Weakened Far Below Minimum Roof Strength Standards So Ford Could Save Money...........................................................2

        2.  Ford Chose Not to Use Its Own Substantially Stronger and Viable Roof Design That Would Save Lives on the Subject 2008 F350 "Super Duty" ................7

    C.  Ford Knew Roof Crush Causes Deaths and Injuries ......................................10

    D.  Ford Continues to Tell the Public That It's "Super Duty" Trucks Are Absolutely Safe" and Continues to Deny That They Are Dangerous..............................14

IV.   Argument and Citation to Authority ................................................................15

    A.  Punitive Damages……....................................................................................15

        1.  Overwhelming Evidence Creates Genuine Issues of Material Fact that Ford Acted with Reckless and Outrageous Indifference to the Safety of Consumers When Designing *and* Failing to Warn About the Dangers of the "Super Duty" Roof ...............................................................................15

    B.  Failure to Warn................................................................................................24

        1.  Post Sale Duty to Warn Under Oregan Common Law................................24

        2.  Pre-Sale Failure to Warn...........................................................................30

        3.  Causation.................................................................................................33

V.    Conclusion......................................................................................................34

# TABLE OF AUTHORITIES

**Cases**                                                                   **Page(s)**

*Andor by Affatigato v. United Air Lines, Inc.*
    303 Or. 505, 739 P.2d 18 (1987).................................................... 15, 16

*Bartlett v. MacRae,*
    54 Or. App. 516, 635 P.2d 666 (1981) ...................................................34

*Breeding v. Massey*
    378 F.2d 171, 178 (8th Cir. 1967) ............................................... 33

*Chafin v. Chafin*
    568 U.S. 165, 133 S. Ct 1017 (2013) ....................................................1

*Cole v. Builders Square*
No. CV99-729-ST, 2001 WL 204761 (D. Or. Jan. 8, 2001) ....................................21

*Crosswhite v. Jumpking Inc.*
411 F. Supp. 2d 1228 (D. Or. 2006) ...................................................................34

*Durham v. County of Maui*
692 F. Supp. 2d 1256 (D. Haw. 2010) .................................................................24

*Dupper v. General Motors Corp*
887 F.2d 1089 (9th Cir. 1986).............................................................................31

*Erickson Air–Crane Co. v. United Technologies Corp.*
303 Or. 281, 735 P.2d 614 (1987) ....................................................25, 27, 31, 34

*Ford Motor Company v. Trejo*
133 Nev. 520, 402 P.3d 649 (2017) .....................................................................29

*Hinzman v. Foremost Insurance Company*
No. 6:22-cv-01798-AA, 2024 WL 1329036 (D. Or. March 28, 2024) (Aiken, J.) ............... 1

*Jane Doe 130 v. Archdiocese of Portland in Oregon*
717 F. Supp. 2d 1120 (D. Or. 2010)....................................................................16

*Kambury v. Daimlerchrysler Corp.*
185 Or. App. 635, 60 P.3d 1103 (2003)...............................................................30

*McMullen v. Volkswagen of America*
274 Or. 83, 545 P.2d 117 (1976) ........................................................................21

*Port of Portland v. Monsanto Company*
No. 3:17-CV-00015-PK, 2017 WL 4236561 (D. Or. Sept. 22, 2017) ……...24, 25, 26, 30, 31

*Port of Portland v. Monsanto Company*
No. 3:17-CV-15-PK, 2017 WL 9098079 (D. Or. Apr. 18, 2017) ………………...........24, 26

*Rojas v. Yamaha Motor Corp.*
No. 17CV31444, 2021 WL 6142756 (Sep. 17, 2021)........................................... 32

*Rodriguez-Medina v. Nissan Motor Co. Ltd*
No. 15CV08227, 2016 WL 11646620 ...............................................24, 25, 26, 27, 30

*Sealey v. Hicks*
309 Or. 387, 788 P.2d 435 (1990) .................................................................26, 27

*Smith v. Fred Meyer*
    70 Or. App. 30, 687 P.2d 1128 (1984) ....................................................30, 31, 32

*Waddill v. Anchor Hocking, Inc*
    190 Or. App. 172, 78 P.3d 570 (2003)....................................................22, 31

*Warner v. Stryker Corp*
    No. CIV. 08-6368-AA, 2011 WL 5999339 (D. Or. Nov. 28, 2011) ...................................23

*Wohl v. Spalding & Evenflo Companies, Inc.,*
    136 Or. App. 503, 901 P.2d 292 (1995) ………....................................................21

## RULES

FMVSS 216....................................................3, 8, 9, 12, 19

FRCP 8(d)(2) ....................................................32

## STATUTE

49 U.S.C.A. § 30103....................................................21

ORS § 31.730....................................................15

49 C.F.R. § 571.216....................................................9, 12

ORS § 30.900....................................................31

ORS § 30.900(1)(2) ....................................................30, 31, 32, 33

## I.    INTRODUCTION

Not long ago, Plaintiff Juan Yraguen was the thriving President and CEO of a family business in Sutherlin that employed dozens of Oregonians.  Like the defectively weak Ford roof that broke his neck, that all came crashing down on May 11, 2022.  That day, Mr. Yraguen was paralyzed when the roof on his 2008 Ford F350 "Super Duty" truck crushed down and broke his spine after the truck slid on black ice and rolled over.  Mr. Yraguen now requires assistance with all basic activities of daily living.  His beloved wife of thirty-five years, Plaintiff Kris Yraguen, is his primary caregiver.  The toll this roof crush has exacted on the Yraguens, their family, their business, and their employees borders the unimaginable.

Defendant Ford moves for *partial* summary judgment on the Yraguens' claims for punitive damages and failure to warn.[1]  Ford does *not* move for summary judgment on Plaintiffs' defective and negligent design claims.  As to the arguments Ford makes, genuine issues of material fact abound so Ford's motion should be denied.

Just today, a federal District Court in Georgia rejected virtually the same arguments Ford makes against a punitive damages award in another "Super Duty" rollover/roof crush case that killed two people.  *Brogdon (Mills) v. Ford*, No. 23-CV-88 (CDL), ECF 177 at 8-11 (M.D. Ga.).

## II.    SUMMARY JUDGMENT STANDARD

This Court has set forth the summary judgment standard on many occasions. *See, e.g., Hinzman v. Foremost Insurance Company*, No:22-cv-01798-AA, 2024 WL 1329036 (D. Or.

---

[1] Ford also seeks partial summary judgment on any "defective or negligent *manufacturing*" claims, but Plaintiffs have made no such claims.  Plaintiffs assert claims for defective and negligent *design*, failure to warn, and punitive damages.  No count in Plaintiffs' Complaint states a claim for defective or negligent "manufacturing."  There is nothing for the Court to rule on regarding this contention of Ford. *Chafin v. Chafin*, 568 U.S. 165, 172 (2013) (courts should not decide questions "that cannot affect the rights of litigants in the case before them" (quotations and citation omitted)).

March 28, 2024) (Aiken, J.). Summary judgment must be denied if the evidence, construed in the light most favorable to the non-moving parties, shows there are genuine issues of material fact. *See id.* "All reasonable doubt as to the existence of a genuine issue of fact should be resolved against the moving party." *Id.*

### III.    STATEMENT OF MATERIAL FACTS[2]

#### A. Ford's dangerously weak roof paralyzed Juan Yraguen.

On November 13, 2007, Ford sold the subject 2008 F350 "Super Duty" it designed and manufactured to Basco Logging, Inc.,[3] the Yraguens' family business, through Ford's dealer in Oregon. Mr. Yraguen was paralyzed on May 11, 2022, when the roof crushed down and broke his cervical spine after the truck slid on black ice and rolled over.[4]

#### B. The dangerously weak "Super Duty" roof.

#### 1. Ford knowingly designed, manufactured, and sold the "Super Duty" with a weak and untested roof structure, which Ford weakened far below minimum roof strength standards so Ford could save money.

From model year 1999–2016, Ford sold three generations of its so-called "Super Duty" trucks. The first generation was model year 1999–2007 (known internally to Ford by the abbreviation "P131"), the second generation was model year 2008–2010 ("P358"), and the third generation was model year 2011–2016 ("P473"). Ford itself claims that its model year 1999–

---

[2] The exhibits cited herein are attached to the Declaration of Ramsey B. Prather, filed contemporaneously with this brief on CM/ECF. The abbreviation "Ex." means an exhibit to this response brief. The abbreviation "PX" means "Plaintiff's Exhibit."

[3] Ex. 1, 11/13/2007 Motor Vehicle Purchase Agreement; ECF 6, ¶¶ 34–35.

[4] Ex. 2, Arndt Report at 13; Ex. 3, Rep. of Treating Neurosurgeon Dr. Raymond Tien at 2 ("I can state to a reasonable medical probability that the cause of his injury was roof crush. A claim that 'diving' caused this injury is inconsistent with the fact he was seat belted and the extent of the roof intrusion."); Ex. 4, Dr. Ziejewski Rep. at 25.

2016 "Super Duty" trucks (Ford F250s, F350s, F450s, and F550s) all utilize the same roof design, which Ford refers to as a "carryover" architecture.[5]

During Ford's design and development of the "Super Duty" roof, Ford did not perform any real-world rollover testing of the roof structure.[6]  Ford contends it utilized only Computer Aided Engineering ("CAE") design models *to estimate* the roof strength.  Ford claims it is "unable to locate any CAE model which would have been utilized" to evaluate the roof crush resistance of the roofs.[7]

What remains of the CAE modeling is a 1996 "Analytical Sign-Off" document, showing Ford set a theoretical roof strength target of 10,500 pounds for its "Super Duty" Crew Cab trucks.[8]  IF CAE modeling was actually done, the roof fell below that roof strength target.[9] Ford never did any testing of the kind required by federal regulations to validate its purported CAE model or to physically assess the strength of the "Super Duty" roof.[10]

---

[5] Ex. 5, Ford's Initial Disclosures at 3–4; *id.* at 10.

[6] Ex. 6, Testimony of Steve Kozak, Ford Global Chief Safety Engineer from 2003–2011 (*Hill v. Ford Motor Company*, Case No. 16-C-04179-S2 (State Court of Gwinnett County, Georgia) 2022 Trial Tr. Vol. 10, 1232:10–14) ("Q Isn't it true that Ford Motor Company itself never conducted a rollover crash test on a 1999 through 2016 Super Duty truck? A I'm not aware of Ford Motor Company testing in that manner.").

[7] Ex. 7, PX 184 at 49–50 (#177).

[8] Ex. 8, PX 210a at 3 (showing a target of 10,500 pounds for the Crew Cab style, the same style as Mr. Yraguen's F350).

[9] *Id.* (showing the theoretical roof strength of the Crew Cab was 10,484 lbs.).

[10] Ex. 7, PX 184, *Hill v. Ford* Ford's Resp. to Pls.' Request for Admissions at 46, 49 (#161 and #174) (admitting Ford did no FMVSS 216 testing to validate the CAE modeling done by Ford and admitting Ford did no drop testing to assess the roof strength of the P131).

But the roof Ford claims to have used CAE modeling on was not the final roof design Ford used in the "Super Duty" trucks it sold. The production "Super Duty" roof was *much, much weaker.*

That's because around the time Ford was completing its CAE modeling, Ford executives prioritized measures to "improve the ['Super Duty'] financial equation" and reduce Ford's production costs.[11] Ford then systematically reduced the thickness of the metal in "Super Duty" roof structure components—and removed some roof structure components altogether—from the design for which Ford claims it did CAE modeling.[12] Ford did so to save money.[13] Ford repeatedly "downgauged" the thickness of the A-pillar (the structural support post on both sides of a vehicles' windshield that connects the roof to the body).[14] Ford then "downgauged" the front header and roof bows (metal beams spanning across the truck).[15] Ford removed the "front

---

[11] Ex. 9, PX 181; Ex. 10, Testimony of Carl Zaas, *Hill* 2022 Trial Tr. Vol. 8, 1056:11–1057:3, 1057:15–1058:17.

[12] Ex. 11, Herbst Rep. at 24 (summarizing downgauging history).

[13] *Id.*

[14] Ex. 12, PX 185, 09/15/98 Concern Detail ("Down gage A-pillar by 2% from 2.4 mm to 2.35 mm for a cost savings of 70 cents per vehicle"); Ex. 13, PX 186, 06/18/98 Concern Detail ("Down gage A-pillar from 2.35 mm to 2.2 mm" and redesign door hinge "for cost savings $3.88 per average vehicle savings."); Ex. 14, PX 188, 08/23/99 Concern Detail ("Down gage A-pillar reinforcement from 2.1 mm to 2.0 mm" and "cost savings per piece - $0.20"); Ex. 10, Testimony of Carl Zaas (*Hill* 2022 Trial Tr. Vol. 8, 1012:19–22).

[15] Ex. 7, PX 184 at 28, 30 (#98 and #104) (downgauge of roof bow from 1.0 mm to 0.74 mm and downgauge of front header from 1.2 mm to 1.07 mm); Ex. 15, PX 189, 08/04/99 Concern Detail ("Down gage front header, and SC/CC roof bows" for cost savings of $0.17 and $0.05 per piece).

header outer" (a beam that helps support the windshield).[16]  Ford made the decision not to use a stronger boron steel for vertical beams.[17]

Shockingly, Ford *did not do any physical testing* to determine the effect all those changes had on roof strength.[18]  Ford never performed *any* physical testing on the roofs of the "Super Duty" trucks after downgauging these parts.[19]  In sum, Ford designed a weak roof, did not physically test its strength/weakness, weakened that roof further, and then did not do any roof strength testing before selling the trucks to the public.

Ford's own documents prove the heavy "Super Duty" had the weakest roof in Ford's entire fleet of cars and trucks.[20]  The "Super Duty" roof had a strength-to-weight ratio ("SWR") of a mere 1.1.[21]  SWR is the measure of roof strength comparing the weight a vehicle's roof can withstand to the weight of the vehicle.  The roof strength of the "Super Duty" was far below the federal *minimum* roof strength standard (1.5 SWR).[22]  It was far below Ford's own supposed roof

---

[16] Ex. 16, PX 182, 06/23/96 Concern Detail (deleting "front header outer" from roof design); *see also* Ex. 10, Testimony of Carl Zaas, *Hill* 2022 Trial Tr. Vol. 8, 1012:12–15

[17] Ex. 17, PX 222 12/02/96 Concern Detail (replacing boron steel with mild steel for a cost savings of $20.86 per vehicle).

[18] Ex. 7, PX 184 at 30, 34, 40 (#103, no testing to determine effect of downgauging roof bow; #117, no testing to determine effect of deleting front outer windshield header; #139, no testing to determine effect of downgauging metal in A-pillar).

[19] Ex. 18, Testimony of Ford engineer Sal Caruso, *Hill* 2022 Trial Tr. Vol. 8, 1055:6–10; *see also* Ex. 19, *Hill v. Ford* Ford's Resp. to 1st Request for Admissions at 51 (#182).

[20] Ex. 20, PX 164a (Ford's internal roof strength chart showing that "Super Duty" had weakest roof in Ford's entire fleet and identifying the SWR as a mere 1.25).

[21] Ex. 21, PX 114 ("The P131 vehicle considered in this study weigh[ed] 8,000 lb. and had a roof strength of 8,900 lb."); Ex. 22, *Hill* 2022 Trial Tr. Vol. 9, 1122:7–1123:24.

[22] Ex. 11, Herbst Rep. at 21. The Super Duty was exempt from this standard until 2016.

strength standard (1.8 SWR).[23]  It was far below Ford's roof strength standard for vehicles sold

under Ford's Volvo brand (3.5 SWR (Ford owned Volvo from 1999–2010)).[24]  And it was far

below the independent Insurance Institute for Highway Safety's ("IIHS") standard for "good"

roof strength (4.0 SWR).  With an SWR of 1.1, the "Super Duty" roof strength is *way below*

what IIHS calls "poor."[25]  Ford has admitted the "Super Duty" roof would not pass a Federal

Motor Vehicle Safety Standard ("FMVSS") 216 roof strength test.[26]

　　　　Ford's decision to weaken the roof to save money (so-called "cost containment") saved

Ford hundreds of millions of dollars, increasing Ford's profits.[27]  Despite Ford engineers'

admissions that the roof "could have been designed stronger,"[28] and testimony from Ford's

corporate representative that Ford could have made stronger roofs for these model year 1999-

2016 "Super Duty" trucks for about $100 per vehicle,[29] *Ford did not do so until model year*

*2017*, thereby increasing Ford's profits by some $550 million.[30]

---

[23] Ex. 23, PX 154 at 1; Ex. 22, Testimony of Ford engineer Jason Balzer, *Hill* 2022 Trial Tr. Vol. 9, 1123:25–1124:13.

[24] Ex. 23, PX 154 at 1; Ex. 24, Testimony of Chris Eikey, *Hill* 2022 Trial Tr. Vol. 18, at 2532:22–25.

[25] Ex. 11, Herbst Report at 19. Under IIHS' rating system, "[f]or an acceptable rating, the minimum required [SWR] is 3.25.  A marginal rating value is 2.5.  Anything lower than that is poor." Ex. 25, PX 170.

[26] Ex. 26, Testimony of Ram Krishnaswami, *Hill* 2022 Trial Tr. Vol. 10, 1292:4–8.

[27] Ex. 9, PX 181; Ex. 27, *Hill* 2022 Trial Tr. Vol. 23, 3377:22–3380:21.

[28] Ex. 18, Testimony of Ford engineer Sal Caruso, *Hill* Trial Tr., Vol. 8, 995:16–997:9.

[29] Ex. 26, Testimony of Ram Krishnaswami, *Hill* 2022 Trial Tr. Vol. 10, 1287:5–11.

[30] Ex. 28, PX 1B (showing Ford sold more than 5.5 million Super Duty trucks).

**2. Ford chose not to use its own substantially stronger and viable roof design that would save lives on the subject 2008 F350 "Super Duty".**

In the early 2000s, the National Highway Traffic Safety Administration ("NHTSA") notified automakers that it was considering increasing the federal minimum standards for roof strength.[31] Ford lobbied hard against that. Ford also lobbied to keep its "Super Duty" trucks exempt from the federal minimum standard.[32] In 2004, when it appeared NHTSA might end that exemption, Ford considered evading the federal minimum standard by increasing the weight of the "Super Duty" trucks so they would not have to comply.[33] Then in January 2005, Ford assembled a team of Ford engineers for what it called the "Enhanced Roof Strength Program *for* Super Duty Trucks" ("ERSP").[34] The purpose of the ERSP was to "[d]ramatically improve[] roof strength performance for truck cab structures."[35] Ford executives were involved with and monitored the development of the ERSP roof.[36]

Within a matter of months, Ford's engineers designed a new "Super Duty" roof with "greatly increased roof crush resistance" and the ability to withstand multiple impacts in a

---

[31] Ex. 11, Herbst Rep. at 40.

[32] Ex. 29, *Hill* 2022 Trial Tr. Vol. 12, 1541:3–10.

[33] Ex. 30, PX 141a.

[34] Ex. 31, PX 135; Ex. 32, *Hill* Trial Tr. Vol. 9, 1108:4–6 ("Q The ERSP team was designing a new stronger roof for the Super Duty trucks; correct? A Correct.").

[35] Ex. 31, PX 135.

[36] Ex. 33, Deposition of Former Ford VP of Global Product Development Derrick Kuzak 14:24–15:3 (referring to Ex. 34, PX 665).

dynamic rollover event.[37]  By December 2005, a test of the ERSP roof showed it could withstand 30,000–37,000 pounds of force.[38]  The ERSP roof was more than *four times* stronger than the roof Ford *later* installed on Mr. Yraguen's 2008 truck.  The final ERSP roof had the ability to withstand at least 45,000 pounds of force.[39]  That ERSP roof could support a "Super Duty" lying on its roof *plus* three competitor-class trucks stacked on top.[40]  As a result of the ERSP, Ford management knew *by 2005* that a much stronger roof *could be built* for the "Super Duty" trucks.[41]  And by September 2006, the ERSP roof was ready for implementation, "exceed[ing] all performance expectations while delivering the FMVSS 216 safety requirements, with manufacturing viability.[42]

Ford did not install the ERSP roof design in *any* of its model year 1999–2016 "Super Duty" trucks.  Ford continued to sell its heavy "Super Duty" trucks with a defectively weak roof for *10 years* after the ERSP roof project was concluded; in fact, Ford made no change to the

---

[37] Ex. 31, PX 135; Ex. 22, Testimony of Jason Balzer, *Hill* 2022 Trial Tr. Vol. 9, 1139:21–1140:3; Ex. 38, PX 133.

[38] Ex. 35, PX 139 at 1–2.

[39] Ex 36, PX 146 (noting max load for Alpha 2 test 45,000 lbs); Ex. 37, PX 149 (photo of truck after Alpha 2 test); Ex. 32, Testimony of Ford engineer Joseph Weishaar, *Hill* 2022 Trial Tr. Vol. 9, 1187:12–1188:4.

[40] Ex. 38, PX 133 at 13; Ex.22, Testimony of Jason Balzer, *Hill* 2022 Trial Tr., Vol. 9, 1113:4–23.

[41] Ex. 22, Testimony of Jason Balzer, *Hill* 2022 Trial Tr. Vol. 9, 1125:11–14; *id*. at 1125:24–1126:2.

[42] Ex. 39, PX 132, Gateway Review Implementation Readiness for Enhanced Roof Strength Project at 1, 3; Ex. 40, PX 113 at 1.

"Super Duty" roofs until NHTSA finally required FMVSS 216 compliance for heavier passenger vehicles.[43]

Ford did, however, implement the ERSP design in its *light* duty F150 platform in 2009.[44] That substantially increased the SWR of the F150's roof.[45]  Ford then boasted about the safety the F150's new "high-strength safety cage structure" and "high-strength steel" roof bows and roof rails.[46]

The safety benefits of increased roof strength and the ERSP roof design were made crystal clear in a series of rollover tests performed for Ford in 2008-2009 and 2015.  In 2008-2009, Ford paid a company called Autoliv to conduct rollover tests on the "Super Duty" trucks. The jaw-dropping test photos showed how the roof could not withstand real-world rollover forces[47] and predicted the structural failures that later occurred in Mr. Yraguen's crash.[48]  Ford received photos, videos, and test reports from this testing, but did nothing.  Then, in 2015, Autoliv conducted rollover testing on the redesigned F150 trucks, as well as model year 2017

---

[43] 49 C.F.R. 571.216a (mandating compliance for vehicles with a gross vehicle weight rating of 6,000 lbs. after September 1, 2016); Ex. 22, Testimony of Jason Balzer, *Hill* 2022 Trial Tr. Vol. 9, 1108:19–22 (Q Isn't it true, sir, that Ford management did not put the ERSP designed stronger roof in the Super Duty trucks until 2017? A '17 -- yeah, that was launched last year, so yes.").

[44] Ex. 40, PX 113 at 1; Ex. 22, Testimony of Jason Balzer *Hill* 2022 Trial Tr. Vol. 9, 1107:15–22 (referencing PX 131).

[45] Ex. 11, Herbst Rep. at 25.

[46] Ex. 42, PX 229 at 2.

[47] *See, e.g.,* Ex.43, PX 255.

[48] *See* Ex. 11, Herbst Rep. at 46 (Figure 34) (photos comparing structural damage of an Autoliv test vehicle to Mr. Yraguen's F350).

"Super Duty' trucks with substantially stronger roof structures.[49]  Those tests showed that the stronger roof structures minimized roof intrusion into the occupant compartment.[50]

### C.  Ford knew roof crush causes deaths and injuries.

Ford has long known of the critical connection between roof crush and injuries.  As early as 1968, Ford knew "people *are* injured by roof collapse" and that "it is a significant number."[51]  In 1970, a Ford safety engineering evaluation stated that "buckling failures" in the roof "result in a possible head injury producing object."[52]  In 1987, a Ford Light Truck Safety Design Guideline Strategy stated that it is necessary for "the roof structure to minimize the risk of restrained occupant injury" and recommended "establishing a guideline that exhibits criteria proportionately better than the [FMVSS] 216 requirements."[53]

In 2000, Ford authorized the publication of a paper which outright stated "the crush resistance of roof structures is ***critical*** to minimizing injuries and enhancing occupant survival during rollover crashes."[54]  That paper was authored by a Ford "Crash Safety Technical

---

[49] Ex. 45, PX 81.

[50] Ex. 11, Herbst Rep. at 47.  The test videos also did not show any movement of the dummies consistent with so-called "diving"—the argument Ford has long made to try to excuse its weak roof designs. *Id.*

[51] Ex. 48, PX 100 at 2 (emphasis provided).

[52] Ex. 49, PX 173 at 2.

[53] Ex. 50, PX 448 at 13.

[54] Ex. 51, PX 50 at 1 (page 3 of PDF) (emphasis added).

Specialist" Ph.D. engineer who worked in Ford's "Crash Safety" department.[55] *Ford's*

*management and legal department reviewed and approved that paper before it was published*.[56]

Ford also knew through its Volvo division that decreasing roof deformation in a rollover

wreck decreased injury risk.  In August 2001, Ford and Volvo engineers met to discuss roof

strength.[57]  Volvo engineers repeatedly emphasized that *roof deformation **causes** occupant*

*injury*,[58] and even provided Ford with a copy of the Friedman & Nash paper, "Advanced Roof

Design for Rollover Protection," which makes clear that "structurally weak roofs are the primary

cause of serious head, face, and neck injuries" to occupants in rollovers, and the "theory that roof

strength is not relevant to occupant injury [presented in the Malibu studies upon which Ford

relies] is ***not valid***."[59]  The Volvo division's approach to roof strength also caused Ford's ERSP

---

[55] Ex. 52, Baccouche Dep. 16:9–17; 31:16–18. The Baccouche paper cited to articles *written by Plaintiffs' experts* Herbst and Meyer; it did not cite to *any* of the affiants or authors upon whom Ford relies for its "diving" argument. *Id*. 29:12-20; Ex. 51, PX 50 at 11. In its MPSJ, Ford contends "the best evidence of what anyone 'knows,' or whether they acted in flagrant disregard of a known and recognized safety risk is what they publicly tell others."  ECF 39 at 36.  This paper stating "the crush resistance of roof structures is ***critical*** to minimizing injuries and enhancing occupant survival during rollover crashes" was published with the Society of Automotive Engineers *for the public*, under Ford's imprimatur, with Ford's authorization.

[56] Ex. 51, PX 50 at 1; Ex. 52, Baccouche Dep., 14:7–14.

[57] Ex. 53, PX 752 at 1; *see also* Ex. 54, PX 260a.

[58] Ex. 54, PX 260a at 8 ("decrease deformation significantly to decrease the injury risk"), 9 ("bigger deformation give higher injury risk") ("There should be no contact between occupant and structure during the rollover sequence to minimize impact and crush injuries.  This is a prerequisite for good real life safety."); 10 ("there is a relation between amount of deformation and injury risk").

[59] Ex. 53, PX 752 at VCC4 0035 (emphasis added).

Team to pick the Volvo XC90 as the "benchmark" for the new roof the ERSP team designed for "Super Duty" trucks.[60]

Citing solely the Affidavit of Ford's frequent testifier Michael Leigh, [61] Ford argues that what it "knew" about the safety risks of roof crush is illustrated by his December 4, 2001 letter to NHTSA, in which Leigh supposedly "gather[ed]" Ford's knowledge on the subject, including information from the Malibu and CRIS studies." ECF 39 at 36–38. However, a Ford engineer who, unlike Leigh, actually worked on the "Super Duty" roof testified he knew nothing about the Malibu or CRIS tests when designing the roof.[62]

American regulators have long rejected Ford's argument that roof crush doesn't cause injuries. Since at least 1971, NHTSA has published information about the link between serious injuries and roof collapse.[63] *The stated purpose* of FMVSS 216 for roof crush resistance has always been "to reduce deaths and injuries due to the crushing of the roof into the occupant compartment in rollover crashes." 49 C.F.R. § 571.216. In 2005, when NHTSA proposed raising the minimum federal roof strength standards, it did so because it found "a statistically significant relationship between injury rates and instances in which the roof intruded below the occupant's normal seating height," and that "injury patterns were less serious in cases in which

---

[60] Ex. 38, PX 133 at 1, 2.

[61] Ex. 55, *Hill* 2022 Trial Tr. Vol. 22, 3187:15–18 (Leigh has testified for Ford 120 times).

[62] Ex. 18, Testimony of Sal Caruso, *Hill* 2022 Trial Tr. Vol. 8, 1040:2–16 (stating that from 1996–2000 when he was working on the "Super Duty" roofs he never heard of Malibu or CRIS, never saw a document referring to Malibu or CRIS, and never created a document referring to Malibu or CRIS).

[63] Ex. 56, PX 256 at 1–2, ("the strength of a vehicle roof affects the integrity of the passenger safety compartment and the safety of the occupants") ("serious injuries are more frequent when the roof collapses").

roof intrusion did not encroach on the pre-crash headroom of the occupant."[64]  In 2020, NHTSA

published an evaluation of its upgraded roof strength standards, stating:

> An occupant in a vehicle with a higher peak SWR is less likely to
> sustain a severe (i.e., fatal or incapacitating) injury when the
> occupant's vehicle rolls . . .  This means that a vehicle's stronger
> roof is associated with a higher survivability and lower chance to
> sustain an incapacitating injury in a rollover crash.[65]

The agency concluded emphatically: "*A stronger roof of a vehicle saves lives and prevents*

*incapacitating injuries in a rollover crash.*"[66]

Researchers and other institutions know and publicize that stronger roofs are directly

related to safety.  In a presentation to the U.S. Senate, IIHS stated that "increased vehicle roof

strength reduces the risk of fatal or incapacitating driver injury in single-vehicle rollover

crashes."[67]  Studies by IIHS have disproven the 1995 Moffat and Padmanaban papers to which

Ford and its affiants regularly cite.[68]  Many other researchers have similarly concluded that roof

strength is critical to protecting occupants from injuries in rollovers.[69]

Ford knew people were being killed, paralyzed, and injured by roof crush in its "Super

Duty" trucks prior to the sale of Mr. Yraguen's F350.  A 2006 Ford memo noted that a stronger

body structure was important because "customers are voicing their opinion in the court room

---

[64] Ex. 57, PX 233 at 49242.

[65] Ex. 58, PX 785A at 37.

[66] *Id*. at 41.

[67] Ex. 59, PX 176 at 15.

[68] *Id*. at 26.

[69] *See* Ex. 60, Meyer Rep. at 23–25 (citing seven papers).

with lawsuits," costing Ford millions of dollars in lost verdicts and settlements.[70] Ford has produced lists of lawsuits, filed both prior to and after the sale of Mr. Yraguen's F350, showing that it has received notice of *hundreds* of instances where the rollover and roof crush of a "Super Duty" truck resulted in occupant injury.[71] Plaintiffs' experts have studied these incidents and identified 114 incidents of Ford "Super Duty" rollovers involving severe roof crush in foreseeable conditions which resulted in catastrophic injury or death and have a high degree of similarity in the structural behaviors and failures to the roof of Mr. Yraguen's "Super Duty."[72]

### D. Ford continues to tell the public that its "Super Duty" trucks are "absolutely safe" and continues to deny that they are dangerous.

After the sale of Mr. Yraguen's F350, and even after the 2008-2009 Autoliv rollover tests irrefutably showing the "Super Duty" roof was defective, Ford continued to call the "Super Duty" trucks a "big, strong, beast of a truck" and to use the "Built Ford Tough" slogan.[73] A Ford advertisement for the "Super Duty" trucks even called them "muscular sheet metal wrapped around an incredibly strong structure," but said nothing about the flimsy roof.[74]

On August 19, 2022, a Georgia jury rendered a verdict against Ford for punitive damages in the amount of $1.7 billion in a case where a Ford "Super Duty" with the same roof crushed during a rollover and killed the two occupants.[75] Afterward, Ford publicly challenged the

---

[70] Ex. 38, PX 133, Balzer Memo.

[71] Ex. 61, PX 331, June 30, 2023 Lists of Lawsuits from Ford's Office of General Counsel.

[72] Ex. 11, Herbst Rep. at 49.

[73] Ex. 62, 2009 Super Duty Print Ad.

[74] Ex. 63, 2010 Super Duty Print Ad.

[75] Ex. 64, *Hill v. Ford* Phase II Verdict Form; Ex. 65, *Hill v. Ford* Judgment.

verdict, issuing statements to national media outlets claiming the verdict was not supported by the evidence.[76]

Amazingly, Ford continues to insist there is nothing at all wrong with the subject roofs. In his September 17, 2024, deposition, Ford's employee and expert witness, Ram Krishnaswami, testified in this case that "Ford has not changed its position" that the roofs of the "Super Duty" trucks are "absolutely safe."[77]

## IV.    ARGUMENT & CITATION TO AUTHORITY

### A.  PUNITIVE DAMAGES

**1.  Overwhelming evidence creates genuine issues of material fact that Ford acted with reckless and outrageous indifference to the safety of consumers when designing *and* failing to warn about the dangers of the "Super Duty" roof.**

Punitive damages are warranted if "it is proven by clear and convincing evidence that the party against whom punitive damages are sought has acted with malice or has shown a reckless and outrageous indifference to a highly unreasonable risk of harm and has acted with a conscious indifference to the health, safety and welfare of others. O.R.S. § 31.730; *see also Andor by Affatigato v. United Air Lines, Inc.*, 303 Or. 505, 517, 739 P.2d 18 (1987) ("conduct that is culpable by reason of motive, intent, or extraordinary disregard of or indifference to known or highly probable risks to others" may justify punitive damages).  "Oregon Supreme Court jurisprudence recognizes that no single formulation of the legal standard for award of punitive damages could apply to the entire range of cases in which punitive damages may be

---

[76] Ex. 66, *Georgia jury awards $1.7 billion in Ford F-250 truck crash*, CBS News, (August 22, 2022).  On November 1, 2024, the Georgia Court of Appeals reversed the trial court judgment from the *Hill* trial on grounds unrelated to this MPSJ and remanded the case for another trial.  The *Hill* plaintiffs will be filing a petition for certiorari to the Georgia Supreme Court.  Plaintiffs see no need to 'argue' about the Georgia Court of Appeals decision here.

[77] Ex. 67, Krishnaswami Dep. at 51:21–56:11.

appropriate[.]" *Jane Doe 130 v. Archdiocese of Portland in Oregon*, 717 F. Supp. 2d 1120, 1140–41 (D. Or. 2010). Instead, "the defendant's culpability may range from a deliberate purpose to cause harm to the plaintiff or to others regardless of gaining any benefit thereby, through an intent to harm the plaintiff or others in order to benefit oneself, and ***a readiness to benefit oneself with conscious indifference to or disregard of a known or highly probable risk of severe harm to others*** to a readiness to expose others to such risks without intending any countervailing benefit to anyone. (quoting *Andor*, 303 Or. at 510-11) (emphasis added).

Ford's conduct is utterly reprehensible. Motivated by financial gain, Ford systematically decreased the strength of the "Super Duty" roof to increase its profits, failed to confirm the roof strength after those decreases, failed to perform any physical test of the roof strength during design and development, then failed to use a much stronger roof its own ERSP engineers designed *for the "Super Duty" trucks,* all while burying its head in the sand to hundreds of notices Ford received that people were getting killed and maimed by roof crush.[78] Ford's conscious decisions resulted in a stunningly weak roof that would not meet federal minimum standards for roof strength, Ford's internal standards for roof strength, or come close to obtaining an "acceptable" rating for roof strength from IIHS.[79] Ford documents acknowledge its "Super Duty" trucks had outrageously weak roofs which Ford knew could injure occupants in rollovers but Ford sold them anyway—approximately 5.5 million of them over a 17-year period.[80] Ford could have fixed the problem by using a stronger roof for as little as $100 per vehicle.[81] But

---

[78] *See supra* notes 11-19, 34-43, and 70-72.

[79] *See supra* notes 21-25.

[80] *See supra* notes 20-21, 26, 28, 30, and 51-60.

[81] *See supra* note 29.

rather than shave a fraction off the *$25 billion* in profits Ford made from selling the "Super Duty" trucks"[82] Ford chose again and again not to utilize a stronger roof. When presented with a substantially stronger roof design for its "Super Duty" trucks (the ERSP roof) that "exceed[ed] all performance expectations" and had "manufacturing viability," Ford chose not to implement that design on its "Super Duty" trucks for ten years and did so only because the government mandated it.[83]

Ford also failed—at any time before or after the sale of Mr. Yraguen's vehicle—to warn consumers of the dangers of its "Super Duty" roofs. Ford refused to warn consumers, despite being presented with photographic and video evidence showing the total collapse of "Super Duty" roofs during rollover tests by a component supplier, and being notified of problems in its roofs via *hundreds* of lawsuits and customer complaints.[84] Instead, Ford marketed the "Super Duty" with advertisements giving consumers a false sense of confidence about the safety of their vehicles, asserting its trucks were "tough," "strong," and had "an incredibly strong structure."[85] Notwithstanding all of the evidence, Ford continues to insist these trucks are "absolutely safe."[86]

Ford omits this appalling evidence from its brief. Rather than have the Court evaluate the totality of its conduct, Ford attempts to shift the debate to only its "conduct in analyzing the connection between roof strength and the risk of occupants' head and neck injuries."[87] This

---

[82] Ex. 28, PX 1B (showing $25 billion in profit before tax from sales of "Super Duty" trucks).

[83] *See supra* notes 41-43.

[84] *See supra* notes 47-50 and 70-72 and accompanying text.

[85] *See supra* notes 73-74.

[86] *See supra* note 77.

[87] ECF 39 at 29.

reframing is no help to Ford. Ford documents spanning decades, including documents from its Volvo division and the article Ford approved for publication by its own "Crash Safety Technical Specialist" Ph.D. engineer, show Ford knew that "people are injured by roof collapse" and that roof crush resistance is "critical to minimizing injuries."[88] Publications from NHTSA, IIHS, and researchers also show it has long been well-known that roof crush causes injuries.[89]

Ford relies almost exclusively on the affidavits of Michael Leigh and Chris Eikey. Leigh works, and Eikey formerly worked, in the Ford department that "supports [Ford's] product liability actions" and "provides support to [Ford's] Office of General Counsel when [Ford] gets sued."[90] Together, the pair have testified for Ford approximately 210-220 times.[91] Leigh has never been a roof structure engineer; has never designed a roof structure component for Ford; and had no involvement with the design, testing, sign-off, or setting of internal roof strength requirements for the "Super Duty."[92] Similarly, Eikey did not work on the model year 1999-2016 "Super Duty" truck programs and was not a member of the ERSP team.[93] Eikey now works for a

---

[88] *See supra* notes 51-60.

[89] *See supra* notes 63-69.

[90] Ex. 55, *Hill* Trial Tr. Vol. 22, 3193:14–3194:4.

[91] Ex. 55, *Hill* Trial Tr. Vol. 22, 3187:15-18 (Leigh 120 times); Ex. 68, 09/18/2024 Eikey Dep. 17:19–18:14 (Eikey 90–100 times).

[92] Ex. 55, *Hill* 2022 Trial Tr. Vol. 22, 3188:11-18, 3189:7–22.

[93] Ex. 24, *Hill* 2022 Trial Tr. Vol. 18, 2477:2–8; 2477:23–2478:6.  Ford's affiants offer hearsay statements, as neither has personal knowledge of the development of the Super Duty trucks or ERSP roof. *U.S. v. Vera*, 770 F.3d 1232 , 1237 (9th Cir. 2014) ("an expert exceeds the bounds of permissible expert testimony . . . when he 'is used as little more than a conduit or transmitter for testimonial hearsay"). *See, e.g.,* ECF 39-3, Leigh Aff. at ¶ 10 ("Ford considered and relied upon available crash testing, field data, and published peer-reviewed literature in connection with the design and development of the 2008 F-350 Super Duty . . .")

consulting firm, where he continues to testify frequently for Ford as a paid witness, including in this case.[94]

Ford argues Leigh's December 6, 2021 letter to NHTSA is an indisputable talisman of what Ford supposedly "knew" about injury causation. In reality, it is nothing more than part of Ford's efforts to lobby NHTSA not to raise roof strength standards, and the letter *ignores information Ford knew before it was sent*.[95] For example, Leigh's letter ignores the 2000 paper published by Ford's crash safety engineer with Ford's approval stating that "the crush resistance of roof structures is critical to minimizing injuries."[96] Leigh's letter also ignores the Friedman and Nash paper *Advanced Roof Design for Rollover Protection*, which refutes the validity of the "Malibu" tests cited in Leigh's letter and was supplied to Ford by its Volvo division in August 2001 *four months before Leigh wrote his letter to NHTSA*.[97]

In addition to being disproven by the general body of scientific literature, the papers Ford and its affiants cite in support of the made-for-litigation contention that "injurious contact occurs before significant deformation" of the roof are the product of consultants paid for by Ford and the automotive industry. For example, three authors of the "CRIS" paper Ford touts were employed by the firm Exponent Failure Analysis Associates, to which Ford paid more than $155 million to between 1996 and 2017.[98] Jeya Padmanaban, a contributing author on one of the

---

[94] ECF 39-2, ¶¶ 2, 5.

[95] ECF 39-3 at 5, ¶¶ 12–13 (stating that the letter was Ford's response to NHTSA's requests for comments on potential changes to FMVSS 216.

[96] *See supra* notes 54-56.

[97] *See supra* notes 57-60.

[98] Ex. 69, PX 268 at 3.

papers Leigh's letter cites, testified Ford paid her $4-5 million dollars over just a two year span "for litigation-related work."[99] Kenneth Orlowski, a contributing author on four papers Leigh's letter cites (including both the "Malibu" and "CRIS" tests) and whose "work is primarily for auto manufacturers or their attorneys," has testified that he has done consulting work for Ford in "around 50 cases."[100]  Ford accuses Plaintiffs of "buy[ing]" their punitive damages claim.[101] In reality, Ford bought its punitive damages 'defense.'

Ford also tries to excuse its conduct by contending that it "continued to investigate the relationship" between roof deformation and injuries through later testing, including drop testing and "ROCS" testing, and claims these tests validated Ford's earlier conclusions.[102]  These made-for-litigation tests are not persuasive.  Putting aside that these tests did not replicate real-world rollovers, studies published by NHTSA and IIHS continued to conclude just the opposite—roof crush does cause serious injuries to vehicle occupants in rollovers.[103]

 Ford's actions speak louder than its words. If Ford really believed the contention Ford and its testifiers make in litigation that vehicle occupants fall out of their seats during rollovers and "dive" into the roof,[104] then Ford could have designed and sold an occupant restraint system

---

[99] Ex. 70, Excerpt 07/13/2021 Dep. of Jeya Padmanaban 20:19–21:15 (*Piacenza v. Ford Motor Company et al.*, Case No. 15L592 (Circuit Court of the 19th Judicial District, Lake County, Illinois).

[100] Ex. 71, Excerpt of 03/01/2109 Dep. of Kenneth Orlowski 56:22–24, 58:13–59:2 (*Locy v. Ford Motor Company et al.,* Case No. 15-CV-823 (Circuit Court Branch 3, Outagamie, Wisconsin).

[101] ECF 39 at 32.

[102] ECF 39 at 38.

[103] *See supra* notes 64-68.

[104] ECF 39 at 16 ("the occupant moves toward the ground. It's physics.").

that prevented "diving."[105] Ford did not do so. What Ford did do–eventually but belatedly–was increase the strength of its vehicle's roofs.[106]

Ford also argues there is no genuine issue of fact for the jury because Ford complied with a non-existent *minimum* safety standard set by the federal government. However, both federal and Oregon law make clear that adherence to a federal agency's minimum standards does not exempt a corporate defendant from common law liability. The federal statute is explicit: "Compliance with a motor vehicle safety standard prescribed under this chapter does not exempt a person from liability at common law." 49 U.S.C.A. § 30103(e). Oregon law echoes this and reinforces it. *Wohl v. Spalding & Evenflo Companies, Inc.*,136 Or. App. 503, 508, 901 P.2d 929 (1995); *McMullen v. Volkswagen of America*, 274 Or. 83, 545 P.2d 117 (1976).

A defendant who manufactures or sells a product it knows or should know is dangerous demonstrates the type of behavior that punitive damages *are intended to deter*. *Cole v. Builders Square*, No. CV99-729-ST, 2001 WL 204761, at *5 (D. Or. Jan. 8, 2001), *aff'd in part, rev'd in part, dismissed in part sub nom.*, 48 Fed. App'x 684 (9th Cir. 2002). Ford cannot dodge punitive damages merely by claiming adherence to minimum standards.

Ford also asserts that "the bulk of Plaintiffs' 'proof' that roof deformation causes injuries in rollover crashes" comes from "self-serving allegations penned by attorneys in lawsuits."[107] This is obviously untrue. But Ford's contention that "lawsuit allegations" "are not 'proof' of anything" defies Oregon law (which is perhaps why Ford cites only one case—*a Texas case*). Lawsuits, and other similar incidents generally involving injuries caused by "Super Duty" trucks,

---

[105] Ex. 60, Meyer Rep. at 20.

[106] *See supra* notes 44-46 and 49-50 and accompanying text.

[107] ECF 39 at 33.

show that Ford was on notice of dangers that its product poses to consumers. *Waddill v. Anchor Hocking, Inc.*, 190 Or. App. 172, 183, 78 P.3d 570 (2003); *Cole*, 2001 WL 204761, at *7 ("Cole seeks to introduce these lawsuits in support of a punitive damages claim as evidence of a continuing course of deliberate indifference to a known danger. As such, these lawsuits are relevant evidence and admissible.").

Lists maintained by Ford and pried from Ford over years of litigation show there have been some 285 lawsuits and claims like this one—roof crush in a rollover involving a 1999–2016 "Super Duty" truck with substantially similar roofs.[108] The enormous volume of these claims is further evidence Ford knew of the dangers posed by the roofs of its "Super Duty" trucks.

*Finally*, Ford tries its best come up with excuses for its lack of physical testing during the design and development of the Super Duty roof. For example, Ford contends that "Plaintiffs will never tell the Court what is [the] 'proper testing'" it should have done when designing the Super Duty roof.[109] However, Plaintiffs experts have made clear that "[a] combination of static roof crush tests, drop tests, and dolly rollover tests should have been conducted on production level vehicles to develop a comprehensive understanding of the performance of the roof structure and to ensure it was capable of protecting occupants in rollover crashes."[110]

Ford's disregard for safety is not only demonstrated by its failure to perform physical tests in the first instance. It is also demonstrated by Ford's subsequent downgauging and removal

---

[108] Ex. 61, PX 331.

[109] ECF 39 at 27.

[110] Ex. 11, Herbst Rep. at 45.

of roof structures, *changes which were not physically tested and not reflected in Ford's 1996 CAE model.*[111]

Ford also asserts that its failure to meet its internal roof strength targets does not demonstrate its intentional or flagrant disregard for safety unless it is proven that achieving the target roof strength would have prevented severe injuries.[112] Ford's assertion is nonsense. The very fact that Ford set a roof strength target and supposedly had an internal roof strength standard proves Ford's own acknowledgement that roof strength *does* matter. If it did not, why set a target and standard in the first place? Also, the fact that Ford's Super Duty trucks had, according to Ford's own engineers and as shown in Ford's own documents, a 1.1 SWR proves Ford knew and just did not care that its design missed its *extremely low* internal standard of 1.8 SWR by a significant margin.[113]

Ford's motion for summary judgment on Plaintiffs' punitive damages claims should be denied. Plaintiff's evidence shows Ford's designed a pitifully weak "Super Duty" roof and that Ford failed to warn consumers about the known immense risk of injury posed by these weak roofs. Plaintiffs' evidence shows Ford undertook this course of action and placed millions of Americans at danger of being killed, paralyzed or injured by roof crush in a "Super Duty" for the worst reason imaginable—to increase Ford's profits. Genuine issues of material fact abound regarding whether Ford acted with conscious indifference to or disregard of a known or highly probable risk of severe harm to others and is liable for punitive damages. *See Warner v. Stryker Corp.*, No. CIV. 08-6368-AA, 2011 WL 5999339, at *2 (D. Or. Nov. 28, 2011) (Aiken, J.)

---

[111] *See supra* notes 11-19.

[112] ECF 39 at 35.

[113] *See supra* note 21 and 23.

(finding genuine issues of material fact regarding manufacturer's knowledge of risks associated with using pain pump to administer local anesthetics and denying defendant's motion for summary judgment on punitive damages); *Brogdon (Mills) v. Ford*, No. 23-CV-88 (CDL), ECF 177 at 8-11 (M.D. Ga. Nov. 5, 2024); *Durham v. County of Maui*, 692 F. Supp. 2d 1256 (D. Haw. 2010) (denying Ford's motion for summary judgment on punitive damages where the evidence showed Ford knew side vehicle impacts caused deaths and injuries, Ford could have installed side airbags for $100 per vehicle, Ford put side airbags in other vehicles, and Ford's failure to install side airbags was a marketing decision).

## B.  FAILURE TO WARN

### 1.  <u>Post-Sale Duty to Warn under Oregon Common Law</u>

Ford had a duty to warn Mr. Yraguen about the dangers of the weak roof *after* Ford sold the truck in November 2007.  As Judge Immergut, Judge Mosman, and Magistrate Judge Papak have all recently held, when a product manufacturer receives "new reports" or learns "new information" about the dangers of a product after selling the product, that triggers the product manufacturer's ***post***-sale duty to warn, under Oregon common law.  *See, e.g., Rodriguez-Medina v. Nissan Motor Co. Ltd.*, No. 15CV08227, 2016 WL 11646620, at *1 (Or. Cir., Multnomah County Sep. 16, 2016) (Immergut, J.); *Port of Portland v. Monsanto Company*, No. 3:17-CV-00015-PK, 2017 WL 4236561, at *10 (D. Or. Sept. 22, 2017) (Mosman, J.); *Port of Portland v. Monsanto Company*, No. 3:17-CV-15-PK, 2017 WL 9098079, at *12 n. 5 (D. Or. Apr. 18, 2017) (Papak, M.J.) (Report and Recommendations).  The post-sale duty to warn arises when the

product manufacturer receives "new reports" or learns "new information" *regardless* of whether there is evidence the product manufacturer was aware of the defect before the sale.[114]  *See id.*

In 2016, Judge Immergut addressed this issue head-on *in an auto products liability case at the summary judgment stage* while she was on the Multnomah County Circuit Court.  In *Rodriguez-Medina v. Nissan Motor Co., Ltd.*, Judge Immergut held that when there is evidence that an automaker receives "new reports" of a defect after the sale of the subject car or truck, these "new reports" "are sufficient to put [the automaker] defendant[] on notice and create[] *a new duty* to investigate and warn" following the sale.  *Rodriguez-Medina*, 2016 WL 11646620, at *1 (emphasis added) ("I conclude that it is an issue of fact whether or not Nissan was negligent in failing to investigate and warn based on those post-2004 reports").[115]  That *post*-sale duty to warn arises under Oregon *common law*—it is independent from a statutory claim for *pre*-sale failure to warn under ORS § 30.900.  *See Erickson Air-Crane Co. v. United Technologies Corp.*, 303 Or. 281, 289, 735 P.2d 614 (1987); *see also Port of Portland*, 2017 WL 4236561, at *7.

In *Port of Portland v. Monsanto Company*, Magistrate Judge Papak held that "a claim for post-sale negligence" exists under Oregon common law when "*both before and after*" a manufacturer "ceased manufacturing and selling" the allegedly defective product, the

---

[114] Ford *denies* it knew the so-called "Super Duty" roofs were defective prior to the sale.  Ford contends the trucks are "absolutely safe."  Ex. 67, Krishnaswami Dep. at 51:21–56:11.  Because Ford denies knowledge of a defect in those roofs *to this day*, there is a disputed issue of material fact as to when Ford acquired that knowledge.  Ford can't rely on allegations in Plaintiffs' complaint as a basis for seeking summary judgment when Ford denies those allegations.

[115] In *Rodriguez-Medina*, there was no dispute Nissan had knowledge of the defect *before* the sale.  The plaintiff admitted that in summary judgment briefing.  *See* Br. of Pl. Opposing Nissan's MSJ in *Rodriguez-Medina v. Nissan Motor Co., Ltd.*, 2016 WL 11646574 (Or. Cir.) (6/16/2016) (stating the defendants "had that duty [to warn] before sale, when the reports admitted above were received—but they also had that duty after sale, when the reports continued.").

manufacturer "*learned more and more* about the health and safety risks posed by [the product] without disclosing its knowledge *to its customers*, *to the public generally*, or to the government." 2017 WL 9098079, at *12 n. 5 (Report and Recommendations) (emphasis added). He concluded that an allegation that the manufacturer "learned *more* about the health and safety risks posed by the [product] *in the 1980s*, *after* [the manufacturer] allegedly sold off the last of its stock of [the product], without disclosing those risks" was "clearly sufficient to state a claim for post-sale negligence" under Oregon's common law failure to warn. *Id.* (emphasis added). Magistrate Judge Papek held that, under Oregon negligence law, a product manufacturer can be held liable for a ***post-sale*** failure to warn even if the manufacturer had knowledge of the dangers of the product before the sale *if* the manufacturer "learn[s] *more* about the health and safety risks posed" by the product *after* the sale. *Id.* at *12 n. 5 (emphasis added).

Judge Mosman affirmed that part of Magistrate Judge Papak's ruling in *Port of Portland v. Monsanto.* He held the product manufacturer's contention that it could not be held liable for a *post*-sale failure to warn was "*meritless*." 2017 WL 4236561, at *10 (emphasis added). As Judge Mosman explained, a ***post***-sale duty to warn arises under Oregon common law when, after the sale, a product manufacturer "learn[s] new information about the health and safety risks" of the product but does not warn consumers about the product. *Id.*

When issuing their respective orders in *Rodriguez-Medina* and *Port of Portland*, Judge Immergut, Judge Mosman, and Magistrate Judge Papak were well aware of the three cases Ford cites in its motion to contend Ford had no post-sale duty to warn about the dangerously weak roofs in the so-called "Super Duty" trucks.[116]  Those three cases, which were all decided on

---

[116] Those cases are *Sealey By and Through Sealey v. Hicks*, 309 Or. 387, 788 P.2d 435, 441 (Or. 1990), *Kambury v. DaimlerChrysler Corp.*, 185 Or. App. 635, 642, 60 P.3d 1103 (2003), and *Erickson Air–Crane Co. v. United Technologies Corp.*, 303 Or. 281, 286, 735 P.2d 614 (1987).

motions to dismiss (*not motions for summary judgment*), were briefed and discussed at length by the parties and considered by the courts in *Rodriguez-Medina* and *Port of Portland*.  As Judge Mosman pointed out, in *Sealey*, the Oregon Supreme Court explicitly "express[ed] no opinion as to whether a properly pleaded *continuing failure to warn* would actually state a cause of action independent of the statutory product liability claim."  *Sealey*, 309 Or. at 399 n.14 (emphasis added).[117]  *Rodriguez-Medina* and *Port of Portland* make clear a ***post***-sale failure to warn claim exists when a product manufacturer learns new information about a defective product even if the product manufacturer had notice of the defect before the sale.

Genuine issues of material fact preclude summary judgment on Plaintiffs' post-sale failure to warn claim in this case.  As Plaintiffs' evidence shows, Ford received "new reports" and learned "new information" about the dangers of the weak "Super Duty" roof *after* Ford sold that truck to Plaintiffs' family business, Basco Logging, Inc. on November 13, 2007 and before the subject wreck on May 11, 2022.  For example, *after* that date and before the subject wreck, Ford received at least *130 "new reports"* of lawsuits and "non-litigated claims" involving

---

[117] In its 2003 *Kambury* decision, the Court of Appeals likewise "express[ed] no opinion" on this issue.  185 Or. App. 635, 642 n.4, 60 P.3d 1103 (2003) (quoting *Sealey*, 309 Or. at 399, n.14). *Erickson* was decided in 1987—three years before the Oregon Supreme Court's decision in *Sealey*—so *Erickson* necessarily could not have answered that question. Far from helping Ford, *Erickson* makes clear that the Yraguens have a claim for post-sale failure to warn under Oregon common law.  In *Erickson*, the Oregon Supreme Court affirmed the denial of a motion to dismiss a claim for negligent post-sale failure to warn because the product manufacturer made false representations about the product's safety after the sale.  303 Or. at 284-85 (after the sale of an airplane, the product manufacturer represented that the airplane part that caused the plane crash "had a useful safe life of 6,000 hours" when it only "had a useful safe life of 4,000 hours"). Following the sale of the truck in November 2007, Ford falsely represented that the "Super Duty" is "absolutely safe" and is "Built Ford Tough."  Per *Erickson*, that also triggers Ford's post-sale duty to warn.

injuries resulting from roof crush in a rollover wreck of a "Super Duty" truck.[118]  There is no question Ford had notice of these claims—they are shown on lists Ford has produced.

Additionally, *after* November 13, 2007, for the first time, Ford had actual rollover testing conducted on the "Super Duty."  In 2008-2009, Ford paid component supplier Autoliv to conduct full-scale rollover crash tests of "Super Duty" trucks. This was the result:



Ex. 43, PX 255.[119]  That testing provided "new information" and a "new report" to Ford about just how deadly this weak roof was.

That same year—2009—IIHS came out with a new rating system for the roof strength of vehicles.  A rating of "Good" requires roof strength of at least 4.0 times the vehicle weight; a mere rating of "poor" requires roof strength of at least 2.5 times the vehicle weight.  Ex. 11,

---

[118] *See* Exs. 61, 75,76, & 77 - lists of lawsuits and non-litigated claims produced by Ford, with each claim served on Ford between November 13, 2007 and May 11, 2022 highlighted.  Those claims range in date from 2008 to 2020.

[119] *See also* Ex. 73, PX 198; Ex. 11, Herbst Rep. at 47-48

Herbst Rep. at 19. There is no dispute Ford became aware of this IIHS rating system in 2009. The 2009 IIHS roof strength rating system was "new information" Ford received further supporting the conclusion that the roofs of the "Super Duty" trucks, which Ford knew had a roof strength of a paltry 1.1 times the vehicle weight, [120] were deadly dangerous.

In 2014, in *Trejo v. Ford*, a Nevada jury found the "the same roof" as the roof in the subject "Super Duty" to be defective. *Trejo* was a products liability suit against Ford that arose from a rollover wreck in which the roof of a 2000 Ford Excursion crushed down, injuring the plaintiff and killing her husband. Herbst Aff. at 3. During the *Trejo* trial, Ford admitted through its attorney, Vaughn Crawford (who represents Ford in *Yraguen*), that the Ford Excursion roof at issue in that case was "virtually identical" to the "PHN131" Ford "Super Duty" truck roof at issue in this case. Herbst Aff. at 4 and Ex. A thereto, Tr. of Ford's Closing Arg. in *Trejo* at 82/2-3. During closing argument, Ford admitted the Ford Excursion roof and the "Super Duty" roof *"are the same roof*." Herbst Aff. at 5 and Ex. A thereto, Tr. of Ford's Closing Arg. in *Trejo* at 82/7-8. In 2017, the Nevada Supreme Court *affirmed* the verdict of the *Trejo* jury finding the roof defective. *See Ford Motor Company v. Trejo*, 133 Nev. 520, 402 P.3d 649 (2017). In its opinion affirming the verdict, the Nevada Supreme Court stated specifically that "Ford based its design of the Excursion on Ford's line of Super Duty pickup trucks, such as the F250, F350, and F450." *Id.* at 521, 402 P.3d 649. Both the 2014 jury verdict *and* the 2017 Nevada Supreme Court opinion affirming it were "new reports" or "new information" to Ford regarding the defectiveness of the roof in the "Super Duty" – and became known to Ford before the subject wreck on May 11, 2022.

---

[120] Ex. 21, PX 114 ("The P131 vehicle considered in this study weigh[ed] 8,000 lb and had a roof strength of 8,900 lb."); Ex. 22, *Hill* 2022 Trial Tr. Vol. 9, 1122:7–1123:24.

In 2015, Ford paid Autoliv to conduct actual rollover crash testing of a 2017 model year "Super Duty" F250. That truck had a much stronger roof. Comparing the results of the 2009 Autoliv testing, conducted on the same model as the Yraguen truck, *to* the results of the 2015 Autoliv testing of the next generation model year 2017 "Super Duty" proves the need for much stronger roofs. Ex. 11, Herbst Rep. at 47-48. *Compare* Ex. 43, PX 255 & Ex. 73, PX 198 (2009 testing) to Ex. 45, PX 81 & Ex. 74, 558B (2015 testing with much stronger roof). The 2015 Autoliv testing also constituted "new reports" or "new information" to Ford regarding the defectiveness of the roof in the subject "Super Duty."

The above are just examples. Plaintiffs' evidence shows that Ford received new reports and learned new information about the dangers of the roof of the "Super Duty" trucks after November 2007, failed to warn, and instead told the public the roofs were "absolutely safe," thereby causing motorists to continue driving "Super Duty" trucks and to be subjected to the dangers of the weak roof. Those facts triggered Ford's post-sale duty to warn under Oregon common law. *Rodriguez-Medina*, 2016 WL 11646620, at *1; *Port of Portland*, 2017 WL 4236561, at *10. Genuine issues of material fact preclude summary judgment on Plaintiffs' post-sale failure to warn claim.

### 2. **Pre-Sale Failure to Warn**

Relying on an old and rarely cited decision of the Oregon Court of Appeals, Ford contends the Yraguens' *pre*-sale failure to warn claim under O.R.S. § 30.900(2) is "redundant" of their "design defect claims." ECF 39 at 27 (citing *Smith v. Fred Meyer*, 70 Or. App. 30, 687 P.2d 1128 (1984)).[121] Plaintiffs respectfully submit *Smith* is distinguishable, is not binding as it has

---

[121] Plaintiffs note that Ford's *Smith* argument solely concerns Plaintiffs' *pre*-sale failure to warn claim under O.R.S. § 30.900(2) and has nothing to do with Plaintiffs' *post*-sale failure to warn

never been cited or approved by the Oregon Supreme Court and does not bar Plaintiff's ***pre***-sale failure to warn claim.[122]

*Smith* merely analyzed whether the plaintiff had alleged facts that could support the existence of a *pre*-sale failure to warn claim under O.R.S. § 30.900(2) *and* a design defect claim under O.R.S. § 30.900(1). *Smith* involves a very different set of allegations than the allegations in this case. In *Smith*, the plaintiff alleged that adhesive tape sold with a mirror hanging kit was defective for use in hanging "glass tiles" on the wall, which was *the only purpose* the adhesive tape served in connection with the "glass tile kit" in which it was sold. In *Smith*, the court held that under the specific facts alleged in the complaint in that case, the plaintiff's pre-sale failure to warn claim was subsumed by the design defect claim. *Id.* at 32-33.

The Yraguens' allegations are different. The Yraguens allege the weak roof does not protect against injuries in the specific circumstance of ***a rollover wreck***. *See, e.g.*, Am. Compl., ECF 25 at 28, ¶ 113 ("That a roof crushing into the occupant space of a vehicle ***during a rollover wreck*** can cause injuries and can kill was and is foreseeable to Ford." (emphasis added)); ECF

---

claim under Oregon common law. *See Erickson Air-Crane Co.* 303 Or. at 289; *Port of Portland*, 2017 WL 4236561, at *7.

[122] *Smith* has only been cited by other courts on five occasions since 1984. It has *never been cited by the Oregon Supreme Court*. Curiously, in *Dupper v. General Motors Corp.*, an unpublished decision, the Ninth Circuit cited *Smith* after holding that the plaintiff could "not state a claim for failure to warn *because there is no defective design to warn of*." 1989 WL 123650, at *4 (9th Cir. 1989) (*unpublished*) (emphasis added). That is the inverse of what Ford contends in this case: Ford contends that the Yraguens have no *pre*-sale failure to warn claim *because they have a design defect claim*. In *Waddill v. Anchor Hocking, Inc.*, 149 Or App 464, 473 (1997), *rev'd*, 330 Or 376 (2000), *adh'd to on recons*, 331 Or 595 (2001), *and rev'd*, 331 Or 595 (2001), the Oregon Court of Appeals distinguished *Smith* and recognized at least one exception to *Smith*. *Smith* is also in conflict with the plain language of O.R.S. § 30.900(2), which provides a cause of action for "any failure to warn regarding a product." The statute's plain language does not contain the limitation engrafted onto it in the *Smith* decision.

25 at 41, ¶ 10 ("a heavier truck needs a stronger roof to protect occupants **in a rollover**."
(emphasis added)).  Plaintiffs allege and have evidence to prove Ford knew the roof was
dangerously weak in the specific circumstance of "rollover wrecks," yet Ford did not warn
anyone of that danger.  Also, unlike in *Smith*, Plaintiffs allege and have evidence to prove that
"Ford did not warn anyone that a five-times-stronger roof was available for the 'Super Duty'
trucks and was both economically and technologically feasible" (i.e., the ERSP roof).  ECF 25 at
41, ¶ 170.[123]

Under the facts alleged and the evidence in *this* case, *Smith* is distinguishable and
irrelevant.  Plaintiffs should be allowed to proceed to trial on both a pre-sale failure to warn
claim under O.R.S. § 30.900(2) and a design defect claim under O.R.S. § 30.900(1).  In *Rojas v.
Yamaha Motor Corporation*, the Deschutes County Circuit Court recently rejected the same
argument Ford makes in this case.  In *Rojas*, the defendants argued in a motion for partial
summary judgment that, under *Smith*, the plaintiff could not proceed to trial on a claim the
manufacturer failed to warn about a vehicle's "faulty door latch or seat cushion" because those
claims were duplicative of the plaintiff's defect claim.  *See* Brief of Yamaha Motor Corp., in
*Rojas v. Yamaha,* 2021 WL 6206402 (Or. Cir., Deschutes Cnt'y. June 21, 2021) (*see* last
paragraph of Sec. A).  Rejecting that argument, the Court denied "defendants' motion for
summary judgment against Plaintiff's claim for failure to warn/instruct."  *Rojas v. Yamaha Motor
Corp.*, No. 17CV31444, 2021 WL 6142756, at *1 (Or. Cir., Deschutes Cnt'y. Sep. 17, 2021).[124]

---

[123] In *Smith*, the plaintiff did not allege the defendants had a much stronger adhesive tape that
would have prevented the mirrors from falling off the wall.

[124] Ford also disregards that *Smith* is a state-court decision involving application of the Oregon
pleading rules.  *Yraguen* is governed by the Federal Rules of Civil Procedure, which explicitly
allow "alternative statements of a claim" and permit a party to "set out 2 or more statements of a
claim" in the complaint.  FRCP 8(d)(2).  Additionally, "the right of a plaintiff *to try his case* on

### 3. <u>Causation</u>

Citing inapposite case law and misstating the facts, Ford contends the Yraguens cannot establish causation with respect to their pre-sale strict liability failure to warn claim because there is purportedly "no evidence that Juan and Kris Yraguen relied upon, or even were aware of, any of the warnings, instructions, or materials that Ford did provide with the subject truck *before it was purchased*." ECF 39 at 23 (emphasis added). That's an unusual contention because it is undisputed that Ford did not provide ***any*** warnings about the weak roof before or after the sale of the subject 2008 F350 "Super Duty" in November 2007. Instead, to this day, Ford contends the roofs on these trucks are "absolutely safe."

Ford bases its causation argument on two irrelevant assertions: (1) Mr. Yraguen's brother Nick handled the purchase of the subject 2008 F350 truck for Basco Logging, Inc.; and (2) Mr. Yraguen "did not do any research online about safety ratings before the truck was purchased." ECF 39 at 24. Ford does not even attempt to explain why Nick's involvement in purchasing the subject truck for Basco Logging, Inc. could be relevant to "causation." Additionally, Ford cites nothing to contend that Mr. Yraguen had a duty to conduct "online" research about safety ratings before the truck was purchased."[125]

Despite contending that Mr. Yraguen was not "aware of [] any of the warnings, instructions, or materials that Ford did provide with the subject truck," Ford omits that it *did not ask* Mr. Yraguen during his deposition whether he reviewed the owner's manual for the

---

alternate theories has uniformly been upheld in the federal courts and plaintiff cannot be required to elect upon which theory to proceed." *Breeding v. Massey*, 378 F.2d 171, 178 (8th Cir. 1967). At the summary judgment stage, *Smith* does not provide a basis for the Court to "dismiss" Plaintiffs' ***pre***-sale failure to warn claim under O.R.S. § 30.900(2).

[125] Given that Ford contends the "Super Duty" trucks are "absolutely safe" and are "Built Ford Tough" it is unclear what, if anything, of relevance Ford contends Mr. Yraguen would have discovered had he conducted "online research" before purchasing the truck. Certainly Ford posted ***no*** warnings about the weak roof that could have been found "online."

subject Ford 350 "Super Duty" before the wreck. In fact, Mr. Yraguen did review it. *See* Decl. of Juan Yraguen at ¶ 4 ("In between the time Basco Logging, Inc. purchased the truck in November 2007 and May 11, 2022, I reviewed the owner's manual provided with the truck."). That fact nullifies Ford's "causation" argument as to Plaintiffs' failure to warn claims.

The cases Ford cites are inapposite. Ford relies primarily on *Bartlett v. MacRae*, 54 Or. App. 516, 635 P.2d 666 (1981). In *Bartlett*, the "plaintiff's husband died as a result of accidentally drinking poisonous dye used to mark cattle" from "a white plastic gallon jug that carried a label" that was "large and clearly marked" "stating its contents were intended for oral use only by animals." *Id.* at 518–19. Given that clear warning went unheeded, the Oregon Court of Appeals held the plaintiff could not establish causation. *Id.* Ford also relies on *Crosswhite v. Jumpking, Inc.*, 411 F. Supp. 2d 1228, 1235–36 (D. Or. 2006), in which the plaintiff was paralyzed after attempting to perform a flip on a trampoline. In *Crosswhite*, the Court held causation could not be established because the plaintiff "ignore[d] ten warnings posted by the defendant on the trampoline, most of which cautioned users against the precise activity in which plaintiff engaged and warning against the possibility of the precise type of injury that resulted." *Id.*

*Bartlett* and *Crosswhite* involve completely different facts than *this* case. Ford never warned anyone that the "Super Duty" roofs are dangerously weak. Ford has told the public the opposite—that the roofs are "absolutely safe."

## V.    CONCLUSION

For the foregoing reasons, Plaintiffs Juan and Kris Yraguen respectfully request that this Court deny Ford's Motion for Partial Summary Judgment on all claims at issue.

Dated: November 5, 2024

Hala J. Gores, OSB No. 890489
hala@goreslaw.com
HALA J. GORES, P.C.
1332 S.W. Custer Drive
Portland, OR 97219
503-295-1940

James E. Butler, Jr., Georgia Bar No. 099625
*Pro Hac Vice*
jim@butlerprather.com
Ramsey B. Prather, Georgia Bar No.
658395
*Pro Hac Vice*
ramsey@butlerprather.com
Daniel E. Philyaw, Georgia Bar No. 877765
*Pro Hac Vice*
dan@butlerprather.com
Allison B. Bailey, Georgia Bar No. 478434
*Pro Hac Vice*
allison@butlerprather.com
BUTLER PRATHER LLP
P.O. Box 2766
Columbus, GA 31902
706-322-1990

 */s/ Judy Snyder*
Judy Snyder, OSB No. 732834
judy@jdsnyder.com
LAW OFFICES OF JUDY SNYDER
4248 Galewood Street
Lake Oswego, OR 97035
503-228-5027
***Attorneys for Plaintiffs***

35 - PLAINTIFFS' RESPONSE TO DEFENDANT FORD'S MPSJ

**CERTIFICATE OF COMPLIANCE**

This brief complies with the applicable word-count limitation under LR 7-2(b) because it contains 10,820 words, including headings, footnotes, and quotations, but excluding the caption, table of contents, table of cases and authorities, signature block, exhibits, and any certificates of counsel.

/s/ Judy Snyder         