# IN THE UNITED STATES DISTRICT COURT

## FOR THE DISTRICT OF OREGON

### EUGENE DIVISION

**JUAN YRAGUEN; KRIS YRAGUEN,**

        Plaintiffs,

No. 6:23-cv-01366-AA

    v.

**OPINION & ORDER**

**FORD MOTOR COMPANY,**

        Defendant.

_____

AIKEN, District Judge.

This case comes before the Court on Defendant Ford Motor Company's Motion for Partial Summary Judgment. ECF No. 39. The Court concludes that this motion is appropriate for resolution without oral argument. For the reasons set forth below, the motion is GRANTED in part and DENIED in part.

## LEGAL STANDARD

Summary judgment is appropriate if the pleadings, depositions, answers to interrogatories, affidavits, and admissions on file, if any, show "that there is no genuine dispute as to any material fact and the [moving party] is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). Substantive law on an issue determines the materiality of a fact. *T.W. Elec. Serv., Inc. v. Pac. Elec. Contractors Ass'n*, 809 F.2d 626, 630 (9th Cir. 1987). Whether the evidence is such that a reasonable jury

could return a verdict for the nonmoving party determines the authenticity of the dispute. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).

The moving party has the burden of establishing the absence of a genuine issue of material fact. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). If the moving party shows the absence of a genuine issue of material fact, the nonmoving party must go beyond the pleadings and identify facts which show a genuine issue for trial. *Id.* at 324.

Special rules of construction apply when evaluating a summary judgment motion: (1) all reasonable doubts as to the existence of genuine issues of material fact should be resolved against the moving party; and (2) all inferences to be drawn from the underlying facts must be viewed in the light most favorable to the nonmoving party. *T.W. Elec.*, 809 F.2d at 630-31.

## BACKGROUND

Plaintiffs Juan and Kris Yraguen are a husband and wife who live in Douglas County, Oregon. First Am. Compl. ("FAC") ¶¶ 24, 135-36. ECF No. 25. Defendant Ford Motor Company is a Delaware corporation with its principal place of business in Michigan. FAC ¶ 27.

In November 2007, Mr. Yraguen's company, Basco Logging, Inc., purchased a new 2008 Ford F-350 "Super Duty" Crew Cab truck. Prather Decl. Ex. 1, ECF No. 43; Yraguen Decl. ¶ 1, ECF No. 41. The truck was manufactured by Defendant and sold to Mr. Yraguen's company by a Ford dealer in Oregon. FAC ¶ 29.

On May 11, 2022, Mr. Yraguen was in a rollover wreck after striking black ice while driving the 2008 Super Duty truck.  Yraguen Decl. ¶ 1; Prather Decl. Ex. 2, at 13.  At the time of the crash, Mr. Yraguen was wearing his seat belt and driving below the speed limit.  Yraguen Decl. ¶ 1; Prather Decl. Ex. 2, at 13.  During the crash, the truck roof "crushed down" on Mr. Yraguen.  Yraguen Decl. ¶ 1.  "Damage to the roof of the truck occurred in the first ground contact," and a "substantial crush of the truck's roof occurred at the driver's seat position."  Prather Decl. Ex. 2, at 13.  Photographs of the truck at the scene of the accident show severe roof deformation, with portions the cab flattened nearly into the body of the truck.  *Id.* at 4.

Plaintiff suffered a serious spinal injury in the crash, which caused paralysis of his legs and left arm.  Prather Decl. Ex. 3, at 2; FAC ¶ 3.  Plaintiff's treating neurosurgeon, Dr. Raymond Tien, stated that the "crushing of the roof into the occupant compartment is entirely consistent with the type of injury [Mr. Yraguen] sustained," and that he could "state to a reasonable medical probability that the cause of [Mr. Yraguen's] injury was roof crush."  Prather Decl. Ex. 3, at 2.

Plaintiff alleges that the roofs of Defendant's Super Duty trucks are dangerously and defectively weak and will deform in rollover accidents, which has "killed, paralyzed, or severely injured hundreds, if not thousands, of American citizens."  FAC ¶ 39.

## DISCUSSION

Plaintiffs bring claims for (1) strict product liability; (2) negligence; (3) failure to warn; and (4) for punitive damages. Defendant moves for summary judgment on Plaintiffs' claims for manufacturing defect, failure to warn, and punitive damages.

As a preliminary matter, Plaintiffs assert that they have not brought a claim for manufacturing defect and that their claims relate to allegations of a design defect. Defendant points out that Plaintiffs' claims could reasonably be read to allege both a design defect and a manufacturing defect. *See, e.g.,* FAC ¶ 155 ("The subject F-350 truck was designed, manufactured, and sold by Ford. The roof of that truck was defectively designed and defectively manufactured."). The Court will accept Plaintiffs' statement that no manufacturing defect claim was intended in the FAC and, to the extent that any such claim is made out, it is conceded by Plaintiffs.

Defendant agrees that there are material questions of fact as to Plaintiffs' claims for a design defect and for negligence and so do not move against those claims. The Court will therefore turn to the claims for failure to warn and for punitive damages.

## I. Failure to Warn

There are two distinct arguments made concerning the alleged failure to warn. First, Plaintiffs assert that Defendant failed to provide an adequate warning about the roofs of the Super Duty trucks at the time of sale, FAC ¶¶ 168-72, and that they subsequently failed to provide any warning concerning the danger posed by the Super

Duty roofs. *See* FAC ¶ 173 ("Ford has concealed the aforesaid dangers and risks for years and continues to do so.").

### A. Pre-Sale Failure to Warn

Oregon's product liability statute, ORS 30.920, provides that it is to be "construed in accordance with Restatement Second of Torts sec. 402A, Comments a to m (1965)." ORS 30.920(3). Comment j of the Restatement concerns warnings and states:

> In order to prevent the product from being unreasonably dangerous, the seller may be required to give directions or warning, on the container, as to its use. . . Where warning is given, the seller may reasonably assume that it will be read and heeded; and a product bearing such a warning, which is safe for use if it is followed, is not in defective condition, nor is it unreasonably dangerous.

Restatement (Second) of Torts, § 402A, comment j (1965).

Consistent with that comment, a plaintiff alleging failure to warn must show that the manufacturer of the product had reason to anticipate danger from the product's use and that a warning would have made the product safe for its intended use. *Waddill v. Anchor Hocking*, 149 Or. App. 464, 473-74 (1997), *rev'd on other grounds*, 330 Or. 376 (2000).

Here, Defendant asserts that the nature of the alleged defect in the Super Duty trucks was such that no warning could have rendered the trucks safe for use. As such, Defendant contends, the pre-sale failure to warn claim is subsumed into the claim for a design defect.

The Oregon Court of Appeals confronted this issue in *Smith v. Fred Meyer, Inc.*, 70 Or. App. 30 (1984). In that case, the plaintiff purchased a glass tile kit, which

came with adhesive tape to mount the tiles to the wall. *Id.* at 32. The adhesive failed to secure the tile, which fell and injured the plaintiff. *Id.* The plaintiff brought an action against the manufacturer alleging in "subparagraph (1)" that the design of the adhesive tape was defective and in "subparagraph (2)" that the manufacturer failed to warn consumers that the adhesive tape would not hold the tiles. *Id.* The trial court granted a motion to strike the failure to warn allegation in subparagraph (2), and the plaintiff appealed. *Id.* The Oregon Court of Appeals affirmed the trial court, holding:

> Although it is true that a product may be unreasonably dangerous because the manufacturer or seller has failed to warn about a danger of which it is or should be aware that may result from use of a product, that is not what subparagraph (2) alleges. We read that subparagraph to allege that defendants were required to warn users that their product, even if used properly, contained an inherent defect, making it unsuitable for its intended use. *If a product is unsuitable for its intended use, and as a result is unreasonably dangerous, then the correct inquiry is whether there is a manufacturing or design defect, not whether the manufacturer should have warned of the defect.* If the tiles fell off the wall because of a defect, then liability would be predicated on the defect as alleged in subparagraph (1), not on a failure to warn of the defect.

*Smith*, 70 Or. App. 32-33 (internal citations omitted, emphasis added).

In essence, *Smith* stands for the proposition that when a claim for failure to warn is based on a failure to warn about a design or manufacturing defect that renders the product unsafe for its intended use, the failure to warn claim will collapse into the claim for the defect.

Plaintiffs argue that that *Smith* is a rarely cited and little-followed precedent and that it is not binding because it has never been adopted by the Oregon Supreme Court. It is true that there are few cases interpreting or building on the holding of

*Smith*. However, those cases that do cite *Smith* confirm the Court's reading of that decision. *See Waddill*, 149 Or. App. at 474 (holding that in *Smith*, the plaintiff's "theory of liability was predicated on the defect in the adhesive and not on the failure to warn, because a warning could not have rendered the tiles safe for their intended use."), *rev'd on other grounds*, 330 Or. 376 (2000); *Dupper v. General Motors Corp.*, 887 F.2d 1089, at *4 (9th Cir. 1989) (unpublished) ("The Oregon Court of Appeals explored the connection between defective design and failure to warn claims in *Smith v. Fred Meyer*," and "held that the plaintiff could not state a separate cause of action for failure to warn of the design which was alleged to be defective."); *Vollrath v. DePuy Synthes Bus. Entities*, Case No. 3:19-cv-1577-SI, 2022 WL 1750501, at *2 (D. Or. Mar. 25, 2022) (denying a motion for reconsideration because "[a]lthough the Court of Appeals in *Waddill* and *Smith* did not use the phrase that this Court did—'that a warning would have made the product *safe*,'—this Court's holding was based on Plaintiff's failure to produce evidence that additional warnings would have made the product safe *either* generally for its intended use *or* for certain uses." (internal citation omitted, emphasis in original)), *aff'd* No. 22-35281, 2023 WL 2326933, at *2 (9th Cir. Mar. 2, 2023) ("The district court also correctly applied Oregon's failure to warn standard . . . Plaintiff also failed to present evidence that additional warnings on the S-ROM implant would have made the product 'safe.'"); *see also Knight v. Just Born, Inc.*, No. CV-99-606-ST, 2000 WL 924624, at *12 (D. Or. Mar. 28, 2000) ("The point of a manufacturing defect is that a product has reacted or performed in an unusual, unforeseeable manner. Because no warning could possibly make a defectively

manufactured product safe for normal use, manufacturers and seller cannot be held liable for the failure to have one.").

Here, Plaintiffs' claim that Defendant's Super Duty trucks were unsafe was based on the weakness of the trucks' cabin roofs, which dangerously deform in rollover accidents. Plaintiffs allege that this was a defect in the design of the Super Duty trucks and Defendant has not moved to dismiss the design defect claim. However, as in *Smith*, Plaintiffs' claim for failure to warn is based on a failure to provide a warning of the alleged design defect. *See* FAC ¶ 168 ("Ford's failure to warn users and consumers, including Plaintiffs, of the defective and unreasonably dangerously weak roofs on the F-350 truck proximately caused Plaintiff's injuries and damages.").[1] The alleged design defect concerns the intended use of the trucks or, perhaps more accurately, it concerns an unavoidable situation arising from the intended use of the trucks. A warning would not save drivers from rollover accidents and, by extension, would not have rendered the trucks safe. Consistent with *Smith*, the Court concludes that Defendant is entitled to summary judgment on Plaintiffs' claim for pre-sale failure to warn.

---

[1] There are situations in which a claim for a design defect and a claim for failure to warn are compatible, but these generally involve cases where the design defect concerns a specific use of the product, which might be overcome by the provision of a warning. *See, e.g., Waddill v. Anchor Hocking, Inc.*, 149 Or. App. 464, 474 (1997) (distinguishing *Smith* and holding that a warning against engaging in a particular use "could have resulted in plaintiff not engaging in that use."), *rev'd on other grounds*, 330 Or. 376 (2000); *Bowden v. United Rentals (North America) Inc.*, Case No. 3:17-cv-1411-SI, 2020 WL 5507528, at *8 (D. Or. Sept. 11, 2020) (holding that a claim for design defect and a claim in the alternative for failure to warn were compatible where, if the defendant prevailed on the design defect claim, the jury could still find that "an adequate warning would have effectively managed the risk."). Here, as noted, Plaintiff's claim is based on a failure to warn *about* the alleged design defect and, because the defect renders the intended use of the trucks unsafe, no pre-sale warning would eliminate or mitigate the risk.

### B. Post-Sale Failure to Warn

The second prong of Plaintiffs' claim for failure to warn concerns Defendant's failure to provide post-sale warnings of the danger of the Super Duty truck roofs based on new information Defendant learned concerning the truck roofs. Defendant asserts that there is no actionable claim for post-sale failure to warn under Oregon law. Defendant also argue that Plaintiffs have alleged that Defendant was aware of the roof defects at the time of the sale and have not alleged that Defendant subsequently acquired additional information about the roofs that would give rise to a claim for post-sale failure to warn. Def. Mot. 20-21.

The Court first addresses Defendant's argument concerning the existence of an independent claim for post-sale failure to warn. In *Sealey v. Hicks*, 309 Or. 387 (1990), the Oregon Supreme Court "express[ed] no opinion as to whether a properly pleaded continuing failure to warn would actually state a cause of action independent of the statutory product liability claim." *Id.* at 399, n.14. In *Kambury v. DaimlerChrysler Corp.*, 185 Or. App. 635 (2003), the Oregon Court of Appeals likewise declined to express an opinion on whether a claim for post-sale failure to warn would state a cause of action separate from statutory product liability. *Id.* at 642, n.4.

In *Port of Portland v. Monsanto Co.*, 3:17-cv-15-PK, 2017 WL 9098079 (D. Or. April 18, 2017) ("*Port of Portland I*"), the defendants argued that the plaintiff had failed to allege a claim for post-sale negligence, "arguing that the complained-of failure to warn post-sale is precisely the same failure to warn alleged in support of

the Port's statutory failure to warn claim." *Id.* at *12 n.5. Judge Papak disagreed, noting that the plaintiff "has alleged that over the course of decades, both before and after old Monsanto [the defendants' predecessor entity] ceased manufacturing and selling PCBs [polychlorinated biphenyl compounds], old Monsanto learned more and more about the health and safety risks posed by PCBs without disclosing its knowledge to its customers, to the public generally, or to the government." *Id.* "In particular, the Port alleges that old Monsanto learned more about the health and safety risks posed by PCBs in the 1980s, after old Monsanto allegedly sold off the last of its stock of PCBs, without disclosing those risks." *Id.* Judge Papak concluded that this was sufficient, under *Sealy* and *Kambury*, to make out a claim for post-sale negligence based on a failure to warn. *Id.*

The *Port of Portland* defendants objected to Judge Papak's recommendation and the matter was referred to Judge Mosman in *Port of Portland v. Monsanto Co.*, No. 3:17-cv-00015-PK, 2017 WL 4236561 (D. Or. Sept. 22, 2017) ("*Port of Portland II*"). In *Port of Portland II*, the defendants objected "on the grounds that Oregon does not recognize post-sale 'failure to warn' as a viable claim that is independent of Oregon's product liability statute." *Id.* at *10. As in the present case, the *Port of Portland* defendants based their argument concerning the existence of the cause of action on *Sealey*. Judge Mosman rejected that argument, noting that *Sealey* expressly declined to reach the question of whether the claim existed independent of statutory product liability claims and had, therefore, "left open the possibility that a

plaintiff could plausibly bring a claim for post-sale negligence based on a defendant's failure to warn." *Id.*

Judge Mosman noted that Oregon courts had previously recognized negligence claims for failure to warn, *Port of Portland II*, 2017 WL 4236561, at *10 (citing *Harris v. Nw. Nat. Gas Co.*, 284 Or. 571, 579-80 (1978)), and had recognized that negligent acts arising after the date of sale used the timeliness requirements of ORS 12.115, rather than the product liability time bar in ORS 30.905. *Id.* (citing *Erickson Air-Crane Co. v. United Tech. Corp.*, 303 Or. 281, 286 (1987)). "Presumably, then, a plaintiff may properly bring a claim for post-sale negligence, based on an underlying failure to warn theory, which is not governed by the timeliness requirements of [ORS] 30.905." *Id.*

Substantively, Judge Mosman found that "the Port has adequately alleged that, over the course of decades, including after Defendants ceased manufacturing and selling PCBs, Defendants learned new information about the health and safety risks of PCBs that they did not disclose" and "which resulted in ongoing environmental contamination." *Port of Portland II*, 2017 WL 4236561, at *10. Judge Mosman concluded that those allegations were "sufficient for purposes of pleading post-sale negligence under the theory that Defendants learned of new dangers associated with PCBs and their disposal after selling them to customers and that Defendants failed to warn of such dangers." *Id.*

Here, the Court finds the reasoning of Judge Papak and Judge Mosman in *Port of Portland I* and *II* persuasive and concludes that, under Oregon law, a plaintiff may

maintain a claim for negligence based on a post-sale failure to warn where the defendant is alleged to have learned new information bearing on the safety of the product and failed to warn the plaintiff of the danger. The Court declines to dismiss Plaintiffs' claim for post-sale failure to warn on the basis that the claim is not independently actionable.

Defendant's secondary argument on the issue of post-sale failure to warn is that Plaintiffs "quite clearly allege that Ford knew of the defective roof structure when it sold the subject truck to the Plaintiffs," and "Plaintiffs do not allege that Ford discovered the roof defect after the sale of the vehicle, thus giving rise to an independent cause of action for post-sale failure to warn; rather, they simply allege that Ford continued to fail to warn about a defect Ford already knew about." Def. Mot. at 21.

Plaintiffs have presented evidence, however, that Defendant's representatives have continued to testify that there is no defect in the roofs of the trucks and assert that the roofs are "absolutely safe" and "perform exactly as Ford intended them to perform." Prather Decl. Ex. 67, at 8-11. Plaintiffs have also presented evidence that Defendant has had additional crash testing done on the Super Duty trucks in 2009, which resulted in the flattening of the truck roof. *See, e.g.,* Prather Decl. Ex. 73 (2009 Autoliv Test B1090122 "done and paid for by Ford."); Ex. 11, at 47-48 (expert report of Professional Engineer Brian Herbst, detailing the Autoliv tests from 2008 and 2009, both post-dating Plaintiff's purchase of the truck involved in the rollover accident).

On this record, the Court finds that there is a material dispute of fact concerning Defendant's receipt of new information concerning the safety of the Ford Super Duty trucks which precludes summary judgment on this claim.

## II.    Punitive Damages

Plaintiffs bring a claim for punitive damages against Defendant concerning the weakness of the Super Duty roofs, alleging that Defendant "has shown a reckless and outrageous indifference to a highly unreasonable risk of harm" and has "acted with a conscious indifference to the health, safety, and welfare of others."  FAC ¶¶ 177-78.

Under Oregon law, punitive damages are "a penalty for conduct that is culpable by reason of motive, intent, or extraordinary disregard of or indifference to know or highly probable risks to others."  *Andor by Affatigato v. United Air Lines, Inc.*, 303 Or. 505, 517 (1987).  To award punitive damages, a defendant's "degree of culpability" must be "greater than inattention or simple negligence."  *Badger v. Paulson Inv. Co., Inc.*, 311 Or. 14, 28 (1991).  "The defendant's culpability may range from a deliberate purpose to cause harm to the plaintiff or others regardless of gaining any benefit thereby, through an intent to harm the plaintiff or others in order to benefit oneself, and a readiness to benefit oneself with conscious indifference to or disregard of a known or highly probable risk of severe harm to others to a readiness to expose other to such risks without intending any countervailing benefit to anyone."  *Andor*, 303 Or. at 510-11.

This standard is codified in ORS 31.730(1), which provides that punitive damages "are not recoverable unless it is proven by clear and convincing evidence

that the party against whom punitive damages are sought has acted with malice or has shown a reckless and outrageous indifference to a highly unreasonable risk of harm and has acted with a conscious indifference to the health, safety and welfare of others."

In ruling on a motion for summary judgment, courts are "guided by the substantive evidentiary standards that apply to the case." *Anderson*, 477 U.S. at 255. Because ORS 31.730(1) requires clear and convincing evidence to award punitive damages, courts must assess motions for summary judgment "through the prism of the substantive evidentiary burden." *Id.* at 254. However, "Oregon courts have explained that 'the clear and convincing standard of proof relates to how a jury weighs the evidence, not to how a trial court assesses the capability of the evidence to establish facts[,]" and therefore "[u]nless no reasonable jury could find 'clear and convincing evidence that the party against whom punitive damages are sought has acted with malice or has shown a reckless and outrageous indifference to a highly unreasonable risk of harm,' a punitive damages claim must go to the jury." *Bauer v. Old Dominion Freight Line, Inc.*, No. 3:17-cv-00510-SB, 2019 WL 339404, at *9 (D. Or. Jan. 28, 2019) (quoting *Knepper v. Brown*, 213 Or. App. 598, 604 n.1 (2007) and *Hamlin v. Hampton Lumber Mills, Inc.*, 222 Or. App. 230, 237 (2008), *rev'd on other grounds*, 347 Or. 526 (2011)).

In cases involving corporate defendants, "punitive damages serve the function to deter enterprises from accepting the risks of harming other private or public interests by recklessly substandard methods of operation at the cost of paying

economic compensation to those who come forward to claim it." *Benson Tower Condo. Owners Ass'n v. Victaulic Co.*, No. 3:13-cv-01010-SI, 2014 WL 5285475, at *16 (D. Or. Oct. 15, 2014) (internal quotation marks and citations omitted). "To justify an award of punitive damages against a company, however, the company's 'conduct must go beyond mere carelessness to a willful or reckless disregard of risk of harm to others of a magnitude evincing a high degree of social irresponsibility." *Id.* (internal quotation marks and citation omitted). The decisions of such corporate defendants "may well be wholly impersonal with respect to any victim, indeed conducted with the hope that no harm will occur, and they may not involve a culpable attitude on the part of any one person responsible for the management of the enterprise; yet . . . such lack of managerial culpability alone does not foreclose punitive damages." *Andor by Affatigato*, 303 Or. at 514 (quoting *Schmidt v. Pine Tree Land Dev. Co.*, 291 Or. 462, 446 (1981)).

Here, Defendant devotes considerable argument to whether roof deformation is the cause of injuries in rollover accidents. Defendant has evidence that strengthening the truck roofs does not change the occupant impact or inherent potential for injury. Def. Mot. 30. However, Plaintiff presents contrary evidence that Defendant was aware of the dangers posed by roof deformation and contends that Defendant declined to mitigate those dangers in order to maximize its profits from the sale of Super Duty trucks. Pls. Resp. 16-17.

At the outset, the Court must clarify that it cannot, on a motion for summary judgment, weigh the contrary studies and determine which is correct. Rather, the

core question before the Court is whether a reasonable jury might be able to find, by clear and convincing evidence, that punitive damages are warranted. *Bauer*, 2019 WL 339404, at *9. If the answer to that question is yes, then the motion must be denied.

Defendant contends that it "considered and relied upon available crash testing, field data (accident data available in publicly maintained databases such as NASS and FARS), and published peer-reviewed literature in connection with the design and development of the 2008 F-350 Super Duty and evaluating injury causation in rollover accidents both, before and after the manufacture of the 2008 F-350 Super Duty." Leigh Aff. ¶ 10, ECF No. 39-3. Defendant asserts that, based on the scientific literature, there was a "lack of a scientific causal relationship between roof deformation and head and neck injuries in any rollover crash, including the 2008 F-350 Super Duty." *Id.* at ¶ 11.

In October 2001, the National Highway Transportation Safety Administration ("NHTSA") requested comments on potential regulatory changes related to truck roofs. Leigh Aff. ¶ 12. Defendant employed Michael Leigh, an engineer, to respond to the NHTSA's request Defendant's behalf. *Id.* In a letter dated December 4, 2001, Defendant told NHTSA that there was no causal relationship between roof deformation and occupant injury risk. Defendant stated that "obviating roof/pillar deformation by using a structure, while maintaining the same roof-to-ground impact environment, does not change the occupant impact or inherent injury potential risk." *Id.* at ¶ 13; Def. Ex. 3, at 8. Defendant "explained that it knew, based on occupant

kinematic studies, that in a rollover accident, a safely belted occupant's head will be in contact with, or very close to, the roof, roof rail, door frame or side glass as a result of rotational forces even before any roof-to-ground contact," and "[t]he occupant is moving toward those structures independent of roof/pillar deformation." Leigh Aff. ¶ 17.

Defendant asserts that its December 2001 letter to the NHTSA represented its belief and understanding concerning the best available studies on roof deformation and injuries in rollover crashes through the time of the sale of the truck to Plaintiffs.

However, in 2000, engineers employed by Defendant authored a paper, "Analytical Crush Resistance of Hybrid Aluminum—RCM Roof Structures," which stated in its abstract that the "crush resistance of roof structures is *critical* to minimizing injuries and enhancing occupant survival during rollover crashes." Prather Decl. Ex. 51, at 3 (emphasis added). Prior to the publication of the paper, the author submitted it for consideration by Defendant's management and legal department and received Defendant's permission to publish the article. Prather Decl. Ex. 52, at 14. The article was not among the sources cited in Defendant's 2001 letter to the NHTSA. Def. Mot. Ex. 3, at 15.

Similarly, in August 2001, a group of engineers employed by Defendant and Volvo met to discuss vehicle roof strength. Prather Decl. Ex. 53. Documents from that meeting state that "[s]trong roof structure with high integrity (deformation reduced)" was considered to be a solution to field data indicating that rollover injuries were caused by "[i]mpact with occupant weight (diving) roof deformation hits

occupant [sic]." Prather Decl. Ex. 53, at 4. These meeting notes state that "[t]o address injuries to neck, spine and head" and avoid contact between the vehicle occupant's head and the roof during a rollover, "[b]oth decreased deformation and improved retention [are] necessary for success." *Id*. at 6. The documents included charts showing that the risk of injury to the head and spine increased with the severity of the roof deformation. *Id*. at 13. The meeting documents state bluntly: "Decreased roof deformation and improved retention will reduce head and neck injury risks significantly." *Id*. at 14.

The documents from the August 2001 meeting also included a published paper, "Advanced Roof Design for Rollover Protection" by Donald Friedman and Dr. Carl Nash of George Washington University. Prather Decl. Ex. 53, at 26-35. In that paper, Nash and Friedman stated that "[s]tructurally weak roofs are the primary cause of serious head, face and neck injuries (HFN injuries) to occupants who are not ejected in rollovers," and posited that the prevailing study on rollovers, "that roof strength is not relevant to occupant injury," was "not valid." *Id*. at 26. The Friedman and Nash paper stated that "[d]espite the overwhelming evidence, auto makers and their experts continue to oppose open scientific discussion of rollover casualties," and "make confusing and deceptive presentations to NHTSA, the courts, and the public," concerning rollover crashes. *Id*. at 26. The Friedman and Nash paper was not among the sources cited in Defendant's 2001 letter to the NHTSA. Def. Mot. Ex. 3, at 15.

The meeting of Ford and Volvo engineers occurred several months before Defendant responded to the NHTSA's inquiries and the documents from that meeting

appear to present information sharply at odds with what Defendant represented to the NHTSA in its December 2001 letter.

The evidence is that Defendant was aware, no later than 2000, that crush resistant roof structures were "critical" to minimizing injuries and reducing fatalities in rollover crashes. Further, Defendant was aware, no later than August 2001, that there was reason to doubt the studies dismissing a connection between roof deformation and rollover crash injuries. Defendant was aware of the danger presented by the truck roofs, as set forth in the studies cited by Plaintiffs, and chose to ignore the risks presented by them, going so far as to represent that the roofs were "absolutely safe." Prather Decl. Ex. 67, at 8-11.

Defendant acknowledges that Plaintiffs have presented evidence, in the form of studies and published papers, that the weakness of a vehicle's roof presented a danger of serious injury to the head and neck of the occupants in a rollover crash. However, as discussed above, Defendant has its own experts, studies, and publications that indicated that the risk of injury from rollovers was not exacerbated by roof deformations. Defendant argues that, when presented with a genuine dispute between competing theories, each backed with scientific evidence, it is not recklessly indifferent to choose one of the theories. In support of their argument, Defendant cites to the Fifth Circuit's decision in *Satcher v. Honda Motor Co.*, 52 F.3d 1311 (5th Cir. 1995), in with the court found that the presence of "a genuine dispute in the scientific community" over the need for a particular safety measure weighed sharply against award of punitive damages. *Id.* at 1317. However, *Satcher* was applying

Mississippi law, which provides that punitive damages are allowed "only in 'extreme cases.'" *Satcher*, 52 F.3d at 1316 (quoting *Tideway Oil Programs, Inc. v. Serio*, 431 So.2d 454, 460 n.1 (Miss. 1983)). The Fifth Circuit concluded in that "no reasonable jury could conclude that [*Satcher*] is an 'extreme case' meriting punitive damages or that Honda's conduct rose to the level of 'malice, ruthless disregard or gross negligence' required for the imposition of such damages." *Id.* at 1317.

As set forth above, the standard for punitive damages in Oregon is somewhat different and Defendant cites to no Oregon decision, or any authority within the Ninth Circuit, adopting the Fifth Circuit's conclusion that "genuine disputes in the scientific community" will foreclose punitive damages. The Court is not persuaded by the reasoning of *Satcher* and declines to apply that decision to this case.

Plaintiffs have also presented, as evidence of Defendant's awareness of the danger of the Super Duty truck roofs and disregard of that danger, a list of nearly three hundred lawsuits "which appear to concern the rollover involving a personal injury and an alleged defect in the roof structure" of Defendant's large trucks. Prather Decl. Ex. 61. Defendant asserts that these lawsuits are not admissible and are not proof of anything other than that lawsuits were filed. In *Ashley v. Walmart, Inc.*, Case No. 3:19-cv-01115-SB, 2021 WL 1969463 (D. Or. April 20, 2021), the court considered a motion for summary judgment on the question of punitive damages in a product liability case and denied the motion, in part, based on the existence of consumer complaints concerning the product at issue. *Id.* at *3-4. Here, the prior litigation against Defendant concerning the truck roofs may be likened to the

consumer complaints in *Ashley*. Defendant was indisputably aware of considerable litigation alleging that the roofs of the Super Duty trucks were unsafe.

Defendant also argues that it is entitled to summary judgment on Plaintiffs' claim for punitive damages because it developed its own internal standards for roof strength for Super Duty trucks "where no federal standard existed, and shared its findings with the applicable regulatory body, NHTSA, in 2001." Def. Mot. 22. Defendant argues that, when there is no federal roof strength standard to apply, they cannot be faulted for disregarding that standard. Def. Mot. 25. However, even formal compliance with a law or regulatory scheme does not preclude a jury from awarding punitive damages under Oregon law. *Johnson v. Medtronic Inc.*, Civ. No. 6:20-cv-00599-MK, 2021 WL 2669560, at *7 (D. Or. June 10, 2021). Neither Defendant's development of its own internal standards nor the lack of a formal regulatory standard will justify the grant of summary judgment in Defendant's favor. The extent to which Defendant's internal standards and regulatory compliance might weigh against the award of punitive damages is a question for the finder of fact.

Assessing the evidence in the light most favorable to Plaintiffs, the Court cannot say that *no* reasonable jury could find by clear and convincing evidence that Defendant showed "a reckless and outrageous indifference to a highly unreasonable risk of harm" and "acted with a conscious indifference to the health, safety and welfare of others." There are disputed material questions of fact on this issue and, as such, summary judgment is inappropriate. Defendant's motion is denied as to punitive damages.

**CONCLUSION**

For the reasons set forth above, Defendant's Motion for Partial Summary Judgment, ECF No. 39, is GRANTED as to Plaintiffs' statutory product liability claim for failure to warn and that claim is dismissed. Plaintiffs affirm that they do not bring a claim for a manufacturing defect and the Court accepts that representation. Defendant's Motion is DENIED as to Plaintiffs' claim for negligence based on post-sale failure to warn. Defendant's Motion is DENIED as to Plaintiffs' claim for punitive damages.

It is so ORDERED and DATED this  5th  day of May 2025

 /s/Ann Aiken                                        
ANN AIKEN
United States District Judge